# 26-\_\_\_\_

# United States Court of Appeals

*for the*

# Second Circuit

IN RE KARTOON STUDIOS, INC.

PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
IN CASE NO. 1:22-CV-00249-AS
(HONORABLE ARUN SUBRAMANIAN)

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS
## Volume 1 of 2 (Pages ADD-1 to ADD-277)

AARON T. MORRIS
ANDREW W. ROBERTSON
MORRIS KANDINOV LLP
305 Broadway, 7th Floor
New York, New York 10007
(212) 431-7473

*Counsel for Petitioner
Kartoon Studios, Inc.*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®          (800) 4-APPEAL • (515587)

i
# TABLE OF CONTENTS

| DESCRIPTION | PAGE |
|---|---|
| Order on Motion for Judgment (ECF No. 405) | ADD-1 |
| Notice of Motion for Entry of Judgment (ECF No. 358) | ADD-6 |
| Memorandum of Law in Support of Motion for Entry of Judgment (ECF No. 360) | ADD-8 |
| Declaration of Michael Jaffa (ECF No. 360-1) | ADD-29 |
| Declaration of Brian Parisi (ECF No. 360-2) | ADD-56 |
| [Proposed] Judgment and Order of Dismissal With Prejudice (ECF No. 361) | ADD-58 |
| Plaintiff's Memorandum of Law in Opposition to Motion for Entry of Judgment (ECF No. 387) | ADD-62 |
| Declaration of Jeffrey S. Abraham in Opposition to Motion for Entry of Judgment (ECF No. 388) | ADD-97 |
| Exhibit 1 to Abraham Declaration - Bradley Woods & Co. Ltd. Response to SEG Subpoena (ECF No. 388-1) | ADD-102 |
| Exhibit 2 to Abraham Declaration - Vinson & Elkins Letter to Iroquois (ECF No. 388-2) | ADD-111 |
| Exhibit 3 to Abraham Declaration - Anson Settlement Offer (ECF No. 388-3) | ADD-115 |
| Exhibit 4 to Abraham Declaration - Kartoon Studios Board Minutes (ECF No. 388-4) | ADD-118 |
| Exhibit 5 to Abraham Declaration - Litigation Committee Minutes (ECF No. 388-5) | ADD-127 |
| Exhibit 6 to Abraham Declaration - Email Correspondence between Aaron Morris and Jeffrey Abraham (ECF No. 388-6) | ADD-132 |

ii
# TABLE OF CONTENTS

| | |
|---|---|
| Exhibit 7 to Abraham Declaration - Email Correspondence between Aaron Morris and Jeffrey Abraham (ECF No. 388-7) | ADD-149 |
| Exhibit 8 to Abraham Declaration - CVI Settlement Email Correspondence (ECF No. 388-8) | ADD-155 |
| Exhibit 9 to Abraham Declaration - CVI Settlement Email (ECF No. 388-9) | ADD-162 |
| Exhibit 10 to Abraham Declaration - Litigation Committee Minutes (ECF No. 388-10) | ADD-164 |
| Exhibit 11 to Abraham Declaration - Email between Jay Lefkowitz and Jeffrey Abraham (ECF No. 388-11) | ADD-169 |
| Exhibit 12 to Abraham Declaration - Email between Jay Lefkowitz and Jeffrey Abraham (ECF No. 388-12) | ADD-177 |
| Exhibit 13 to Abraham Declaration - Kartoon Studios Letter to N.Y. Court re Empery Indemnification (ECF No. 388-13) | ADD-187 |
| Exhibit 14 to Abraham Declaration - Email Correspondence between Aaron Morris and Jeffrey Abraham (ECF No. 388-14) | ADD-190 |
| Exhibit 15 to Abraham Declaration - Email Correspondence between Jay Lefkowitz and Jeffrey Abraham (ECF No. 388-15) | ADD-195 |
| Kartoon Studios, Inc.'s Reply Brief in Support of Motion for Entry of Judgment (ECF No. 395) | ADD-202 |
| Declaration of Michael Jaffa in Support of Reply (ECF No. 395-1) | ADD-221 |
| Exhibit 1 to Reply Jaffa Declaration - Minutes of the Board of Directors (ECF No. 395-2) | ADD-225 |
| Exhibit 2 to Reply Jaffa Declaration - Minutes of the Litigation Committee (ECF No. 395-3) | ADD-234 |
| Exhibit 3 to Reply Jaffa Declaration - Memorandum re Background (ECF No. 395-4) | ADD-239 |

iii
## TABLE OF CONTENTS

| | |
|---|---|
| Exhibit 4 to Reply Jaffa Declaration - Minutes of the Litigation Committee  (ECF No. 395-5) | ADD-245 |
| Exhibit 5 to Reply Jaffa Declaration - Memorandum re Indemnity (ECF No. 395-6) | ADD-250 |
| Exhibit 6 to Reply Jaffa Declaration - Minutes of the Litigation Committee ( (ECF No. 395-7) | ADD-257 |
| Exhibit 7 to Reply Jaffa Declaration - Memorandum re Case (ECF No. 395-8) | ADD-260 |
| Exhibit 8 to Reply Jaffa Declaration - Minutes of the Litigation Committee  (ECF No. 395-9) | ADD-278 |
| Exhibit 9 to Reply Jaffa Declaration - Minutes of the Litigation Committee (ECF No. 395-10) | ADD-281 |
| Exhibit 10 to Reply Jaffa Declaration - Minutes of the Board of Directors (ECF No. 395-11) | ADD-286 |
| Exhibit 11 to Reply Jaffa Declaration - Kartoon Studios, Inc. Form 10-K (ECF No. 395-12) | ADD-293 |
| Declaration of Andrew Schlesinger (ECF No. 395-13) | ADD-496 |
| Declaration of John J. Rockey (ECF No. 395-14) | ADD-504 |
| Declaration of Henry Ike (ECF No. 395-15) | ADD-505 |
| Amended Complaint (ECF 105) | ADD-507 |

ADD-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD AUGENBAUM,<br><br>                    Plaintiff,<br><br>        -against-<br><br>ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; and RICHARD MOLINSKY,<br><br>                    Defendants.<br><br>        -and-<br><br>KARTOON STUDIOS, INC.<br><br>                Nominal Defendant. | 22-cv-249 (AS)<br><br>ORDER |

ARUN SUBRAMANIAN, United States District Judge:

On May 6, 2026, Kartoon Studios (the "company") filed a motion for entry of judgment, asking this Court to approve a private settlement between it and seven of the defendants in this case (the "Settling Defendants"). That settlement purports to release all of Todd Augenbaum's claims against those defendants. Because Section 16(b) of the Securities Exchange Act of 1934 does not authorize a security issuer to release a security holder's claims under these factual circumstances, the company's motion is DENIED.

The statute provides that suits to recover short-swing profits "may be instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." 15 U.S.C. § 78p(b). In other words, the statute gives a security owner a primary—not derivative—right to pursue claims if a company fails to act on a demand within sixty days. *See* Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* § 9.02[8][b] (6th ed. 2024) ("It is clear that a security holder of an issuer has an express unfettered right, rather than a derivative right, to sue under Section 16(b) if the issuer rejects the security

1

holder's demand that it recover short-swing profits."); *id*. § 9.03[1][a][ii] ("Section 16(b) expressly creates a primary right, not a derivative or secondary right . . . ."); Arnold S. Jacobs, 5A *Disclosure & Remedies Under the Sec. Laws* § 4:182 (Dec. 2025 Update) ("[A] Section 16(b) cause of action is a statutorily created right, not a derivative or secondary right."); *see also, e.g.*, *Chechele v. Elsztain*, 2012 WL 12358221, at *2 (S.D.N.Y. Aug. 1, 2012) ( "[T]he instant Section 16(b) action is not a derivative action."); *Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC*, 286 F. Supp. 2d 279, 281 (S.D.N.Y. 2003) ("[A] § 16(b) cause of action is a statutory enabling right directly empowering the shareholder to sue; it is not a derivative or secondary right grounded on rights and interests possessed primarily by the corporation and emanating from common law."); *Blau v. Oppenheim*, 250 F. Supp. 881, 885 (S.D.N.Y. 1966) (same).

That makes sense given the statutory purpose of Section 16(b). *DiLorenzo v. Murphy*, 443 F.3d 224, 228 (2d Cir. 2006) ("The judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with its legislative purpose." (cleaned up and quotation omitted)). That purpose is to protect the public from insider trading. *See, e.g.*, *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 180 (2d Cir. 2012) ("Congress enacted § 16(b) to serve a general interest in safeguarding the integrity of the stock market against insider trading."); *Silverman v. Re*, 194 F. Supp. 540, 542 (S.D.N.Y. 1961) ("[T]he Act was primarily intended as an instrument of a statutory policy of which the general public is the ultimate beneficiary."). And it explains why, unlike traditional common-law derivative actions, Section 16(b) "authorizes shareholder suits to recover insider 'short swing' profits on behalf of the company notwithstanding the decision of the board of directors not to sue." *Burks v. Lasker*, 441 U.S. 471, 484 n.13 (1979); *see also, e.g.,* Jacobs, 5A *Disclosure & Remedies Under the Sec. Laws* § 4:182 (noting that while a board of directors' business judgment is relevant in a derivative action, "the express language of Section 16(b) renders this general rule inapplicable to Section 16(b) suits"); Romeo & Dye, *Section 16 Treatise & Reporting Guide*, § 9.03[1][a][ii] ("[U]nlike derivative actions, an action under Section 16(b) by a security holder may proceed even if the issuer's board does not favor it.").

While it arose in a different context, the Second Circuit's decision in *Magida v. Continental Can Company* reinforces these principles. There, the defendant brought an estoppel defense to a shareholder's Section 16(b) claim based on the company's approval of the purchase-and-sale transaction at issue. 231 F.2d 843, 846–47 (2d Cir. 1956). The court rejected that defense, observing that:

> Since the policy of the statute is to protect minority stockholders and the public against manipulated market fluctuations, certainly this stockholder, who became such after the acts in question had taken place, *cannot be estopped by corporate acts, even those having the apparent approval of a majority of stockholders*.

*Id*. (emphasis added).

So, under the statute, the issuer is given a right of first refusal to bring the action to vindicate the statutory purpose and its own financial interests. But if it sits on its rights or otherwise fails to

2

diligently prosecute the action, then a plaintiff-shareholder may step in to do so. In that situation, the primary right to prosecute the case is vested in the plaintiff-shareholder, who assumes the responsibility to protect minority shareholders and the public.

Here, no one seems to dispute that Augenbaum properly initiated this action after the company failed to act on his demand to sue. But the company asserts that it may enter into a settlement that would release Augenbaum's claims against the Settling Defendants. Dkt. 360-1 at 13, Section 4.1 ("[A]ny stockholder of Kartoon . . . shall fully and forever release . . . any and all claims . . . in the [federal and state court actions].").

The company identifies nothing in the statute that expressly allows this. But it highlights that a security holder may sue "in the name and in behalf of the issuer," 15 U.S.C. § 78p(b), and that "any recovery will inure only to the issuer's benefit," *Gollust v. Mendell*, 501 U.S. 115, 127 (1991). True enough. That doesn't change the fact that, to serve its primary purpose, the statute gives a security holder a primary right to prosecute an action after the issuer chooses not to. *See id.* at 124–25 ("Congress clearly intended to put a private-profit motive behind the uncovering of this kind of leakage of information, by making the stockholders its policemen." (cleaned up)). "If, subsequent to commencement of suit, a corporation's board of directors can determine with finality that prosecution of insiders will not be in the best interests of the company, and thereby foreclose stockholder action, the opportunity for evasion of the statutory policy is obvious." *Pellegrino v. Nesbit*, 203 F.2d 463, 467 (9th Cir. 1953).

The Court is also unconvinced by the cases the company marshals in support of its view. Asked whether "there [is] any case under Section 16(b) where an issuer has been permitted to settle the case after a security holder properly initiated the suit under the statute," the company's counsel replied that they were "not aware of a case specifically." May 13, 2026 Hearing Tr. at 13:19–23. They then argued that under *Wolf v. Barkes*, 348 F.2d 994 (2d Cir. 1965), settlement is "something that the issuer would have a right to do because the claim is a derivative claim." *Id.* at 13:25–14:2. But *Wolf* didn't deal with Section 16(b) at all. Instead, *Wolf* involved a more traditional derivative action under Section 14(a), which lacks an express right of action for shareholders and, as at least some courts have held, is subject to the business judgment rule. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) (observing that despite the lack of an express right of action for shareholders under Section 14(a), a derivative action should be implied); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 2006 WL 2849783, at *1, 7 (S.D.N.Y. Oct. 4, 2006) ("Section 14(a) claims" alleging "materially misleading proxy statements" are "indisputably derivative in nature and thus are subject to the . . . business judgment rule."). As discussed above, while Section 16(b) shareholder actions bear some similarities to conventional derivative actions, they are not, in fact, derivative.

After the hearing, the company raised *Gibbons v. Morgan*, 2017 WL 3917041 (S.D.N.Y. Sept. 6, 2017), which did dismiss a Section 16(b) case after a parallel settlement had been reached that covered any "derivative" claims. But that case muddles the key point. In *Gibbons*, the court largely evaluated the case under Delaware law—not federal securities law—and then held that the Section 16(b) claim was derivative and thus foreclosed by the separate settlement. To rebut one case

3

holding that derivative and Section 16(b) claims are different, the court emphasized only that the statute says that the claims are brought in the name of the issuer, and the profits are recoverable by the issuer. But the court didn't grapple with what makes Section 16(b) suits distinct: that the statute explicitly grants a right to sue to the stockholder, that this was a *new* cause of action that didn't exist at common law, that the business judgment rule doesn't apply, or the explicit statutory purpose in favor of the public attached to Section 16(b). Indeed, the Jacobs treatise makes a point of contrasting *Gibbons* from the "thoughtful" cases recognizing the distinctions between derivative actions and Section 16(b) suits. Jacobs, 5A *Disclosure & Remedies Under the Sec. Laws* § 4:182. So the Court declines to follow *Gibbons*.

Otherwise, the company points to cases that don't involve the facts presented here. A prime example is *Revive Investing LLC v. FBC Holdings S.A.R.L.*, 2021 WL 734976 (S.D.N.Y. Feb. 25, 2021). In that case, the district court, adopting a magistrate judge's report and recommendation, approved a settlement involving two shareholders, the issuer, and the defendant in a Section 16(b) case, over the objection of the plaintiff, another shareholder. But there, the non-settling plaintiff hadn't invoked its right to sue, instead waiting over a year after the settlement was reached to file suit. *Id*. at *1–2. *Revive* says nothing about the issuer's right to settle a case *after* a plaintiff-shareholder has sued (in this case, four years after the case was filed and just weeks before trial).

The company also relies on *Silverman v. Re*, 194 F. Supp. at 542. There, the court permitted the corporation to join the lawsuit where it believed the plaintiff was not vigorously prosecuting the action. *Id*. It reasoned that prohibiting the corporation from joining the suit would "disregard[] the remedial purposes of the Act," which is to benefit the general public. *Id.* In other words, consistent with the pro-enforcement purpose of Section 16(b), sometimes the corporation can join the suit when the plaintiff fails to prosecute. Unlike in *Silverman*, here the company hasn't asserted that Augenbaum has failed to vigorously prosecute this action, and likely for that reason, hasn't tried to intervene. Similarly, in *Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215 (2d Cir. 2018), the court allowed a company to step into the case under Federal Rule of Civil Procedure 17 to prevent its dismissal, after the plaintiff-shareholder lost her financial stake in the action. *Id.* at 226–28.

*Klein* did say that a contrary holding would "contravene the purpose of shareholder derivative suits." *Id.* at 227. *But see id*. at 229 (Lohier, J., dissenting) (rejecting the "analogy between . . . a Section 16(b) action" and "shareholder derivative suits" for standing purposes, in part because "'[t]he standing requirements for shareholder derivative suits are not applicable to a § 16(b) plaintiff'" (quoting *Mendell ex rel. Viacom, Inc. v. Gollust*, 909 F.2d 724, 728 (2d Cir. 1990)). However, that nomenclature isn't surprising, given that "a Section 16(b) case and a derivative action have much in common." Jacobs, 5A *Disclosure & Remedies Under the Sec. Laws* § 4:182. Nevertheless, as explained above, they "are distinguishable in a number of ways," *id*., including those directly relevant here, such as the express statutory right granted to shareholders, the inapplicability of the business judgment rule, and the legislative policy to benefit the general public. The mere invocation of derivative-suit language in cases like *Klein* doesn't give the company the right to shut down this case in the way it envisions, the opposite of the outcome *Klein*

ADD-5

effectuated by keeping the case going. Augenbaum remains a shareholder and is continuing to prosecute this case.

To be clear, the Court is not deciding issues that are not presented here. It is not deciding whether the company would be permitted to intervene to prosecute this suit if Augenbaum fails to do so diligently, or whether the company could enter into a settlement that leaves Augenbaum's claims intact. Similarly, the Court doesn't decide whether a company may settle a claim before a security holder properly files suit; or after an action is assigned back to a company; or whether and what type of Court review would apply to a valid settlement. At issue here is whether the Court, under these factual circumstances, will approve a private settlement that doesn't include the lone plaintiff and which purports to release his claims. The answer is no.

And zooming out, the opposite conclusion would lead to a host of dicey legal questions. Here are just a few: Does the Court have authority to approve or disapprove the company's settlement with the Settling Defendants? If so, what is the legal authority for that and what standards apply? While the parties have suggestions, drawing from standards applicable to class actions and the like, they haven't pointed to any statute or rule of procedure that would clearly apply under the circumstances. Would notice to shareholders be warranted? No formal notice has been provided in this case, which is heading to trial in two weeks. *See* Fed. R. Civ. P. 23.1(c) (noting that for traditional derivative-action settlements, "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders"). And what about the arguments made by Augenbaum? There is no suggestion that he hasn't prosecuted this case diligently. And he and his counsel have invested significant time and resources into this case over the past four years. Augenbaum argues that the company's settlement undervalues this case and was negotiated under circumstances that, at least from his perspective, suggest it wasn't an arm's length deal. Can the Court consider those arguments, and what weight should they be given? These difficult questions underscore why permitting an issuer to settle a case under these circumstances is not permitted.

For the reasons stated above, the company's motion for entry of judgment is DENIED. The Clerk of Court is respectfully directed to terminate the motion at Dkt. 358.

SO ORDERED.

Dated: May 27, 2026
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge

5

ADD-6

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM, *derivatively on behalf of Kartoon Studios, Inc.*, <br><br> Plaintiff, <br><br> v. <br><br> ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; and RICHARD MOLINSKY, <br><br> Defendants, <br><br> -and- <br><br> KARTOON STUDIOS, INC., <br><br> Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

**NOTICE OF MOTION FOR ENTRY OF JUDGMENT**

**PLEASE TAKE NOTICE** that Nominal Defendant Kartoon Studios, Inc. ("Kartoon"), through its undersigned counsel, respectfully moves this Court, before the Honorable Arun Subramanian, in Courtroom 15A, at the United States Courthouse, 500 Pearl Street, New York, New York, for an order pursuant to Federal Rule of Civil Procedure 54(b) entering the proposed judgment attached hereto against Defendants Anson Investments Master Fund LP, CVI Investments, Inc., Iroquois Master Fund Ltd., Iroquois Capital Investment Group, LLC, L1 Capital

ADD-7

Global Opportunities Master Fund, M3A LP, and Richard Molinsky and staying this action solely with respect to those Defendants.

In support of this motion, Kartoon submits the following accompanying documents:

(i)     Memorandum of Law in Support of Kartoon's Motion for Entry of Judgment;

(ii)    Declaration of Michael Jaffa;

(iii)   Declaration of Brian Parisi; and

(iv)    Proposed Judgment.

Respectfully submitted,

By: /s/ Aaron T. Morris

**MORRIS KANDINOV LLP**
Aaron T. Morris (#5675178)
Andrew W. Robertson (#4288882)
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law

Counsel for Kartoon Studios, Inc.

2

ADD-8

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

TODD AUGENBAUM, *derivatively on behalf of Kartoon Studios, Inc.*,

        Plaintiff,

        v.

ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; and RICHARD MOLINSKY,

        Defendants,

-and-

KARTOON STUDIOS, INC.,

        Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

**CONFIDENTIAL**

**FILED UNDER SEAL**

**KARTOON STUDIOS, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR ENTRY OF JUDGMENT**

ADD-9

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND .......................................................................................3

      A.    This Litigation ...............................................................................3

      B.    Defendants' Indemnity and Advancement Claims..................................3

      C.    The Company's Financial Condition........................................................4

      D.    The Company's Evaluation Of The
            Potential Value Of The Claims In This Action ........................................4

      E.    The Settlement Terms...............................................................................8

ARGUMENT ..............................................................................................................10

I.    JUDGMENT SHOULD BE ENTERED
      AGAINST THE SETTLING DEFENDANTS ...............................................10

      A.    The Section 16(b) Claim Belongs Exclusively To The Company ........10

      B.    The Board Properly Exercised Its Authority To Negotiate
            A Value-Maximizing Settlement With The Settling Defendants...........12

      C.    The Company-Negotiated Settlement
            Does Not Require Court Approval ..........................................................14

II.    THIS ACTION SHOULD BE STAYED
      AS TO THE SETTLING DEFENDANTS.....................................................16

CONCLUSION ..........................................................................................................17

ADD-10

## TABLE OF AUTHORITIES

**Cases**       **Page(s)**

*AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*,
  9 F. App'x 53 (2d Cir. 2001) ............................................................. 13

*In re Amerco Derivative Litig.*,
  127 Nev. 196 (2011) ............................................................. 12

*Analytical Survs., Inc. v. Tonga Partners, L.P.*,
  684 F.3d 36 (2d Cir. 2012) ............................................................. 10

*Auerbach v. Bennett*,
  47 N.Y.2d 619 (1979) ............................................................. 11, 12

*Avalon Holdings Corp. v. Gentile*,
  597 F. Supp. 3d 640 (S.D.N.Y. 2022) ............................................................. 10

*Craftsman Fin. & Mortg. Co. v. Brown*,
  64 F. Supp. 168 (S.D.N.Y. 1945) ............................................................. 2, 14

*Donoghue v. Bulldog Invs. Gen. P'ship*,
  696 F.3d 170 (2d Cir. 2012) ............................................................. 10, 11

*Gibbons v. Morgan*,
  2017 WL 3917041 (S.D.N.Y. Sept. 6, 2017) ............................................................. 10

*Gollust v. Mendell*,
  501 U.S. 115 (1991) ............................................................. 10

*Jones v. Nuclear Pharmacy, Inc.*,
  741 F.2d 322 (10th Cir. 1984) ............................................................. 12

*Kahn v. Kaskel*,
  367 F. Supp. 784 (S.D.N.Y. 1973) ............................................................. 15

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*,
  906 F.3d 215 (2d Cir. 2018) ............................................................. 10

*Landis v. North Am. Co.*,
  299 U.S. 248 (1936) ............................................................. 16

*Los Angeles City Employees' Ret. Sys. v. Sanford*,
  2026 WL 125986 (Del. Ch. Jan. 16, 2026) ............................................................. 11, 12

ADD-11

*Milliken v. Am. Realty Cap. Hosp. Advisors, LLC,*
  2018 WL 3745669 (S.D.N.Y. Aug. 7, 2018) .......................................................... 16

*In re Oracle Corp. Derivative Litig.,*
  808 A.2d 1206 (Del. Ch. 2002) ........................................................................ 11

*Philip Morris Inc. v. Heinrich,*
  1997 WL 781907 (S.D.N.Y. Dec. 18, 1997) ........................................................ 16

*Prince v. Am. Airlines,*
  2011 WL 2534965 (S.D.N.Y. June 24, 2011) ...................................................... 16

*Revive Investing LLC v. FBC Holdings S.A.R.L,*
  2021 WL 56905 (S.D.N.Y. Jan. 7, 2021) ............................................................ 15

*Safe & Green Holdings Corp. v. Shaw,*
  2023 WL 5509319 (S.D.N.Y. Aug. 25, 2023) ...................................................... 10

*Salovaara v. Jackson Nat. Life Ins. Co.,*
  246 F.3d 289 (3d Cir. 2001) ............................................................................ 15

*Smolowe v. Delendo Corp.,*
  136 F.2d 231 (2d Cir. 1943) ...................................................................... 10, 11

*Spiegel v. Buntrock,*
  571 A.2d 767 (Del. 1990) ................................................................................ 11

*Star v. TI Oldfield Dev., LLC,*
  962 F.3d 117 (4th Cir. 2020) ........................................................................... 15

*Wolf v. Barkes,*
  348 F.2d 994 (2d Cir. 1965) ......................................................................... 2, 14

*Zapata v. Maldonado,*
  430 A.2d 779 (Del. 1981) ........................................................................... 11, 12

**Statutes**                                                                              **Page(s)**

  8 Del. C. § 141(a) .................................................................................... 11, 12

  15 U.S.C. § 78 ........................................................................................ *passim*

ADD-12

## PRELIMINARY STATEMENT

This derivative action asserts claims pursuant to Section 16(b) of the Securities Exchange Act of 1934 on behalf of Kartoon Studios, Inc. ("Kartoon" or the "Company"). While the Company initially rejected the Plaintiff's demand to bring the claims itself, the Board of Directors (the "Board") launched a process beginning in January 2026 to reevaluate the potential value of the claims following the Court's denial of Defendants' summary judgment motions, renewed indemnity and advancement demands by certain of the Defendants, and a significant decline in the Company's operating capital. The efforts were spearheaded by a Litigation Committee (the "Committee"), which considered substantial analysis and advice regarding the claims, the likelihood of success at trial, and the Company's financial condition and potential liabilities. The Committee engaged extensively with the parties, including Plaintiff's counsel, through special counsel at Kirkland & Ellis, which was provided a single mandate: to negotiate the largest settlement available to the Company under the circumstances.

The process culminated in a negotiated settlement of the Section 16(b) claims at a valuation of $50 million. Currently, six of the eight Defendants (the "Settling Defendants")[1] have agreed to participate *pro rata*, which would result in gross cash proceeds to the Company of $36.5 million (the "Settlement"). The Settlement includes an immediate bridge payment of $5 million to the Company (structured as a loan until entry of judgment) as well as the release of all pending and threatened claims for indemnity and advancement by the Settling Defendants, which total at least $13 million as of today and are expected to multiply through trial.

---

[1] The Settling Defendants are Anson Investments Master Fund LP, CVI Investments, Inc., Iroquois Master Fund Ltd., Iroquois Capital Investment Group, LLC, L1 Capital Global Opportunities Master Fund, M3A LP, and Richard Molinsky.

ADD-13

This motion seeks entry of judgment against the Settling Defendants in furtherance of the Settlement. The Section 16(b) claims in this action are, and have always been, property of the Company and subject to the Board's authority to manage the Company's affairs in the best interests of stockholders. The Second Circuit has long recognized that a corporation retains the power to settle its own claims even after a derivative action has been filed, and that Rule 23.1's approval requirement was never intended to reach company-negotiated settlements of this kind. *See, e.g., Craftsman Fin. & Mortg. Co. v. Brown*, 64 F. Supp. 168, 178-79 (S.D.N.Y. 1945); *Wolf v. Barkes*, 348 F.2d 994, 996-97 (2d Cir. 1965).

Pending the Court's entry of judgment, the Company also requests that the Court immediately stay this action solely as to the Settling Defendants, triggering the Settling Defendants' obligation to make the $5 million bridge payment under the Settlement Agreement (for the avoidance of doubt, the Company does not seek to disrupt the currently scheduled trial as to the non-settling Defendants). The Settlement is of *critical* importance to the Company's operations: it will double the Company's market capitalization, provide operating capital for the Company to continue operations indefinitely without expensive and dilutive financing, and avoid further litigation and defense costs as to the Settling Defendants' indemnity and advancement claims. Absent finalizing the Settlement, the Company expects to exhaust its current operating capital by mid-June 2026 with no assurance that alternative financing on acceptable terms would be available. Under these circumstances, the Board believes that the Settlement is not only in the Company's best interests but is necessary for its survival.

For these reasons and as set forth in further detail below, the Court should enter the proposed judgment filed herewith and stay this Action solely as to the Settling Defendants.

2

ADD-14

## FACTUAL BACKGROUND

### A.      This Litigation

On October 28, 2020, Plaintiff made a demand on the Company to pursue claims against Defendants pursuant to Section 16(b) of the Securities Exchange Act of 1934. In light of concerns over the viability of Plaintiff's legal theory, the Company elected not to pursue the claims itself. Declaration of Michael Jaffa ("Jaffa Dec.") ¶ 14. In January 2022, Plaintiff filed this Action asserting the Section 16(b) claims derivatively "for the benefit of Genius Brands" (n.k.a. Kartoon Studios, Inc.). *See, e.g.,* ECF No. 105 at 44.

In January 2024, the Court denied Defendants' Motion to Dismiss. ECF No. 142. In September 2025, the Court denied the parties' cross-motions for summary judgment. ECF No. 287.

### B.      Defendants' Indemnity and Advancement Claims

Following the filing of this action, certain Defendants made demands on the Company for indemnity and advancement of costs pursuant to the Securities Purchase Agreement ("SPA") at issue in this case.[2] Jaffa Dec. ¶ 15. The Company rejected the demands on the grounds that indemnification of Section 16(b) liability is impermissible as a matter of public policy and the language of the SPA does not extend to Section 16(b) claims. *Id.* In May 2023, solely in order to avoid further litigation burden and expense, the Company agreed to a tolling and standstill agreement with certain of the Defendants pursuant to which the Company paid $407,581.93 in interim costs incurred in this action. *Id.* The standstill expired after the Court's ruling on Defendants' motions to dismiss. *Id.*

---

[2] Defendants claim that § 9(k) of the SPA requires the Company to advance defense costs incurred in this Action and ultimately indemnify Defendants for any liability, which the Company has repeatedly rejected. The Company reserves all rights and waives none.

ADD-15

Following the Court's ruling on summary judgment, certain Defendants began to renew their claims for indemnity and advancement, which the Company again rejected.[3] Jaffa Dec. ¶ 16.

On January 6, 2026, Defendant Iroquois filed a lawsuit in New York state court seeking advancement from the Company. *See Iroquois Master Fund Ltd., et al. v. Kartoon Studios, Inc.*, No. 650077/2026. On February 3, 2026, the *Iroquois* action was removed to federal court but subsequently dismissed in light of the subsequent *Empery* filing discussed below.

On February 12, 2026, Defendant Empery filed a materially identical action in New York state court. *See Empery Asset Master, Ltd., et al. v. Kartoon Studios, Inc.*, No. 650906/2026. The complaint alleges that Empery is entitled to advancement of expenses in excess of $3.5 million.

## C.  The Company's Financial Condition

At year-end 2025, the Company reported $2.9 million in cash and $3.9 million in marketable securities. As of today, the Company's reserves have declined to $2.2 million in readily available cash and marketable securities. Declaration of Brian Parisi ("Parisi Dec.") ¶ 2. Based on the Company's internal cash flow analysis and projections, at its current rate of spend, the Company will require additional capital through financing or otherwise to continue operations by no later than mid-June 2026. *Id.*

## D.  The Company's Evaluation Of The Potential Value Of The Claims In This Action

On January 30, 2026, the Board convened a special meeting to discuss the developments in the Action, including the Court's ruling denying summary judgment, the Company's current

---

[3] On November 7, 2025, Defendant Iroquois made a demand for advancement of $5.2 million of defense costs. In the ensuing months, the Company received similar indemnification demands from Defendants Molinsky (January 9, 2026 for $650,000), Anson (February 6, 2026 for $2,800,000), Brio (February 10, 2026 for $468,070.18), and M3A (February 12, 2026 for an unspecified dollar amount). Jaffa Dec. ¶ 16. Total advancement claims received to date are approximately $13 million. *Id.*

4

ADD-16

financial condition, the potential value of the claims to the Company, and the indemnification and advancement demands made by certain of the Defendants. Jaffa Dec. ¶ 2. Following extensive discussion, the Board determined unanimously to form the Committee to further analyze the Company's litigation positions, explore potential settlement structures that could be value maximizing for the Company, test the potential to reach a resolution in the near term, and advise the Board with respect to the foregoing and recommended next steps. *Id.* The Board appointed Jeffrey Schlesinger and Anthony Thomopoulos to serve as co-Chairs of the Committee. *Id.* ¶ 3. The Board authorized and empowered the Committee to, among other things, evaluate the merits and potential value of the Section 16(b) claims in the Action; evaluate the Defendants' indemnification and advancement claims; engage directly with the parties to the Action, including the mediator, David Murphy of Phillips ADR, to discuss a potential resolution of the claims; make recommendations to the Board as may be, in the Committee's view, in the best interests of the Company and its stockholders; and submit for the Board's consideration any specific proposals for the potential settlement or prosecution of the Section 16(b) claims. *Id.* The Committee was empowered to retain advisors deemed necessary to fulfill its mandate and was given full access to the Company's officers and employees as necessary. *Id.*

On February 2, 2026, the Committee met and determined to retain Aaron Morris of Morris Kandinov LLP in connection with the Action and the work of the Committee. *Id.* ¶ 4. At the time, the Committee was aware of Morris Kandinov's prior representation of a non-party, Special Equities Group, which had previously received a subpoena in the Action. *Id.* The Committee determined that the prior representation did not present a conflict of interest with respect to the Company. *Id.* Mr. Morris provided the Committee an overview of the history and procedural status of the Action, including the claims asserted therein, and the history and status of the Defendants'

ADD-17

indemnification and advancement claims. *Id.* The Committee thereafter authorized counsel to make an initial outreach to the other parties and the mediator in the Action, Mr. Murphy. *Id.* On February 13, 2026, at the Committee's request, the Committee received a memorandum from counsel regarding the history and background of the Action. Id. ¶ 5.

On March 9, 2026, the Committee met to discuss further developments relating to the Action following initial discussions with counsel for the Plaintiff, Jeffrey Abraham, the mediator, Mr. Murphy, and counsel for Defendants. *Id.* ¶ 6. To avoid even the appearance of a conflict relating to Morris Kandinov's prior representation, the Committee determined to engage Kirkland & Ellis ("K&E") to represent the Committee in connection with all settlement negotiations between the parties. *Id.*

On March 27, 2026, at the Committee's request, the Committee received a detailed memorandum from counsel regarding the nature, status, and history of the Defendants' claims for indemnification and advancement under the Securities Purchase Agreement at issue in the Action. *Id.* ¶ 7.

Also on March 27, 2026, the Committee met to receive an update as to discussions between K&E and the other parties to the Action. *Id.* ¶ 8. Based on these discussions, K&E informed the Committee that it believed that a resolution of the Section 16(b) claims appeared to be possible with certain of the Defendants, potentially in the range of $35 million to $50 million. *Id.* The Committee authorized K&E to continue these discussions. *Id.*

On April 6, 2026, at the request of the Committee, the Committee received a memorandum from counsel regarding the legal principles, evidentiary record, and central disputes in the Action, including an overview of the law under Sections 16(b) and 13(d) of the Securities Exchange Act of 1934, Plaintiff's anticipated evidence and testimony at trial, and Defendants' anticipated

6

evidence and testimony at trial. *Id.* ¶ 9. The memorandum included, as exhibits, relevant deposition testimony of the parties and was transmitted with electronic access to the full case file and deposition transcripts for the Committee's convenience. *Id.*

On April 16, 2026, the Committee met to discuss ongoing settlement communications with the parties and potential next steps. *Id.* ¶ 10. K&E advised the Committee that, after significant back and forth, Defendants had agreed to a global resolution at $50 million with six of the eight defendants participating *pro rata*, reflecting a gross cash settlement payment of $36.5 million. *Id.* Following substantial discussion by the Committee regarding, among other things, the merits of the potential settlement, the Company's current financial condition and cash position, the potential of the settlement to provide a cash infusion that could avoid or mitigate the need for near-term financing, the pending indemnity and advancement claims, the likelihood of a recovery at trial, and the potential delay in receiving an award at trial caused by an appeal, the Committee concluded that it was satisfied with the efforts of K&E to maximize the dollar amount of a settlement pre-trial and that the risks to the Company of the claims proceeding to trial were high in light of the probability of success and the Company's current need for additional capital. *Id.*

On April 20, 2026, Mr. Schlesinger, on behalf of the Committee, participated in a call with counsel for Plaintiff, Mr. Abraham, regarding the Action, the potential settlement, and Plaintiff's view as to settlement. *Id.* ¶ 11.

Later in the day on April 20, 2026, the full Board met to receive an update and recommendation from the Committee. *Id.* ¶ 12. The Board received an update as to, among other things, the procedural history of the Action and the Section 16(b) claims asserted, the Committee's evaluation process and recent discussion with counsel for Plaintiff, the pending claims for indemnity and advancement made by the Defendants, the negotiation with the parties and the

7

ADD-19

potential gross and net value of the potential settlement with the Settling Defendants, the Company's financial position and current cash and financing requirements, and the likelihood of success at trial and the timing of payment of any verdict in favor of the Company. *Id.* Mr. Schlesinger and Mr. Thomopoulos addressed the Board directly as to their observations and findings throughout the process and the numerous business factors relevant to the Company's decision as to whether to settle the Section 16(b) claims or prosecute them at trial. *Id.* After an extensive discussion among all directors present at the meeting, the Board resolved to approve the settlement with the Settling Defendants, but to delay acceptance in order to allow counsel for Plaintiff additional time to participate directly in the negotiations to the extent that counsel was willing to do so. *Id.*

On or about May 1, 2026, K&E informed the Company that counsel for Plaintiff had not substantively engaged in subsequent settlement discussions and was unlikely to participate in further settlement negotiations.[4] *Id.* ¶ 13. Therefore, pursuant to the authority provided by the Board at its April 20, 2026 meeting, the Company executed the Definitive Settlement Agreement with the Settling Defendants. *See* Jaffa Dec., Ex. 1.

**E.     The Settlement Terms**

The relevant terms of the Settlement are as follows:

- The Settling Defendants will collectively pay the Company $36.5 million. Jaffa Dec., Ex. 1 at § 2.3.

---

[4] During the April 20, 2026 call between Mr. Schlesinger and counsel for Plaintiff, Mr. Schlesinger acknowledged and expressed appreciation for counsel's work on behalf of the Company thus far in the litigation. Ultimately, however, counsel did not put forward a settlement demand or otherwise attempt to meaningfully participate in settlement discussions with Defendants. *See* Jaffa Dec. ¶ 13.

ADD-20

- Within five days of the Court's entry of a stay of proceedings as to the Settling Parties, the Settling Defendants will collectively advance $5 million to the Company, structured initially as a loan. *Id.* § 2.3(a)-(b).

- Upon entry of judgment, all accrued interest under the loan will be forgiven and the Company will retain the $5 million as well as the additional $31.5 million, which will be deposited in escrow within 45 days. *Id.* § 2.3(b). If the Court declines to enter judgment or judgment is reversed or modified on appeal, the initial payment plus accrued interest is repayable by the Company within fifteen business days. *Id.*

- The Company and the Settling Defendants will provide mutual releases of all claims that were or could have been asserted relating to the Action, expressly including any claims for indemnity or advancement of defense costs asserted by Defendants against the Company. *Id.* § 4.1.

- The Settling Parties may terminate the Agreement if the Court has not entered a stay within twenty-one days of execution or if the Court declines to enter judgment as requested by the Company. § 3.3.

The initial payment of $5 million to the Company is anticipated to provide sufficient capital for the Company's operations through at least year-end 2026. Parisi Dec. ¶ 3. Moreover, the full contemplated settlement payment of approximately $36.5 million will provide indefinitely for all capital needs of the Company without the need for additional financing. *Id.* In the alternative, if the settlement funds are not made available to the Company in the near term, the Company anticipates the need for significant additional financing, which is expected to be both expensive to the Company and dilutive to the Company's stockholders. *Id.* ¶ 4.

9

ADD-21

**ARGUMENT**

**I. JUDGMENT SHOULD BE ENTERED AGAINST THE SETTLING DEFENDANTS**

**A. The Section 16(b) Claim Belongs Exclusively To The Company**

Section 16(b), 15 U.S.C. § 78p, created a statutory claim for issuers (*i.e.*, companies) to police the trading in their shares by "insiders," including those who own more than ten percent of the company's stock. *Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.,* 906 F.3d 215, 219, 226 (2d Cir. 2018) (noting that "the issuer of the securities at issue, is the real party in interest"). Derivative plaintiffs have "no direct financial interest in the outcome of the litigation" because Section 16(b) claims may be brought "solely on the corporation's behalf" and "any recovery will inure only to the issuer's benefit." *See Gollust v. Mendell*, 501 U.S. 115, 125 n.7, 127 (1991). The "express purpose" of the statute is to "prevent misuse of the corporation's information, not any individual stockholder's." *See Gibbons v. Morgan*, No. 14-CV-9061 (KBF), 2017 WL 3917041, at *5 (S.D.N.Y. Sept. 6, 2017). Accordingly, companies regularly litigate Section 16(b) claims directly. *See, e.g.*, *Safe & Green Holdings Corp. v. Shaw*, No. 23CV2244 (DLC), 2023 WL 5509319, at *1 (S.D.N.Y. Aug. 25, 2023) (company alleging § 16(b) claim against greater than 10% group); *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 42 (2d Cir. 2012) (company obtaining judgment against greater than 10% holder); *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640 (S.D.N.Y. 2022) (same).

The statute also permits stockholders of the issuer to pursue a Section 16(b) claim derivatively on the company's behalf if the company initially declines to pursue the claim itself. 15 U.S.C. § 78p(b) ("Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after

10

ADD-22

request or shall fail diligently to prosecute the same thereafter."); *Smolowe v. Delendo Corp.*, 136 F.2d 231, 241 (2d Cir. 1943) ("Ordinarily the corporate issuer must bring the action; and only upon its refusal or delay to do so, as here, may a security holder act for it in its name and on its behalf."); *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012) (Where a "shareholder plaintiff pursues a § 16(b) claim on behalf of an issuer, the claim is derivative in the sense that the corporation is the instrument").

A company's refusal to initially pursue a Section 16(b) claim does not waive or divest a company's ownership of the claim or entitlement to pursue or manage it. Rather, as the Second Circuit held in *Qlik Techs., Inc.*, a "company that rejects a [Section 16(b)] demand to sue does so with the knowledge that a shareholder can sue on its behalf." 906 F.3d 215, 227-28 (2d Cir. 2018). If, thereafter, the "company were disallowed from joining a suit under Rule 17(a)(3) merely because it had rejected a shareholder's demand, its ability (and the ability of its other shareholders) to recover assets of which it was illegally deprived would stand or fall with the continuing financial interest of the representative shareholder," causing companies to "reasonably doubt whether relying on a derivative shareholder to protect their interests would be prudent." *Id.*; *cf. In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206, 1212-13 (Del. Ch. 2002) (denying plaintiff's motion for voluntarily dismissal in favor of a different forum because the motion sought to "usurp the authority of the Committee before the Committee has even had a reasonable time to complete its review and investigation"); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (granting committee's motion because the "decision to bring a lawsuit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation").

11

ADD-23

**B.** **The Board Properly Exercised Its Authority To Negotiate
A Value-Maximizing Settlement With The Settling Defendants**

The power of a corporation, through its directors, to manage its own claims is fundamental and recognized by courts across jurisdictions. *See* 8 Del. C. § 141(a); *Los Angeles City Employees' Ret. Sys. v. Sanford*, No. 2024-0998-KSJM, 2026 WL 125986, at *20 (Del. Ch. Jan. 16, 2026) ("Litigation assets are like any other assets; the board of directors controls them"); *Zapata v. Maldonado*, 430 A.2d 779, 785–86 (Del. 1981) (After a litigation demand the board "never would have lost its statutory managerial authority. The demand requirement itself evidences that the managerial power is retained by the board."); *Auerbach v. Bennett*, 47 N.Y.2d 619, 631-32 (1979) ("[T]he very nature of the corporate organization" requires that "it [is] only the existing board of directors which had authority . . . to decide whether to prosecute" claims); *In re Amerco Derivative Litig.,* 127 Nev. 196, 232 (2011) ("Among the matters entrusted to a corporation's directors is the decision to litigate—or not to litigate—a claim by the corporation against third parties.").[5]

It is beyond dispute that companies regularly settle Section 16(b) claims with and without litigation. Even where a derivative action has been filed, a company retains authority to settle its Section 16(b) claims with or without the participation of the derivative plaintiff. *Compare Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324-26 (10th Cir. 1984) (approving Section 16(b) settlement negotiated by the plaintiff and approved by a special litigation committee over the objections of other stockholders); *with AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*, 9 F. App'x 53, 54 (2d Cir. 2001) (Section 16(b) claim was assigned and then "settled without participation by [Plaintiff's] counsel").

---

[5] Kartoon Studios, Inc. is a Nevada corporation. "Nevada courts look to Delaware law for guidance on issues of corporate law." *See Green on Behalf of Smith & Wesson Holding Corp. v. Monheit*, 2010 WL 11579099 at *5 (D. Nev. Mar. 3, 2010).

Here, the Board's decision to monetize the Section 16(b) claims as to the Settling Defendants falls well within its fundamental authority to manage the assets and affairs of the Company. Although the Board initially declined to pursue the Section 16(b) claims directly, the landscape with respect to both the viability of the claim and financial position of the Company changed significantly following the Court's summary judgment ruling in September 2025, including that the Court's validation of the liability theory increased the settlement value of the claims substantially. Moreover, the Company's cash available to fund its ongoing operations had declined meaningfully, defense costs arising from multiple indemnity and advancement demands and litigations further jeopardized the already difficult cash position, and the potential indemnity liability had grown into an existential threat that only continued to increase as Defendants incurred defense costs in connection with trial preparation.

The Board's determination to reevaluate the potential value of the Company's claims in January 2026 was wholly consistent with—*if not required by*—its fiduciary duties to the Company and stockholders. The Board's process for understanding and evaluating the claims, led by its Litigation Committee, was extensive and its negotiations were guided by experienced counsel at Kirkland & Ellis, who engaged in numerous rounds of negotiations with counsel for all parties and the mediator to obtain an outcome at the high-end of the range of the Company's initial valuation of the claims. The Board's decision was informed by the fact that the Company's cash position was dwindling, the Company expected to run out of operating capital by June 2026, and that any subsequent financing would be both expensive and highly dilutive to stockholders. In the alternative, the Settlement would effectively *double* the Company's market capitalization, meet all operating capital needs for the foreseeable future, and resolve all outstanding claims for indemnity and advancement and avoid defense costs relating to those claims. Considering these multifaceted

13

dynamics relevant to the Company's operations, the Board exercised its business judgment in determining that the Settlement was not only in the best interests of the Company, but that the Company's very survival depended on it. That reasoned decision should be respected and judgment entered against the Settling Defendants.

### C.      The Company-Negotiated Settlement Does Not Require Court Approval

Because the settlement was negotiated directly by the independent, empowered managers of the Company, this Court need not approve it pursuant to Rule 23.1, which is designed only to protect the company's interests in settlements negotiated by a *derivative plaintiff*, which may or may not have the consent of the company's managers. *Craftsman Fin. & Mortg. Co. v. Brown*, 64 F. Supp. 168, 178-79 (S.D.N.Y. 1945) (the original "evil" addressed by Rule 23.1 was "private settlements under which the plaintiff stockholder and his attorney got the sum paid in settlement, and the corporation got nothing—although it was the corporation's claim that was being settled"). The Company's resolution of its own claims—which are, at this point, its single largest asset—is guarded by wholly different mechanisms of fiduciary duty, corporate waste, and other legal standards governing the conduct of a company's fiduciaries. For example, in *Wolf v. Barkes*, the Second Circuit drew a clear distinction between settlements negotiated by even a *conflicted* board (unlike the independent board here) and those negotiated by a derivative plaintiff:

> While a board of directors dominated by the defendants with whom settlements are made would find it hard to provide a release that would survive charges of self-dealing, dismissal or compromise by an independent stockholder, with the corporation simply standing idle, would not be subject to such easy attack. A new derivative suit against management for fraud or waste in releasing corporate claims for inadequate payment can redress improper settlements even without setting them aside; finding a management target when the derivative shareholder has terminated the corporate claim may be a harder assignment. When the acquiescence of a derivative plaintiff to a dismissal or a consent judgment has in effect been purchased by the defendants, the supposed vigorous champion of the shareholders

14

ADD-26

at large has been retired; far from policing the disposition of the corporate claim, he may well assist in seeing that the news does not leak out to stir other shareholders to inquiry. No such silencing of the derivative plaintiff occurs when the corporation settles out of court with some of the defendants. Indeed, he is the very person most likely to challenge the settlement, either by pursuing the original action and attempting to overthrow the settlement or by bringing a new action against the directors in which the settlement itself is the gravamen of the complaint.

348 F.2d 994, 996-97 (2d Cir. 1965). The court noted that "[n]o one would contend that a corporation could not negotiate a release of corporate claims, even against insiders, before a derivative suit was started," and the "corporation's interest in achieving a favorable settlement does not cease because derivative litigation has begun." *Id.* While the "commencement of a derivative suit provides a handle for judicial supervision not present when the corporation negotiates at an earlier stage," the court ruled that "the corporation's power to make its own out-of-court settlements, subject to normal shareholder redress, is not abolished by a procedural rule [Rule 23.1] that does not embrace these either in its language or in its primary rationale." *Id.*; *see also Kahn v. Kaskel*, 367 F. Supp. 784, 789 (S.D.N.Y. 1973) ("There is nothing in Rule 23.1 which in any way prohibits a corporation from making an out-of-court settlement and giving a general release merely because a derivative action, brought on its behalf, is pending in a federal court."); *Salovaara v. Jackson Nat. Life Ins. Co.*, 246 F.3d 289, 296 (3d Cir. 2001) ("A corporation may enter into a settlement despite the existence of a derivative action when doing so is in the corporation's best interests."); *Star v. TI Oldfield Dev., LLC*, 962 F.3d 117, 133 (4th Cir. 2020) ("[S]ettlements that are in the best interests of the company, entered by a disinterested board, [will]

15

moot a related derivative suit asserting identical or similar claims arising out of the same underlying facts.").[6]

## II. THIS ACTION SHOULD BE STAYED AS TO THE SETTLING DEFENDANTS

This Court has broad discretion to stay this Action as to parties and claims, which "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.,* 299 U.S. 248, 254 (1936); *Prince v. Am. Airlines*, 2011 WL 2534965, at *1 (S.D.N.Y. June 24, 2011) ("broad discretion" for the Court to stay proceedings while parties seek resolution); *Milliken v. Am. Realty Cap. Hosp. Advisors, LLC*, 2018 WL 3745669, at *4 (S.D.N.Y. Aug. 7, 2018) (staying case pursuant to the "Court's discretionary power to manage its docket" in part to "assist the parties' settlement negotiations"); *Philip Morris Inc. v. Heinrich*, 1997 WL 781907 (S.D.N.Y. Dec. 18, 1997) (granting stay as to one defendant while allowing action to continue against other defendants).

Here, a stay as to the Settling Defendants is both justified and imperative to the operations of the Company. If, because of Plaintiff's stated opposition to the Settlement, the Court does not immediately enter judgment, it should grant the requested stay in the interim to permit the

---

[6] While the Company contends that *Wolf* constitutes binding precedent and establishes clearly that Rule 23.1 has no application to the Company's negotiated settlement, the terms otherwise easily satisfy the approval standard because the Settlement "fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted." *Revive Investing LLC v. FBC Holdings S.A.R.L*, 2021 WL 56905, at *6 (S.D.N.Y. Jan. 7, 2021), report and recommendation adopted 2021 WL 734976 (S.D.N.Y. Feb. 25, 2021). For all of the reasons set forth above, the Settlement is anticipated to be *transformative* for the Company (its entire market cap as of today is only $36.8 million) at a point when it expects to run out of operating capital within *weeks*, not months, and faces indemnity and advancement claims that, if proven, would render it insolvent (indeed, defense costs alone may threaten the same). Plaintiff's counsel has not made a superior offer (or suggested how the Company might obtain one), and no rational businessperson could choose to expose the Company to the risks of trial over the current Settlement terms.

16

ADD-28

Company to receive the bridge payment of $5 million pursuant to the Settlement Agreement, which is necessary for the Company to continue uninterrupted operations. Parisi Dec. ¶¶ 3-4. Thereafter, the Company will expeditiously seek to effectuate the Settlement, including by participating in any briefing the Court may order in light of Plaintiff's opposition. Holding otherwise would not only be inequitable to the parties seeking to resolve this matter (which would then be required to prepare for trial in parallel) but would be harshly prejudicial to the Company and would undercut the Board's rationale in structuring the Settlement as a means of providing immediate, non-dilutive capital necessary to continue the Company's mission. As to the Plaintiff, the stay will cause no prejudice because Plaintiff may continue to prepare for trial against the non-settling Defendants and need not commit time and resources as to claims that have been resolved.

## CONCLUSION

For the foregoing reasons, Kartoon Studios, Inc. respectfully requests that the Court grant its Motion, enter the attached proposed judgment, and stay this proceeding solely as to the Settling Defendants.

Respectfully submitted,

By: /s/ Aaron T. Morris

**MORRIS KANDINOV LLP**
Aaron T. Morris (#5675178)
Andrew W. Robertson (#4288882)
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law

Counsel for Kartoon Studios, Inc.

17

ADD-29

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

        Plaintiff,

        v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP; IROQUOIS MASTER
FUND LTD.; IROQUOIS CAPITAL
INVESTMENT GROUP, LLC; L1 CAPITAL
GLOBAL OPPORTUNITIES MASTER FUND;
M3A LP; and RICHARD MOLINSKY,

        Defendants,

-and-

KARTOON STUDIOS, INC.,

        Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

**CONFIDENTIAL**

**FILED UNDER SEAL**

## DECLARATION OF MICHAEL JAFFA

STATE OF CALIFORNIA        )
                             ) SS:
COUNTY OF LOS ANGELES    )

MICHAEL JAFFA declares under penalty of perjury as follows:

1.      I am the Chief Operating Officer at Kartoon Studios, Inc. (the "Company"). This declaration is based on my personal knowledge in the foregoing capacity.

ADD-30

2. On January 30, 2026, the Company's Board of Directors (the "Board") convened a special meeting to discuss the above-captioned action (the "Action"), including the Court's ruling denying summary judgment, the Company's current financial condition, the potential value of the claims to the Company, and the indemnification and advancement demands made by certain of the Defendants. Following extensive discussion among the members of the Board regarding the foregoing topics and related business factors relevant to the Company, the Board determined unanimously to form a Litigation Committee (the "Committee") to further analyze the Company's litigation positions, explore potential settlement structures that could be value-maximizing for the Company, test the potential to reach a resolution in the near term, and advise the Board with respect to the foregoing and recommended next steps.

3. The Board appointed Jeffrey Schlesinger and Anthony Thomopoulos to serve as co-Chairs of the Committee. The Board authorized and empowered the Committee to, among other things, evaluate the merits and potential value of the Section 16(b) claims in the Action; evaluate the Defendants' indemnification and advancement claims; engage directly with the parties to the Action, including the mediator, David Murphy of Phillips ADR, to discuss a potential resolution of the claims; make recommendations to the Board as may be, in the Committee's view, in the best interests of the Company and its stockholders; and submit for the Board's consideration any specific proposals for the potential settlement or prosecution of the Section 16(b) claims. The Committee was empowered to retain advisors deemed necessary to fulfill its mandate and was given full access to the Company's officers and employees as necessary.

4. On February 2, 2026, the Committee met and determined to retain Aaron Morris of Morris Kandinov LLP in connection with the Action and the work of the Committee. The Committee was aware of Morris Kandinov's prior representation of a non-party, Special Equities

Group, which had previously received a subpoena in the Action. The Committee determined that the prior representation did not present a conflict of interest with respect to the Company. Mr. Morris provided the Committee an overview of the history and procedural status of the Action, including the claims asserted therein, and the history and status of the Defendants' indemnification and advancement claims. The Committee thereafter authorized counsel to make an initial outreach to the other parties and the mediator in the Action, Mr. Murphy.

5. On February 13, 2026, at the Committee's request, the Committee received a memorandum from counsel regarding the history and background of the Action.

6. On March 9, 2026, the Committee met to discuss further developments relating to the Action following initial discussions with counsel for the Plaintiff, Jeffrey Abraham, the mediator, Mr. Murphy, and counsel for Defendants. To avoid even the appearance of a conflict relating to Morris Kandinov's prior representation, the Committee determined to engage Jay Lefkowitz of Kirkland & Ellis to represent the Committee in connection with all negotiations between the parties.

7. On March 27, 2026, at the Committee's request, the Committee received a detailed memorandum from counsel regarding the nature, status, and history of the Defendants' claims for indemnification and advancement under the Securities Purchase Agreement at issue in the Action.

8. Also on March 27, 2026, the Committee met to receive an update as to discussions between Mr. Lefkowitz and the other parties to the Action. Based on these discussions, Mr. Lefkowitz informed the Committee that he believed that a resolution of the Section 16(b) claims appeared to be possible with certain of the Defendants, potentially in the range of $35 million to $50 million. The Committee authorized Mr. Lefkowitz to continue these discussions.

9.      On April 6, 2026, at the request of the Committee, the Committee received a memorandum from counsel regarding the legal principles, evidentiary record, and central disputes in the Action, including an overview of the law under Sections 16(b) and 13(d) of the Securities Exchange Act of 1934, Plaintiff's anticipated evidence and testimony at trial, and Defendants' anticipated evidence and testimony at trial. The memorandum included, as exhibits, relevant deposition testimony of the parties and was transmitted with electronic access to the full case file and deposition transcripts for the Committee's convenience.

10.     On April 16, 2026, the Committee met to discuss ongoing settlement communications with the parties and potential next steps. Mr. Lefkowitz advised the Committee that, after significant back and forth, Defendants had agreed to a global resolution at $50 million with six of the eight defendants participating *pro rata*, reflecting a gross cash settlement payment of $36.5 million.[1] Following substantial discussion by the Committee regarding, among other things, the merits of the potential settlement, the Company's current financial condition and cash position, the potential of the settlement to provide a cash infusion that could avoid or mitigate the need for near-term financing, the pending indemnity and advancement claims, the likelihood of a recovery at trial, and the potential delay in receiving an award at trial caused by an appeal, the Committee concluded that it was satisfied with the efforts of Mr. Lefkowitz to maximize the dollar amount of a settlement pre-trial and that the risks to the Company of the claims proceeding to trial were high in light of the probability of success and the Company's current need for additional capital.

---

[1] The settlement participants are Defendants Anson Investments Master Fund LP, CVI Investments, Inc., Iroquois Master Fund Ltd., Iroquois Capital Investment Group, LLC, L1 Capital Global Opportunities Master Fund, M3A LP, and Richard Molinsky (the "Settling Defendants").

11. On April 20, 2026, Mr. Schlesinger, on behalf of the Committee, participated in a call with counsel for Plaintiff, Mr. Abraham, regarding the Action, the potential settlement, and Plaintiff's view as to settlement.

12. Later in the day on April 20, 2026, the full Board met to receive an update and recommendation from the Committee. The Board received an update as to, among other things, the procedural history of the Action and the Section 16(b) claims asserted, the Committee's evaluation process and recent discussion with counsel for Plaintiff, the pending claims for indemnity and advancement made by the Defendants, the negotiation with the parties and the potential gross and net value of the potential settlement with the Settling Defendants, the Company's financial position and current cash and financing requirements, and the likelihood of success at trial and the timing of payment of any verdict in favor of the Company. Mr. Schlesinger and Mr. Thomopoulos addressed the Board directly as to their observations and findings throughout the process and the numerous business factors relevant to the Company's decision as to whether to settle the Section 16(b) claims or prosecute them at trial. After an extensive discussion among all directors present at the meeting, the Board resolved to approve the settlement with the Settling Defendants, but to delay acceptance in order to allow counsel for Plaintiff additional time to participate directly in the negotiations to the extent that counsel was willing to do so.

13. On or about May 1, 2026, Mr. Lefkowitz informed me that counsel for Plaintiff had not substantively engaged in subsequent settlement discussions and was unlikely to participate in further settlement negotiations. While Plaintiff's counsel informed Mr. Lefkowitz that he is interested in a settlement that fairly reflects the value of the claims asserted in the Action, he has not put forward a settlement demand or otherwise attempted to meaningfully participate in further

settlement discussions. Therefore, pursuant to the authority provided by the Board at its April 20, 2026 meeting, I caused the Company to finalize the settlement with the Settling Defendants. A true and correct copy of the Definitive Settlement Agreement is attached hereto as **Exhibit 1**.

14.     The Company's initial rejection of the Plaintiff's demand to pursue the Section 16(b) claims in October 2020 was based on, among other things, concerns over the viability of the Plaintiff's legal theory with respect to a group under Section 13(d) of the Securities Exchange Act of 1934.

15.     Following the filing of this action, certain Defendants made demands for indemnity and advancement of costs pursuant to the Securities Purchase Agreement ("SPA") at issue in this Action. The Company rejected the demands on the grounds, among others, that indemnification of Section 16(b) liability is impermissible as a matter of public policy and the language of the SPA does not extend to Section 16(b) claims. In May 2023, solely in order to avoid further litigation burden and expense, the Company agreed to a tolling and standstill agreement with certain of the Defendants pursuant to which the Company paid $407,581.93 in interim costs incurred in this Action. The standstill expired after the Court's ruling on Defendants' motions to dismiss.

16.     Following the Court's ruling on summary judgment, certain Defendants began to renew their claims for indemnity and advancement, which the Company again rejected. On November 7, 2025, Defendant Iroquois made a demand for advancement of $5.2 million of defense costs. In the ensuing months, the Company received similar indemnification demands from Defendants Molinsky (January 9, 2026 for $650,000), Anson (February 6, 2026 for $2,800,000), Brio (February 10, 2026 for $468,070.18), and M3A (February 12, 2026 for an unspecified dollar amount). Total advancement claims received to date are approximately $13 million.

17.     I declare under penalty of perjury that the foregoing is true and correct.

**ADD-35**

Michael Jaffa

Date: 5/5/2026

**Exhibit 1**

ADD-37

# DEFINITIVE SETTLEMENT AGREEMENT

**This Definitive Settlement Agreement** (this "Agreement") is entered into as of May 5, 2026, by and among the following parties (collectively, the "Settling Parties"):

**Kartoon Studios, Inc.** (f/k/a Genius Brands International, Inc.), a corporation organized under the laws of the State of Nevada (the "Company" or "Kartoon");

**Anson Investments Master Fund LP** ("Anson");

**CVI Investments, Inc.** ("CVI");

**Iroquois Master Fund Ltd.** and **Iroquois Capital Investment Group, LLC** (collectively, "Iroquois");

**L1 Capital Global Opportunities Master Fund** ("L1");

**M3A LP** ("M3A");

and **Richard Molinsky** ("Molinsky"; together with Anson, CVI, Iroquois, L1, and M3A, the "Settling Defendants").

## RECITALS

**WHEREAS**, the Company is a party to the action captioned *Todd Augenbaum v. Anson Investments Master Fund LP et al.*, Case No. 1:22-CV-00249-AS, pending in the United States District Court for the Southern District of New York (the "Federal Litigation");

**WHEREAS**, the Company and certain Settling Defendants are parties to the action captioned *Iroquois Master Fund Ltd. and Iroquois Capital Investment v. Kartoon Studios, Inc.*, Index No. 650077/2026 (N.Y. Sup.) (together with the Federal Litigation, the "Actions");

**WHEREAS**, the Settling Parties, through extensive arm's-length negotiations, have reached a resolution of the Actions and desire to memorialize the terms of their settlement in this Agreement;

**WHEREAS**, the Board of Directors of the Company has reviewed and considered the Agreement and has approved its terms as in the best interests of the Company and authorized the Company to enter into it;

**WHEREAS**, each Settling Party denies any liability, wrongdoing, or fault, and enters into this Agreement solely to avoid the cost, burden, and uncertainty of continued litigation;

**NOW, THEREFORE**, in consideration of the mutual covenants, representations, warranties, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Settling Parties agree as follows:

1

ADD-38

## ARTICLE I — DEFINITIONS

**Section 1.1 — Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

"Actions" means, collectively, (i) the Federal Litigation, and (ii) *Iroquois Master Fund Ltd. and Iroquois Capital Investment v. Kartoon Studios, Inc.*, Index No. 650077/2026 (N.Y. Sup.), and any related pending matters between and among any of the Settling Parties.

"Court" means the United States District Court for the Southern District of New York.

"Court Approval" means the Court's entry of the Judgments.

"Effective Date" means the date on which the Court enters the Judgments.

"Escrow Payment" has the meaning set forth in Section 2.3(c).

"Federal Litigation" means *Todd Augenbaum v. Anson Investments Master Fund LP et al.*, Case No. 1:22-CV-00249-AS, pending in the Court.

"Individual Payment" means each Settling Defendant's allocated share of the Settlement Payment, as set forth in Exhibit A.

"Initial Payment" means the collective loan of up to $5,000,000.00 to be made by the Settling Defendants to the Company.

"Judgments" means stipulated judgments to be agreed and entered dismissing the Action as to each Settling Defendant, in forms acceptable to each Settling Party in its sole and absolute discretion.

"Release Date" means the earliest to occur of: (i) a decision by the appellate court of last resort affirming the Court Approval; (ii) the expiration of any time to appeal or further appeal the Court Approval if no appeal or further appeal is filed; or (iii) final affirmance of the Court Approval by a court of last resort.

"Released Claims" has the meaning set forth in Section 4.1.

"Released Parties" has the meaning set forth in Section 4.1.

"Releasing Parties" has the meaning set forth in Section 4.1.

"Settlement Payment" means the aggregate sum of $36,500,000.00 to be paid by the Settling Defendants to the Company, as allocated among the Settling Defendants in Exhibit A.

"Settling Defendants" means, collectively, Anson, CVI, Iroquois, L1, M3A, and Molinsky.

"Settling Parties" means, collectively, the Company and the Settling Defendants.

## ARTICLE II — SETTLEMENT PAYMENTS

**Section 2.1 — Aggregate Settlement Amount.** The Settling Defendants shall collectively pay the Settlement Payment to the Company to resolve all claims in the Actions, subject to the conditions on the Escrow Payment and the Initial Payment set forth in Section 2.3.

ADD-39

**Section 2.2 — Allocation Among Settling Defendants.** The Settlement Payment shall be allocated among the Settling Defendants as set forth in Exhibit A attached hereto and incorporated herein by reference. Each Settling Defendant's Individual Payment shall be that Settling Defendant's sole financial obligation under this Agreement. No Settling Defendant shall be jointly or severally liable for the Individual Payment of any other Settling Defendant.

**Section 2.3 — Payment Terms.**

(a) *Initial Payment.* The Settling Defendants shall collectively pay $5,000,000.00 in the amounts specified in Exhibit A (the "Initial Payment") in immediately available funds within five (5) business days of the later to occur of (a) the Court granting a stay of all proceedings in the Federal Litigation with respect to the Settling Parties; and (b) the Company providing all reasonably requested tax and KYC information.

(b) *Interest on Initial Payment.* Interest shall accrue on the original principal Initial Payment at the rate of 17% per annum compounded quarterly. In the event the trial court declines to enter the Judgments or any appellate court reverses or modifies the Court Approval, the Initial Payment plus any accrued interest shall be payable to the Settling Defendants within fifteen (15) business days of the event giving rise to the repayment obligation. If the Release Date occurs, the Settling Defendants shall automatically forgive all accrued interest, and the Company shall not be obligated to return the Initial Payment or any interest that has accrued on the Initial Payment. In no event shall interest payable hereunder exceed the maximum rate permitted under applicable law, and if any provision of this Agreement is in contravention of applicable law, such provision shall be deemed modified to limit such interest to the maximum rate permitted under applicable law.

(c) *Escrow Payment.* The Settling Defendants shall collectively pay $31,500,000.00 in the amounts specified in Exhibit A (the "Escrow Payment") within forty-five (45) days of the later to occur of (a) the Effective Date, and (b) receipt of all reasonably requested tax and KYC information. The Escrow Payment shall be deposited into an escrow account established in accordance with an escrow agreement in a form mutually agreed upon by the Settling Parties (the "Escrow Agreement"), and shall be released to the Company upon the Release Date.

**Section 2.4 — Late Payments.** If any Settling Defendant fails to make its Individual Payment within the time period set forth in Section 2.3, such Settling Defendant shall pay interest on the unpaid amount at the rate of nine percent (9%) per annum, accruing from the date payment was due until the date payment is received by the Company.

**Section 2.5 — Tax Treatment.** Each Settling Party shall be responsible for its own tax obligations arising from the Settlement Payment. Nothing in this Agreement shall be construed as tax advice to any Settling Party, and each Settling Party is advised to consult with its own tax advisors regarding the tax consequences of the Settlement Payment.

**Section 2.6 — No Additional Payments.** No payments or benefits are owed by any Settling Party to any other Settling Party beyond those expressly set forth in this Agreement.

**Section 2.7 — Reservation of Rights.** The Settling Defendants reserve all rights to obtain the return of or collect the Initial Payment and Escrow Payment if the Court declines to enter the Judgments or if the Judgments are vacated or modified on appeal or otherwise, whether in

ADD-40

bankruptcy or otherwise, and the provisions of this Section 2.7 shall survive any termination of this Agreement.

**Section 2.8 — No Joint Obligations.** No Settling Defendant shall have any obligation with respect to the Individual Payment of any other Settling Defendant. A failure by one or more Settling Defendants to make its Individual Payments shall in no way affect the rights, obligations or benefits to any other Settling Defendant under this Agreement.

**Section 2.9 — Protection of Paying Settling Defendants.** Notwithstanding anything to the contrary in this Agreement, if any Settling Defendant timely funds its share of the Initial Payment and timely deposits its share of the Escrow Payment in accordance with this Agreement, the failure by any other Settling Defendant to fund its share of the Initial Payment or deposit its share of the Escrow Payment shall not impair, delay, limit or otherwise affect such paying Settling Defendant's rights, protections or benefits under this Agreement, including the effectiveness, validity and enforceability of the releases granted in its favor upon the Release Date.

## ARTICLE III — PROCEDURE FOR COURT APPROVAL AND ENTRY OF JUDGMENTS

**Section 3.1 — Notification to the Court.** Subject to and in reliance on this Agreement, within one (1) business day of the execution of this Agreement, the Company shall notify the Court that it has reached a settlement agreement with the Settling Parties and shall request (a) a stay of all proceedings in the Federal Litigation with respect to the Settling Parties, and (b) entry of the Judgments.

**Section 3.2 — Stay of Proceedings.** The Settling Parties shall cooperate fully and in good faith to obtain a stay of all proceedings in the Federal Litigation with respect to the Settling Parties and entry of the Judgments by the Court.

**Section 3.3 — Termination.**

(a) If the Court has not stayed proceedings in the Federal Litigation with respect to the Settling Parties within twenty-one (21) days of the execution of this Agreement any Settling Party shall have the right, but not the obligation, to terminate this Agreement as to itself upon written notice to the other Settling Parties. Thereafter, the Aggregate Settlement Amount would decrease by the amount Settling Defendants which terminated this Agreement were previously scheduled to contribute.

(b) If the Court declines to enter the Judgments in forms acceptable to each Settling Defendant in its sole and absolute discretion, any Settling Party shall have the right, but not the obligation, to terminate this Agreement as to itself upon written notice to the other Settling Parties. In the event that any Settling Party terminates this Agreement as to itself, this Agreement shall be null and void as to that Settling Party, and all payments made by such Settling Defendants shall be returned to them, with interest accruing as set forth in Section 2.3(b) as to the Initial Payment. Thereafter, the Aggregate Settlement Amount would decrease by the amount Settling Defendants which terminated this Agreement were previously scheduled to contribute.

4

ADD-41

**Section 3.4 — Reversal on Appeal.** In the event that any appellate court reverses or modifies the Court Approval, this Agreement shall be null and void and all payments made by the Settling Defendants to either the Company or the Escrow Account shall be returned to them, with all accrued interest within thirty (30) days of such reversal or modification becoming final, and that parties shall be restored to their respective positions as they existed on the date of this Agreement. The Company shall cooperate with securing the release of the Escrow Account to the Settling Defendants.

## ARTICLE IV — MUTUAL RELEASES

**Section 4.1 — Releases.** Upon the Release Date, each Settling Defendant, Kartoon, and any stockholder of Kartoon (collectively, the "Releasing Parties"), on behalf of themselves and their respective owners, officers, directors, partners, members, managers, principals, employees, agents, attorneys, predecessors, successors, parents, subsidiaries, affiliates, and assigns, for promises and undertakings and other good and valuable consideration, receipt of which is hereby acknowledged, and intending to be legally bound, hereby shall fully and forever release and discharge each other and their respective owners, officers, directors, partners, members, managers, principals, employees, agents, attorneys, predecessors, successors, parents, subsidiaries, affiliates, and assigns (collectively, the "Released Parties") from any and all claims, demands, actions, causes of action, suits, damages, losses, obligations, judgments, and liabilities, including without limitation any claims for indemnity or advancement of defense costs, whether known or unknown, asserted or unasserted, that were or could have been asserted by any party in the Actions (collectively, the "Released Claims").

**Section 4.2 — Reservation of Rights.** Notwithstanding Section 4.1, the releases set forth therein shall not include: (a) claims to enforce the terms of this Agreement; or (b) claims that arise after the date of execution of this Agreement and are unrelated to the subject matter of the Actions.

**Section 4.3 — Waiver of Unknown Claims.** Each Settling Party expressly waives any right or benefit under any law of any jurisdiction that would otherwise limit a release to only those claims known or suspected to exist at the time of the release. This waiver applies even if the Releasing Party would not have agreed to the settlement had it known of such claims at the time of execution. Each Settling Party acknowledges that it may hereafter discover facts different from or in addition to those that it now knows or believes to be true with respect to the Released Claims, and agrees that the releases contained herein shall remain effective in all respects notwithstanding such discovery.

The Parties intend that the releases shall be effective as a full and final accord and satisfaction of (and as a bar to) all claims, rights, causes of action, suits, obligations, damages and liabilities of any nature, character or kind whatsoever, that were or could have been asserted with respect to the matters released, whether or not now known or suspected. The Parties expressly waive any rights or benefits available to them under the provisions of Section 1542 of the California Civil Code, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE

5

ADD-42

MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

The Parties acknowledge that they understand the language and effect of Section 1542 of the California Civil Code but nevertheless elect to release the other to the full extent described in this Agreement and specifically waive any rights that they may otherwise have under Section 1542, and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, that are comparable or equivalent to California Civil Code Section 1542. This reference to Section 1542 of the California Code shall not be construed as an indication that the Parties intend to have California law apply to this Agreement. For the avoidance of doubt, this Section 4.3 shall not be deemed to waive, release, or limit, to any extent, any claims preserved by any Party under Section 4.2 or otherwise reserved under this Agreement, including, specifically and without limitation, any claims brought by any Party to enforce the terms of this Agreement.

**Section 4.4 — Tolling.** The running of any statute of limitations or other contractual, legal or equitable time-related defense applicable to any claims, causes of action or defenses relating to the any right any Settling Defendant may have to indemnification, advancement or reimbursement for fees and expenses incurred in connection with the Federal Action (the "Tolled Claims") is tolled and suspended for the period beginning on the date hereof and lasting until December 31, 2028, or to such later date as the Parties may agree in writing (the "Tolling Period"). The Tolling Period shall not be included in the calculation of the running of any statute of limitations or for any other contractual, legal or equitable time-related defense applicable to the Tolled Claims. Any claim filed or defense asserted during the Tolling Period shall be deemed to have been filed or asserted on the date hereof for purposes of the statute of limitations or other contractual, legal or equitable time-related defenses relating to the Tolled Claims. Without limiting the generality of the foregoing, no Party may assert that the passage of time between the date hereof and the conclusion of the Tolling Period caused any prejudice or injury in connection with the Tolled Claims. The Tolling Period shall terminate upon the Release Date, and each Settling Party covenants not to file any lawsuit concerning the Tolled Claims until: (i) that Settling Party has terminated this Agreement as to itself pursuant to Section 3.3, or (ii) Court Approval has been reversed upon appeal. For the avoidance of doubt, this Section 4.4 shall survive the termination of this Agreement pursuant to Section 3.3 or 3.4.

## ARTICLE V — CONFIDENTIALITY OBLIGATIONS

**Section 5.1 — Confidentiality of Mediation.** Nothing in this Agreement shall be construed to waive or modify the confidentiality protections afforded to the mediation proceedings, including to the exchange of any drafts of this Agreement, under the mediation confidentiality agreement or under Federal Rule of Evidence 408.

**Section 5.2 — Permitted Disclosures.** Notwithstanding the confidentiality obligations set forth in Section 5.1, the Settling Parties may publicly disclose this Agreement and exhibits to this Agreement to the United States District Court for the Southern District of New York, including Judge Arun Subramanian, in the Federal Litigation to effectuate the entry of the Judgments or enforce the terms of this Agreement.

6

ADD-43

Prior to the public disclosure of this Agreement in the Federal Litigation, the Settling Parties may disclose the terms of this Agreement to:

(a) counsel for plaintiff in the Federal Litigation;

(b) the mediator and any arbitrator engaged to resolve disputes concerning this Agreement;

(c) each Settling Party's respective attorneys, accountants, auditors, tax advisors, insurers, and financial advisors;

(e) to any regulatory or governmental authority to the extent required by law or regulation.

Notwithstanding the foregoing, no Settling Party shall issue a press release regarding this Agreement or its terms.

## ARTICLE VI — NO ADMISSION OF LIABILITY

**Section 6.1 — No Admission.** This Agreement reflects a compromise and settlement of disputed claims. Nothing in this Agreement or any related document shall be construed as an admission of liability, wrongdoing, or fault by any Settling Party. Each Settling Defendant expressly denies that it acted as part of a "group" within the meaning of Section 16(b) of the Securities Exchange Act of 1934.

**Section 6.2 — Inadmissibility.** This Agreement and any discussions, negotiations, or proceedings relating thereto shall not be offered or received in evidence in any action or proceeding as an admission, concession, or evidence of liability, wrongdoing, or fault, pursuant to Federal Rule of Evidence 408 and any analogous state rule or statute.

## ARTICLE VII — COOPERATION

**Section 7.1 — General Cooperation.** The Settling Parties shall cooperate fully and in good faith to effectuate the dismissal of the Actions and the entry of the Judgments in accordance with this Agreement. Without limiting the generality of the foregoing, each Settling Party agrees to execute and deliver such additional documents and instruments as may be reasonably necessary or desirable to carry out the purposes and intent of this Agreement.

## ARTICLE VIII — REPRESENTATIONS AND WARRANTIES

**Section 8.1 — Representations and Warranties.** Each Settling Party represents and warrants to each other Settling Party that:

(a) *Authority.* Such Settling Party has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder. The Settling Parties enter into this Agreement knowingly, intentionally, willingly, voluntarily and without reservation, at arm's length.

(b) *Represented by Counsel.* The Parties each acknowledge they have each had the opportunity to retain and consult their own separate independent counsel to review this Agreement, and to seek the legal advice of such independent counsel of their choosing in connection with this Agreement, and each of the Parties has done so before executing this Agreement.

7

ADD-44

(c) *Due Authorization.* This Agreement has been executed by a person duly authorized to bind such Settling Party.

(d) *No Assignment of Claims.* Such Settling Party has not assigned, transferred, or encumbered any of the Released Claims.

(e) *Voluntary Execution.* Such Settling Party enters into this Agreement voluntarily and with full knowledge of its terms.

(f) *No Other Agreements.* No promise or inducement has been offered or made to such Settling Party, except as set forth in this Agreement, to induce it to enter into this Agreement.

(g) *No Presumption Against Drafter.* There shall be no presumption against the drafter with respect to this Agreement, and this Agreement shall not be construed less favorably against the party who may have drafted (or whose counsel may have drafted) any of the language contained in this Agreement. This Agreement shall be deemed to have been drafted jointly by the Settling Parties. Any ambiguity found to exist shall be resolved by construing the terms of this Agreement fairly and reasonably in accordance with the purpose of this Agreement.

## ARTICLE IX — GOVERNING LAW AND DISPUTE RESOLUTION

**Section 9.1 — Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflicts-of-law principles.

**Section 9.2 — Mediation and Arbitration.** Any dispute arising out of or related to this Agreement shall be resolved first by mediation before Mark Helm. If mediation is unsuccessful within thirty (30) days of the initiation of such mediation (or such longer period as the parties may agree), the dispute shall be resolved by final and binding arbitration administered by JAMS in New York, New York. The arbitration shall be conducted in accordance with the then-current JAMS Comprehensive Arbitration Rules and Procedures. The arbitrator shall have the authority to award any remedy or relief that a court of competent jurisdiction could order, including specific performance, injunctive relief, and attorneys' fees and costs to the prevailing party. The decision of the arbitrator shall be final and binding upon the parties and may be entered as a judgment in any court of competent jurisdiction.

## ARTICLE X — ATTORNEYS' FEES AND COSTS

**Section 10.1 — Attorneys' Fees.** Each Settling Party shall bear its own attorneys' fees, costs, and expenses incurred in connection with the Actions and the negotiation and execution of this Agreement.

**Section 10.2 — Augenbaum Fees.** Kartoon shall be solely responsible for payment of an award of attorneys' fees and costs, if any, to counsel for Todd Augenbaum related to the Federal Litigation. Kartoon reserves all rights and arguments with respect to such a fee award.

## ARTICLE XI — MISCELLANEOUS PROVISIONS

**Section 11.1 — Entire Agreement.** This Agreement, together with the Escrow Agreement and the other exhibits attached hereto, sets forth the entire agreement among the Settling Parties with

8

ADD-45

respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, and understandings, whether oral or written.

**Section 11.2 — Amendments.** This Agreement may not be modified, amended, or supplemented except by a written instrument executed by all Settling Parties.

**Section 11.3 — Severability.** If any provision of this Agreement is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the validity, legality, and enforceability of the remaining provisions shall not be affected or impaired thereby, and such provision shall be reformed to the minimum extent necessary to make it valid, legal, and enforceable while preserving the intent of the Settling Parties.

**Section 11.4 — Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Facsimile, electronic (*i.e.*, Docusign), and PDF signatures shall be deemed original signatures for all purposes.

**Section 11.5 — No Third-Party Beneficiaries.** This Agreement is intended for the benefit of the Settling Parties and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person or entity, except for those expressly identified as Released Parties in Article IV.

**Section 11.6 — Waiver.** The failure of any Settling Party to insist upon or enforce strict performance of any provision of this Agreement shall not be construed as a waiver of any future default of the same or similar nature. No waiver of any provision of this Agreement shall be effective unless made in writing and signed by the waiving Settling Party.

**Section 11.7 — Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Settling Parties and their respective successors and permitted assigns. No Settling Party may assign its rights or obligations under this Agreement without the prior written consent of all other Settling Parties.

**Section 11.8 — Construction.** This Agreement has been negotiated by the Settling Parties at arm's length and with the benefit of legal counsel, and no provision of this Agreement shall be construed against any Settling Party on the ground that such Settling Party drafted or proposed such provision.

**Section 11.9 — Survival.** The provisions of Section 4.4 (Tolling), Article V (Confidentiality Obligations), Article VI (No Admission of Liability), Article IX (Governing Law and Dispute Resolution), and Article X (Attorneys' Fees and Costs) shall survive termination of this Agreement.

**Section 11.10 — Headings.** The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 11.11 — Notices.** All notices, requests, demands, or other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given when (a) delivered personally, (b) sent by registered or certified mail, return receipt requested,

ADD-46

postage prepaid, (c) sent by nationally recognized overnight courier service, or (d) sent by email with confirmation of receipt, to the Settling Parties at the following address:

If to Kartoon Studious, Inc:

Jay Lefkowitz
Jeffrey Goldfine
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
lefkowitz@kirkland.com
jeffrey.goldfine@kirkland.com

If to Anson Investments Master Fund LP:

Dennis H. Tracey, III
Catherine Bratic
Elizabeth Cochrane
**HOGAN LOVELLS US LLP**
390 Madison Avenue
New York, New York 10017
(212) 918-3000
dennis.tracey@hoganlovells.com
catherine.bratic@hoganlovells.com
elizabeth.cochrane@hoganlovells.com

If to CVI Investments, Inc.:

Susan L. Saltzstein
Kurt Wm. Hemr
Jeffrey S. Geier
**SKADDEN, ARPS, LSATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
(212) 735-3000
Susan.Saltzstein@skadden.com
Kurt.Hemr@skadden.com
Jeffrey.Geier@skadden.com


If to Iroquois Master Fund Ltd. and Iroquois Capital Investment Group, LLC:

Christopher J. Clark
Benjamin Butzin-Dozier
**CLARK SMITH VILLAZOR LLP**
666 Third Avenue, 21st Floor
New York, NY 10019
Tel.: (212) 582-4400

10

ADD-47

clark@cvsllp.com
Benjamin.dozier@csvllp.com


If to L1 Capital Global Opportunities Master Fund:

Jared R. Clark
**ELLIOTT LEVINE JAROSLAW NEILS LLP**
485 Lexington Avenue, 14th Floor
New York, New York 10017
(917) 287-1480
jclark@eljnlaw.com


If to M3A LP:

Richard Asche
**LITMAN, ASCHE & GIOELLA, LLP**
140 Broadway #38
New York, New York 10005
(212) 809-4500
richardasche@lagnyc.com
and

Jennifer Furey
**GOULSTON & STORRS**
One Post Office Square, 25th Floor
Boston, MA 02109
jfurey@goulstonstorrs.com


If to Richard Molinsky:

Kieran M. Corcoran
Stinson LLP
140 Broadway, Suite 2330
New York, NY 10005
(646) 883-7480


**[SIGNATURE PAGES FOLLOW]**

11

ADD-48

**KARTOON STUDIOS, INC.**

By: _____

Name:

Title:


*[signatures continued on next page]*

ADD-49

**ANSON INVESTMENTS MASTER FUND LP**

By: _____

Name:

Title:

*[signatures continued on next page]*

13

ADD-50

**CVI INVESTMENTS, INC.**

By: Heights Capital Management, Inc.
Its authorized agent

_____

Name:

Title:

***[signatures continued on next page]***

ADD-51

**IROQUOIS MASTER FUND LTD.**

By: _____

Name:

Title:

**IROQUOIS CAPITAL INVESTMENT GROUP, LLC**

By: _____

Name:

Title:

*[signatures continued on next page]*

15

ADD-52

**L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND**

By: _____

Name:

Title:

*[signatures continued on next page]*

ADD-53

**M3A LP**

By: _____

Name:

Title:

***[signatures continued on next page]***

ADD-54

**RICHARD MOLINSKY**

By: _____

Name:

Title:

ADD-55

**EXHIBIT A — ALLOCATION OF SETTLEMENT PAYMENT AMONG SETTLING DEFENDANTS**

| Settling Defendant | Initial Payment | Total Payment | Percentage |
|---|---|---|---|
| Anson Investments Master Fund LP | $2,910,000 | $21,204,034.25 | 58.21% |
| CVI Investments, Inc. | $532,000 | $3,875,178.20 | 10.64% |
| Iroquois Master Fund Ltd. / Iroquois Capital Investment Group, LLC | $655,500 | $4,773,670.49 | 13.11% |
| L1 Capital Global Opportunities Master Fund | $317,500 | $2,312,109.70 | 6.35% |
| M3A LP | $519,000 | $3,779,993.28 | 10.38% |
| Richard Molinsky | $66,000 | $482,482.02 | 1.32% |
| **Total** | **$5,000,000** | **$36,427,467.94** | **100%** |

Iroquois has agreed to contribute an additional $72,532.06, bringing the aggregate settlement amount reflected in this Exhibit A to $36,500,000.00.

19

ADD-56

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

TODD AUGENBAUM,

        Plaintiff,

        v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP; IROQUOIS MASTER
FUND LTD.; IROQUOIS CAPITAL
INVESTMENT GROUP, LLC; L1 CAPITAL
GLOBAL OPPORTUNITIES MASTER FUND;
M3A LP; and RICHARD MOLINSKY,

        Defendants,

-and-

KARTOON STUDIOS, INC.,

        Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

**CONFIDENTIAL**

**FILED UNDER SEAL**

## DECLARATION OF BRIAN PARISI

| STATE OF CALIFORNIA | ) |
| --- | --- |
| | ) SS: |
| COUNTY OF LOS ANGELES | ) |

BRIAN PARISI declares under penalty of perjury as follows:

    1.    I am the Chief Financial Officer at Kartoon Studios, Inc. ("Kartoon" or the "Company"). This declaration is based on my personal knowledge in the foregoing capacity.

ADD-57

2. As of May 5, 2026, the Company holds 2.2 million in readily available cash and marketable securities. Based on the Company's internal cash flow analysis and projections, at its current rate of spend, the Company will require additional capital through financing or otherwise to continue operations by no later than mid-June 2026.

3. Pursuant to the terms of the settlement with certain of the Defendants in this action, the Company would be entitled to an initial payment of $5 million within five (5) business days of the Court granting a stay of proceedings in this litigation and the Company providing appropriate tax and other documentation. This initial payment is anticipated to provide sufficient capital for operations through at least year-end 2026. Moreover, the full contemplated settlement payment of approximately $36.5 million will provide for all capital needs of the Company without the need for additional financing.

4. In the alternative, if the settlement funds are not made available to the Company in the near term, the Company anticipates the need for significant additional financing, which is expected to be both expensive to the Company and dilutive to the Company's stockholders.

5. As of May 5, 2026, the Company's current market capitalization is $36.8 million.

6. I declare under penalty of perjury that the foregoing is true and correct.

Brian Parisi
Date: 5/5/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM,<br><br>    Plaintiff,<br><br>  v.<br><br>ANSON INVESTMENTS MASTER FUND LP;<br>BRIO CAPITAL MASTER FUND LTD.; BRIO<br>SELECT OPPORTUNITIES FUND, LP; CVI<br>INVESTMENTS, INC.; EMPERY ASSET<br>MASTER, LTD.; EMPERY DEBT<br>OPPORTUNITY FUND, LP; EMPERY TAX<br>EFFICIENT, LP; EMPERY ASSET<br>MANAGEMENT, LP; IROQUOIS MASTER<br>FUND LTD.; IROQUOIS CAPITAL<br>INVESTMENT GROUP, LLC; L1 CAPITAL<br>GLOBAL OPPORTUNITIES MASTER FUND;<br>M3A LP; RICHARD MOLINSKY,<br><br>    Defendants,<br><br>  -and-<br><br>KARTOON STUDIOS, INC.,<br><br>    Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

**[PROPOSED] JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE**

This matter came before the Court on Kartoon Studios, Inc.'s ("Kartoon" or the "Company") application for entry of judgment against the Settling Defendants pursuant to the Definitive Settlement Agreement dated May 6, 2026 (the "Agreement"). This Judgment incorporates by reference the definitions in this Agreement, and all capitalized terms used herein shall have the same meanings set forth in the Agreement.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:**

1

1. This Court has jurisdiction over the subject matter of this Action and over all Settling Parties.

2. The Court finds that the Board of Directors of Kartoon, being fully informed and following an arm's-length negotiation with the Settling Defendants, has duly and properly authorized the Company to enter into the Settlement. The Settling Parties are hereby directed to perform the Agreement.

3. The above-captioned action is dismissed with prejudice against each and all of the Settling Defendants (Anson Investments Master Fund LP, CVI Investments, Inc., Iroquois Master Fund Ltd., Iroquois Capital Investment Group, LLC, L1 Capital Global Opportunities Master Fund, M3A LP, and Richard Molinsky).

4. No Settling Party shall make applications against any other Settling Party or any Released Party for fees, costs, or sanctions pursuant to Rule 11, Rule 37, Rule 45, or any other court rule or statute, with respect to any claims or defenses in this Action or to any aspect of the institution, prosecution, or defense of this Action. Each Settling Party shall bear its own attorneys' fees, costs, and expenses incurred in connection with the Action and the negotiation and execution of the Agreement.

5. Upon the Release Date, each of the Releasing Parties, on behalf of themselves and their respective shareholders, owners, officers, directors, partners, members, managers, principals, employees, agents, attorneys, predecessors, successors, parents, subsidiaries, affiliates, and assigns, shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Parties, as defined in Section 4.1 of the Agreement.

6. Upon the Release Date, all Releasing Parties and any and all owners of any

Kartoon security (as defined in 17 C.F.R. § 240.3a11-1 under the Securities Exchange Act of 1934) or derivative security (as defined in 17 C.F.R. § 240.16a-1(c) under the Securities Exchange Act of 1934) shall be forever barred and enjoined from commencing, instituting, intervening in, or participating in, prosecuting, or continuing to prosecute any action or other proceeding in any court of law or equity, arbitration tribunal, administrative forum, or other forum of any kind (whether brought directly, in a representative capacity, derivatively, or in any other capacity) asserting any of the Released Claims against any of the Released Parties.

7.      Notwithstanding the foregoing, the releases set forth herein shall not include: (a) claims to enforce the terms of the Agreement; or (b) claims that arise after the date of execution of the Agreement and are not Released Claims.

8.      Neither the Agreement, nor the settlement, nor any of their terms or provisions, nor any act performed or document executed pursuant to or in furtherance of them, nor any of the negotiations or proceedings connected with them: (a) is or may be deemed to be or may be used as an admission of, concession or evidence of, the validity of any Released Claim, the truth of any fact alleged in the Action, the deficiency of any defense that has been or could have been asserted in the Action, or of any alleged wrongdoing, liability, negligence, or fault of any Settling Party or Released Party; or (b) is or may be deemed to be or may be used as an admission, concession, or evidence of any fault or misrepresentation or omission of any Settling Party or Released Party in any civil, criminal, administrative, or other proceeding before any court, administrative agency, arbitration tribunal, or other body. Any Settling Party or Released Party may file the Agreement and/or this Judgment in any other action or other proceeding that may be brought against them in order to support a defense, argument, or counterclaim based on principles of res judicata, collateral estoppel, release, judgment bar or reduction, or any other

3

ADD-61

theory of claim preclusion or issue preclusion or similar defense, argument, or counterclaim.

9.      Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of the settlement set forth in the Agreement; (b) disposition of the Settlement Payment, the Escrow Payment, and the Initial Payment; (c) all Settling Parties for the purpose of construing, enforcing, and administering the Agreement and this Judgment; and (d) all claims in the above-captioned action against the non-Settling Defendants (Brio Select Opportunities Fund, LP, Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, and Empery Asset Management, LP).

10.      There is no just reason for delay in the entry of this Judgment and immediate entry by the Clerk of the Court is expressly directed pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

**SO ORDERED.**

DATED: _____

_____
THE HONORABLE ARUN SUBRAMANIAN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

4

ADD-62

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM,<br><br>         Plaintiff,<br><br>    v.<br><br>ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; AND RICHARD MOLINSKY,<br><br>         Defendants,<br><br>    -and-<br><br>KARTOON STUDIOS, INC.<br><br>         Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO GENIUS'S MOTION FOR JUDGMENT**

Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email:  jabraham@aftlaw.com
         mklein@aftlaw.com

Evan Mandel
Robert Glunt
**MANDEL BHANDARI LLP**
80 Pine Street, 33rd Floor
New York, New York 10005
Telephone: (212) 269-5600
Email: em@mandelbhandari.com
        glunt@mandelbhandari.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 1

The Company and Jaffa ........................................................................................ 1

Anson ................................................................................................................... 3

Aaron Morris and SEG ........................................................................................ 3

Post-Summary Judgment Settlement Discussions ............................................... 5

The "Litigation Committee" ................................................................................. 5

Subsequent Developments ................................................................................... 9

ARGUMENT .................................................................................................................. 9

A.    Plaintiff Possesses a Primary Right to Pursue §16(b) Claims Which May Not Be Settled by the Company in This Action ......................................... 9

B.    Genius Fails to Demonstrate Any Principle of Federal Law Which Allows the Company to Supplant Plaintiff in This Case...................................... 11

C.    Genius Cannot Utilize State Law Principles to Supplant Plaintiff's Primary Right to Prosecute and Settle This §16(b) Claim............................... 12

D.    Even if State Law Were to Apply, Genius Has Not Carried Its Burden of Demonstrating That the Board Properly Exercised Its Business Judgment ......... 14

1.    Genius Makes No Showing of Independence........................................... 15

2.    Genius Fails to Demonstrate Good Faith................................................. 16

E.    Genius Has Otherwise Failed to Make a Record Supporting the Fairness of the Proposed Settlement...................................................................... 22

CONCLUSION................................................................................................................ 27

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*,
    9 F. App'x 53 (2d Cir. 2001) ...................................................................... 12

*Auerbach v. Bennett*,
    47 N.Y.2d 619 (1979) ................................................................................ 15

*Augenbaum v. Anson Invs. Master Fund LP*,
    2025 WL 2780854 (S.D.N.Y. Sept. 30, 2025)............................................. 4

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    845 A.2d 1040 (Del. 2004) ........................................................................ 16

*Blau v. Hodgkinson*,
    100 F. Supp. 361 (S.D.N.Y. 1951) ............................................................ 14

*Brinckerhoff v. JAC Holding Corp.*,
    263 A.D.2d 352, 692 N.Y.S.2d 381 (1st Dep't 1999) ............................... 17

*Burks v. Lasker*,
    441 U.S. 471 (1979)...................................................................... 10, 13, 14

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)................................................................................... 11

*Citadel Holding Corp. v. Roven*,
    603 A.2d 818 (Del. 1992) .......................................................................... 21

*City of Orlando Police Pension Fund v. Page*,
    970 F. Supp. 2d 1022 (N.D. Cal. 2013) .................................................... 20

*City of Pontiac Gen. Employees' Ret. Sys. v. Bush*,
    2021 WL 2588979 (N.D. Cal. June 24, 2021) ........................................... 20

*Donaldson Lufkin & Jenrette Sec. Corp. v. Star Techs., Inc.*,
    148 Misc.2d 880, 561 N.Y.S.2d 371 (N.Y. Sup. Ct. 1990), *on reargument*, 150 Misc.2d
    126, 567 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991), *aff'd*, 180 A.D.2d 495, 580 N.Y.S.2d 657
    (1st Dep't 1992) ........................................................................................ 21

*Donoghue v. Bulldog Invs. Gen. P'ship*,
    696 F.3d 170 (2d Cir. 2012)................................................................. 10, 11

*Dottenheim v. Murchison*,
    227 F.2d 737 (5th Cir. 1955) ...................................................................... 9

*Epstein v. Shindler*,
     26 F.R.D. 176 (S.D.N.Y. 1960) ....................................................... 24

*FTR Consulting Group, Inc. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*,
     2005 WL 2234039 (S.D.N.Y. Sept. 14, 2005)....................................... 24

*Gollust v. Mendell*,
     501 U.S. 115 (1991)................................................................. 9, 10, 13

*HB Gen. Corp. v. Manchester Partners, L.P.*,
     95 F.3d 1185 (3d Cir. 1996)......................................................... 11

*In re Par Pharm., Inc. Derivative Litig.*,
     750 F. Supp. 641 (S.D.N.Y. 1990) .................................................. 16

*In re XO Commc'ns, Inc.*,
     330 B.R. 394 (Bankr. S.D.N.Y. 2005)............................................... 10

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
     411 F. Supp. 2d 458 (S.D.N.Y. 2006)............................................... 11

*Jain v. J.P. Morgan Sec., Inc.*,
     177 P.3d 117 (Wash. App. 2008)................................................... 20

*Jones v. Nuclear Pharmacy, Inc.*,
     741 F.2d 322 (10th Cir. 1984) ...................................................... 12

*Joy v. North*,
     692 F.2d 880 (2d Cir.1982), cert. denied, 460 U.S. 1051 (1983) .................... 16

*Kahn v. Tremont Corp.*,
     694 A.2d 422 (Del. 1997) ........................................................... 17

*Kamen v. Kemper Fin'l Servs., Inc.*,
     500 U.S. 90 (1991).................................................................. 15

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*,
     906 F.3d 215 (2d Cir. 2018)......................................................... 12

*Levner v. Saud*,
     903 F. Supp. 452 (S.D.N.Y. 1994), *judgment aff'd*, 61 F.3d 8 (2d Cir. 1995) ......... 13

*Levy ex rel. Mktg. Servs. Grp., Inc. v. General Elec. Cap. Corp.*,
     2001 WL 987873 (S.D.N.Y. Aug. 30, 2001)......................................... 24

*Levy v. Gen. Elec. Capital Corp.*,
     2002 WL 1225542 (S.D.N.Y. June 4, 2002) ......................................... 23

*Lewis v. Wells*,
    325 F. Supp. 382 (S.D.N.Y. 1971) ................................................................ 14

*Magida v. Cont'l Can Co.*,
    231 F.2d 843 (2d Cir. 1956)........................................................................ 13

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
    471 F.3d 377 (2d Cir. 2006)........................................................................ 12

*Matter of DISH Network Deriv. Litig.*,
    133 Nev. 438 (2017) ....................................................................... 15, 16, 19

*Mendell In Behalf of Viacom, Inc. v. Gollust*,
    909 F.2d 724 (2d Cir. 1990)........................................................................ 13

*Molybdenum Corp. of Am. v. Int'l Min. Corp.*,
    32 F.R.D. 415 (S.D.N.Y. 1963) ................................................................... 23

*Morales v. Quintel Ent., Inc.*,
    249 F.3d 115 (2d Cir. 2001)........................................................................ 25

*Moses v. New York Times Co.*,
    79 F.4th 235 (2d Cir. 2023) ........................................................................ 24

*Nedick's Stores, Inc. v. Genis*,
    34 F.R.D. 235 (S.D.N.Y. 1963) ................................................................... 23

*Orchard Hotel LLC v. D.A.B. Grp. LLC*,
    172 A.D.3d 530 (1st Dep't 2019) ................................................................ 19

*Pellegrino v. Nesbit*,
    203 F.2d 463 (9th Cir. 1953) ................................................................ 13, 14

*Penske Media Corp. v. Shutterstock, Inc.*,
    548 F. Supp. 3d 370 (S.D.N.Y. 2021)........................................................... 22

*Playboy Enters., Inc. v. Dumas*,
    960 F. Supp. 710, 720 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) ................. 23

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*,
    687 F. Supp. 2d 381 (S.D.N.Y. 2010)........................................................... 23

*Revive Investing LLC v. FBC Holdings S.A.R.L.*,
    2021 WL 56905 (S.D.N.Y. Jan. 7, 2021) .......................................... 22, 23, 24

*Revive Investing LLC v. FBC Holdings S.A.R.L.*,
    2021 WL 734976 (S.D.N.Y. Feb. 25, 2021), *as amended* (Feb. 26, 2021) ................ 22, 23

*Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC*,
    286 F. Supp. 2d 279, 282 (S.D.N.Y. 2003)........................................................ 10

*Segen v. Comvest Venture Partners, LP*,
    2005 WL 1320875 (D. Del. June 2, 2005)......................................................... 14

*Sutherland v. Sutherland*,
    968 A.2d 1027 (Del. Ch. 2008)......................................................................... 20

*Transunion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................................... 10

*Volk v. Zlotoff*,
    285 F. Supp. 650 (S.D.N.Y. 1968) .................................................................... 14

*William J. Jenack Est. Appraisers & Auctioneers, Inc. v. Rabizadeh*,
    22 N.Y.3d 470 (2013) ....................................................................................... 15

**Statutes, Rules & Regulations**

15 U.S.C. §77k(a) .................................................................................................... 19

15 U.S.C. §77l(a)(2).................................................................................................. 19

15 U.S.C. §78j(b) ..................................................................................................... 19

15 U.S.C. §78p(b) ...............................................................................................*passim*

15 U.S.C. §78r(a) ..................................................................................................... 19

15 U.S.C. §80a-35(b) ............................................................................................... 13

Fed. R. Civ. P. 17................................................................................................ 11, 13

Fed. R. Civ. P. 23(e)(2)............................................................................................ 24

Fed. R. Civ. P. 23.1.................................................................................................. 16

Fed. R. Civ. P. 24..................................................................................................... 13

Fed. R. Civ. P. 7(b)(1)(A)........................................................................................ 22

FRE 502(d)................................................................................................................. 6

FRE 801(c)................................................................................................................ 16

**Other Authorities**

Arnold S. Jacobs,
   1 *Section 16 of the Securities Exchange Act* (September 2025 Update)..................... 10, 25

Arnold S. Jacobs,
   5A *Disclosure & Remedies Under the Sec. Laws* (Dec. 2025 Update) ........................... 13

Guy P. Lander,
   *14A U.S. Sec. Law for Financial Trans.* (2d ed. Dec. 2025 Update)................................ 25

Plaintiff respectfully submits this memorandum of law in opposition to the judgment sought by Genius Brands International, Inc., n/k/a Kartoon Studios, Inc. ("Genius" or the "Company") (Dkt. 359, the "Motion"; Dkt. 360, the "Memo.").[1]

## PRELIMINARY STATEMENT

In the 90 years since Congress enacted Section 16(b), no corporate issuer in the position of Genius has ever been permitted to settle a §16(b) claim without the support of shareholder-plaintiff bringing the underlying claim the issuer had rejected precisely because the structure of the statute as well as controlling precedent preclude issuers from doing so. Even aside from its tactic being precluded, the record Genius placed before this Court does not even come close to establishing that the proposed settlement is fair and reasonable or that the purported process used to achieve the "Proposed Settlement" was the product of independent or good faith process. Therefore, and as discussed in greater detail below, Genius's motion should be denied in its entirety.

## STATEMENT OF FACTS

**The Company and Jaffa**

Genius has "a history of operating losses and incurred net losses in each fiscal quarter since [its] inception[,]" having recorded cumulative losses of more than $695 million since 2020, losing: $401,670,000 in 2020; $126,291,000 in 2021; $45,595,000 in 2022; $77,103,000 in 2023; $20,739,000 in 2024 and; $24,532,000 in 2025. *See* 2025 Form 10-K at 10, F-6; 2023 Form 10-K at 63; 2021 Form 10-K at F-6.[2] Despite having raised $117.5 million in 2020 in the transactions at issue in this litigation and a subsequent transaction in October 2020 (2020 Form 10-K at 21-22)

---

[1] Terms undefined herein are defined in the Motion or Memo. "Exhibit #" refers to exhibits to the Declaration of Jeffrey S. Abraham (the "Abraham Declaration" or "Abraham Decl.").

[2] Genius's SEC filings are available at https://www.sec.gov/edgar/browse/?CIK=1355848.

1

and ending 2021 with $115.1 million in working capital, Genius has been in a precarious financial condition for at least the past two years. 2021 Form 10-K at 1; 2025 Form 10-K at 9.

Notwithstanding these uniformly poor results, Genius has repeatedly proclaimed that coming developments would be "transformative" or constitute "transformational" developments including the Company's:

- 2016 deal with Sony (2/25/2016 Form 8-K at Ex. 99.1);

- projected 2016 financial outlook (11/18/2015 Form 8-K at Ex. 99.1);

- 2017 launch of *Kid Genius Cartoons Plus!* (9/28/2017 Form 8-K at Ex. 99.1);

- 2018 launch of *Rainbow Rangers* on Nickelodeon (11/21/2018 Form 8-K at Ex. 99.1);

- 2019 partnership with Alibaba (10/16/2019 Form 8-K at Ex. 99.1);

- 2021 acquisition of ChizComm (11/17/2020 Form 8-K, Ex.99.1 & Ex.10.1; 2020 Form 10-K at 19; 2/02/2021 Form 8-K at Ex.99.1);

- 2021 acquisition of WOW! Unlimited Media Inc. (10/27/2021 Form 8-K at Ex. 99.1);

- overall performance in 2023 (Apr. 9, 2024 Form 8-K at Ex. 99.1); and

- 2025 partnership with Nvidia (11/14/2025 Form 8-K at Ex. 99.1).

In October 2025 Genius sold 42% of its equity for approximately $7.3 million, valuing the Company at approximately $17.4 million. 2025 Form 10-K at 25-26. Genius made that sale without disclosing in any Securities and Exchange Commission ("SEC") filing the potential range of recovery in this litigation despite subsequently acknowledging that this action is its largest corporate asset. Dkt. 360 at 14. In contrast, Genius has been punctilious about disclosing the amounts sought in the indemnification lawsuits filed by Empery and Iroquois – which Plaintiff believes are frivolous, *see infra* at pp.20-21. 2025 Form 10-K at F-47.

2

Genius has also been continuously hostile toward Plaintiff's claims by not only rejecting Plaintiff's demand on which Defendants relied in moving to dismiss, but gratuitously disparaging the §16(b) claim as "unsupported by any facts," "quite remarkable" and "improbable". Dkt. 96-6 at pp.2-6, Dkt. 97 at 8. Michael Jaffa ("Jaffa"), Genius's General Counsel, has been at the forefront of that hostility by providing a declaration which was Exhibit 1 to Defendants' summary judgment motion (Dkt. 232 ¶1), implying that Defendants considered it to be their very best piece of evidence.   Jaffa's Declaration swears that the Company never considered Defendants to be acting as a group and that Plaintiff's allegations are "without merit[.]" Dkt. 232-1 at ¶¶1, 8, 16. Jaffa, as general counsel, is also presumably responsible for the contents of Genius's recent SEC filings, which seem aimed at depressing the Company's stock price, with Genius contending that its market capitalization supports the Proposed Settlement. *See* Nov. 28, 2025, Form 8-K, Dkt. 360 at pp.2, 13, 16 n.6.

**Anson**

Anson is exposed to a potential judgment of $191.4 million plus pre-judgment interest in this action. Dkt. 323-29 ¶¶40-41. Anson has a long history of working closely with Genius (Dkt. 235 (Defendants' R.561. Statement) at ¶25) and provided the funds for the October 2025 capital raise, giving it an up-to-42% equity interest in Genius. December 10, 2025 Prospectus [Rule 424(b)(3)] (available on EDGAR). As part of that financing, Anson has contractual rights enabling it to restrict Genius's ability to obtain additional financing for the next two years. 2025 Form 10-K at 10. The risk which Genius has identified from failing to obtain additional funding is the need "to modify our business plans accordingly." *Id*.

**Aaron Morris and SEG**

Aaron Morris ("Morris") of Morris Kandinov LLP represents Special Equity Group ("SEG") in this action, including defending SEG's Rule 30(b)(6) deposition through Jonathan

3

Shechter and being listed as counsel in responding to Plaintiff's subpoena. Dkt. 232-16, Abraham Decl. ¶2. Genius has an ongoing dispute concerning the excessive attorneys' fees claimed by SEG with respect to its indemnification agreement in this case. 2025 10-K at F-48; *see also* May 15, 2026 Form 10-Q at p.45 (as a result of Morris's representation of SEG in this case, "SEG has presented bills for legal expenses totaling several hundred thousand dollars, ***a figure that the Company views as excessive***.") (emphasis added).

Defendants are repeat clients of SEG, which views them as "friends and family." Dkt. 226-1 at 404-11. Shechter is listed as a trial witness (*see* Dkt. 237 at Exs. 2, 3 (witness lists)), which is unsurprising given that SEG played a central role in this case, as "discovery has uncovered a trove of messages between SEG, Heyward, and defendants in the lead up to the March 2020 transaction and afterwards." *Augenbaum v. Anson Invs. Master Fund LP*, 2025 WL 2780854, at *5-6 (S.D.N.Y. Sept. 30, 2025) (cleaned up).

Nor is there any question that Morris Kandinov has an irreconcilable conflict of interest: While SEG testified in this action that it would be devastating for SEG's business if Plaintiff prevailed, Genius's shareholders obviously want to yield the maximum value from the company's largest asset. As Schecter testified at SEG's deposition in this matter: "It would be better for the industry if the defendants were found not liable." (Dkt. 232-16 (("Schecter Tr.") at 353:19-24.) If an issuer's CEO is found to be part of a §16(b) group alongside investors, "[i]t would be impossible to conduct my business" (*id.* at 42:2-11.) – or at least the way business is conducted by SEG. Schecter testified that companies would necessarily go bankrupt if investors are not permitted to do what Defendants did in this case (*id.* at 63:13-65:6) and that it is more efficient for investors to coordinate with each other by having their lawyers edit the transaction documents. *Id.* at 74:15-75:7. Similarly, with respect to voting agreements – which have been previously been found to

4

create a group in many §16(b) cases – Schecter claimed that it is "imperative" that key shareholders signed one here to support Defendants' transactions. *Id.* at 268:10-269:5.

**Post-Summary Judgment Settlement Discussions**

Shortly after the Court's summary judgment decision, Plaintiff engaged in an in-person mediation session with CVI facilitated by Mr. Murphy. Abraham Decl. ¶3. Discussions with CVI stalled soon after that mediation.

On December 11, after Plaintiff had reached out to Anson, it communicated an opening offer of $35 million subject to a most-favored-nation clause ("MFN"). This represents "21% of the claimed damages on a Chevron basis" (Abraham Decl. ¶6 and Exhibit 3), which is approximately 70% more than the $21,204,034.25 Anson is now offering to pay in the Proposed Settlement. Abraham Decl. ¶2, Dkt. 360-1 at Exhibit A.

On February 24, faced with settlement talks stagnating, Plaintiff reached out to CVI with Plaintiff ultimately being informed that CVI was still willing to settle the case for $7.5 million, which Plaintiff calculates as 28.1% of CVI's *Chevron*-based disgorgement. Abraham Decl. ¶¶11, 12, Exhibit 9.

Plaintiff separately reached out to Iroquois and had an in-person meeting with Iroquois's counsel (without Mr. Murphy). At that meeting, Iroquois's counsel withdrew an earlier settlement offer, perhaps because Defendants had decided they would instead attempt to cut a deal with Genius. Abraham Decl. ¶4.

**The "Litigation Committee"**

On January 30, 2026, Genius's Board formed the Litigation Committee, retaining Morris as counsel with "in coordination with Jaffa" before its first meeting on February 2, 2026. Exhibit 4, Exhibit 5. The purported trigger for forming the Committee was the indemnification action filed by Iroquois. Memo. at 1. Genius then chose to retain new counsel to represent it in the

5

indemnification action even though Vinson & Elkins LLP had been actively fending off those claims for years. *See, e.g.*, Abraham Decl. ¶¶5, 21, Exhibit 2, Exhibit 13.

On February 6, 2026, Morris informed Plaintiff that he was counsel for the Litigation Committee and asked to arrange a time to speak about Plaintiff's strategic thinking "in the coming weeks." Exhibit 6. Morris declined to provide the minutes evidencing the Committee's formation and actions unless Plaintiff signed a stipulation pursuant to FRE 502(d), which Morris promptly provided. Plaintiff declined to enter because doing so could potentially tie Plaintiff's hands in opposing the settlement, which it seemed that Morris was intent on pushing through. Exhibit 6.

On February 13, 2026, Morris sent Plaintiff the January 30, 2026 minutes establishing the Committee while stating that the minutes reflecting Morris's engagement would be provided when finalized. Exhibit 7. On February 20, 2026, Plaintiff's counsel inquired regarding the Morris engagement minutes to which Morris proposed a call the next week and then on February 24, 2026, stated that "there's no immediate urgency." Exhibit 6.

On March 4, 2026, Morris informed Plaintiff that he believed the Committee would be retaining Jay Lefkowitz to negotiate for the Committee, while Morris would remain counsel for the Company. Abraham Decl. ¶13. The Committee's March 9, 2026, minutes state that after considering, among other things, "the apparent unwillingness of defendants to discuss resolution in the absence of separate counsel [from Morris], and the potential that counsel for plaintiff may make similar arguments, the Committee determined to engage Mr. Lefkowitz to handle negotiations, if any, with the *Augenbaum* parties." Exhibit 10.

On March 10, 2026, Lefkowitz, who had not been engaged until at the earliest the day before, asked for a ten-minute call. Exhibit 11. During a call on March 11, 2026, Lefkowitz stated he wanted to speak to Plaintiff's counsel "before [he] dove into" getting up to speed and

6

negotiating. Abraham Decl. ¶16. On March 18, 2026, Lefkowitz stated during a telephone call with Plaintiff's counsel that he had only started reviewing the summary judgment filings but was actively negotiating with Defendants and could see reaching a settlement of $40-$50 million. Abraham Decl. ¶17. Plaintiff explained that the amount of the Proposed Settlement was below the range of reasonableness, that: there were different strengths and weaknesses for each Defendant and, in particular, lumping Anson together with other Defendants is value-destructive given the strength of the evidence against Anson; that Plaintiff had been attempting to engage with Defendants individually to see if settlements could be reached; and, that before the Committee had appeared, Plaintiff had settlement offers indicating a far higher recovery. Abraham Decl. ¶16.

On April 8, 2026, Morris, acting on behalf of the Committee, requested a video meeting with Plaintiff. Exhibit 6. On April 13, 2026, Plaintiff's counsel wrote to Morris stating, among other things, that a meeting would be unproductive because it was apparent that Genius had already agreed to a settlement Plaintiff believed to be inadequate. Plaintiff also once again raised the issue of Morris's conflict given his firm's representation of SEG and the ongoing indemnification dispute with Genius in which Morris appeared to have a direct financial interest. *See* Exhibit 6. On April 16, 2026, Morris expressed outrage at any suggestion of conflict but as previously mentioned, certain Defendants expressed concern over the same issue. *See* Exhibit 6, Exhibit 10.

On April 20, 2026, Plaintiff's counsel participated in an approximately one-hour telephone conference call with Committee member Schlesinger as well as Jaffa and Morris but which Lefkowitz did not attend. Exhibit 6, Abraham Decl. ¶18. On April 22, 2026, following an unsuccessful effort to arrange a call with Mr. Murphy to discuss settlement issues, Lefkowitz demanded that Plaintiff provide a global counter-offer – rather than ones directed to the individual Defendants' settlement offers – otherwise Genius would move for Court approval. Abraham Decl.

ADD-76

¶19. Lefkowitz initially refused to provide those amounts, but on April 24 stated that Plaintiff could figure out the amount that each Defendant would be applying based upon pro-rating the settlement amount to the total *Chevron*-based disgorgement, and on April 27 stated that Brio and Empery were not parties to the Proposed Settlement. Exhibit 12. Plaintiff offered to speak with Mr. Murphy, who in response to an email then offered evening times, but notwithstanding Plaintiff's stated willingness to have the meeting, no meeting took place. Exhibit 12; Abraham Decl. ¶20. To remove any doubt that Plaintiff's prior statements had been misunderstood, on May 3, Plaintiff wrote to Messrs. Lefkowitz and Morris explaining that the proposed settlement was well below the amounts being previously discussed with Anson and CVI. Abraham Decl. ¶23 & Exhibit 15.

On May 4, during a telephone status conference with the Court addressing CVI's stay request, Morris stated that a stay was also appropriate because Genius had agreed to a proposed settlement which it planned to present to the Court with a fulsome record. On May 6, Morris filed its motion for dismissal of the claims against the six proposed settling Defendants for $37 million based upon an aggregate settlement value of $50 million if all Defendants joined (Dkt. 360 at 1), representing approximately 13.77% of the potential *Chevron*-based disgorgement of $363,079,218. Dkt. 232-31 at Table 6. Jaffa provided a supporting declaration, *inter alia,* referencing an April 6, 2026, memo which is not attached and alluded to discussions with Mr. Murphy, suggesting he was involved in negotiating the Proposed Settlement (Dkt. 360-1 ¶¶3, 4, 6, 9) when, in fact, that is at best misleading. Tr. at 16:25-17:13.

On May 13, a counsel for Brio stated in Court that Brio would be joining the settlement on a proportional basis. Tr. at 39:4-22. However, the $2,500,000 which Brio apparently agreed to pay, in fact, amounts to approximately 7% of its *Chevron*-based disgorgement of $35,620,470. Dkt.

8

232-31 at Table 6. Empery has stated that it is not interested in settling this litigation. Abraham Decl. ¶25.

**Subsequent Developments**

At the May 13 Status Conference, the Court suggested a process by which Plaintiff would make settlement demands treating the amounts contained in the Proposed Settlement as opening offers and Defendants would respond by Monday, May 18. Tr. at 46:17-49:11. On May 14, Plaintiff made those individual settlement demands which he also communicated to Mr. Murphy. Abraham Decl. ¶25. On Monday, May 18, Plaintiff reached a settlement with L1 Capital – the only Defendant that moved for reconsideration of the Court's summary judgment order (Dkt. 292) – for $3,550,000 representing an approximately 50% bump from the amount agreed to by the Litigation Committee. Abraham Decl. ¶25.

**ARGUMENT**

**A.    Plaintiff Possesses a Primary Right to Pursue §16(b) Claims Which May Not Be Settled by the Company in This Action**

Section 16(b) is pellucid in stating that the relevant federal interest as being "[f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner…." 15 U.S.C. §78p(b). Congress chose to vest control over §16(b) actions with the securityholder, *i.e*, Plaintiff, once the issuer, *i.e.,* Genius, fails to act on a demand within sixty days. 15 U.S.C. §78p(b). Congress acted intentionally in doing so as the Supreme Court explained to create "a private-profit motive" in "making ***the stockholders its policemen***." *Gollust v. Mendell*, 501 U.S. 115, 124-25 (1991) (cleaned up, emphasis added).

Congress accomplished its goal by "creat[ing] a new cause of action, which, while similar in some respects to a secondary or derivative right, is … in reality a primary right." *Dottenheim v. Murchison*, 227 F.2d 737, 738 (5th Cir. 1955). Indeed, it is hornbook law that a "a Section 16(b)

9

cause of action is a statutorily created right, not a derivative or secondary right." Arnold S. Jacobs, 1 *Section 16 of the Securities Exchange Act* §3:35 (September 2025 Update).[3] This statutory structure of §16(b) when combined with the statute being an express private right of action precludes a corporate issuer from obtaining dismissal of a plaintiff-shareholder's claim. *Burks v. Lasker,* 441 U.S. 471, 584 & n.13 (1979); *accord Burks*, 441 U.S. at 487 (Stewart, J., concurring) (disagreeing with majority opinion and, instead, opining that to the extent federal law is silent on the issue state law should apply without regard to issues of federal policy).

*Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 176 (2d Cir. 2012), does not alter this analysis notwithstanding the Court's concern that the case potentially "leaves the question open as to why the issuer should not be able to, as the real party in interest, step into the case if circumstances arise that might make it fair and equitable for the issuer to intervene" such as if the stockholder stopped prosecuting the case diligently. Tr. at 8:19-9:15. Plaintiff respectfully submits that the only holding in *Donoghue* is that a §16(b) action is sufficiently similar to common law breach of fiduciary duty claim to provide the "close historical or common-law analogue" providing for Article III standing consistent with the Supreme Court's decision in *Transunion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Plaintiff also respectfully submits that the issuer, *i.e.*, Genius, being a real party in interest has been, as previously discussed, a feature of §16(b) since its very inception with the corporate issuer receiving any net recovery.

---

[3]    *See also Chechele v. Elsztain,* explaining that "a § 16(b) cause of action is a statutory enabling right directly empowering the shareholder to sue; it is not a derivative or secondary right grounded on rights and interests possessed primarily by the corporation and emanating from common law." 2012 WL 12358221, at *2 (S.D.N.Y. Aug. 1, 2012); *Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC*, 286 F. Supp. 2d 279, 282 (S.D.N.Y. 2003) (explaining that "§ 16(b) cause of action is a statutory enabling right directly empowering the shareholder to sue; it is not a derivative or secondary right grounded on rights and interests possessed primarily by the corporation and emanating from common law."); *In re XO Commc'ns, Inc.*, 330 B.R. 394, 426 (Bankr. S.D.N.Y. 2005) ("the statutory right of the security holder to commence a Section 16(b) cause of action is not derivative of any right of the corporation" and such a claim "does not simply revert to the corporation's estate upon its filing of bankruptcy").

*Donoghue* also recognizes that "the statute authorizes two categories of private persons to sue for relief: (1) 'the issuer' of the security traded in violation of §16(b); *or* (2) 'the owner of any security of the issuer in the name and in behalf of the issuer,' but only 'if the issuer shall fail or refuse to bring such suit within sixty days after the request or shall fail diligently to prosecute the same thereafter.'" 696 F.3d at 174 (quoting 15 U.S.C. § 78p(b)). Accordingly, Plaintiff is also a real party in interest because he is "a party authorized by statute" to pursue the claim. Fed. R. Civ. P. 17(a)(1)(G). Having more than one real party in interest within the meaning of federal law is not unusual because "[t]here may be multiple real parties in interest for a given claim." *HB Gen. Corp. v. Manchester Partners, L.P.*, 95 F.3d 1185, 1196 (3d Cir. 1996); *accord Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 411 F. Supp. 2d 458, 462 (S.D.N.Y. 2006) ("Defendants are wrong in supposing that there can be only one real party in interest … the question whether one or more than one person or entity is a real party in interest with respect to any given claim depends upon whether substantive law gives one or more than one person a right to enforce that claim.").

**B.    Genius Fails to Demonstrate Any Principle of Federal Law Which Allows the Company to Supplant Plaintiff in This Case**

This Court enquired whether there were any circumstances under which a corporate issuer could reassume control of a §16(b) action. Tr. at 8:11-10:10. The statute does not provide for any such action and, therefore, the presumption must be in the context of the federal securities laws that no such right exists. *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191-92 (1994) (applying the principle of *expressio unius est exclusio alterius* to interpreting the Securities Exchange Act of 1934).

Plaintiff at the status conference stated that a corporate issuer could potentially intervene in the action. Tr. at 12:1-7. However, any such action would necessarily be governed by Fed. R.

11

Civ. P. 24, which is a provision of federal law that does not seem inconsistent with §16(b). However, Genius has not moved to intervene and Plaintiff believes any such intervention motion is necessarily dependent, among other things, on Plaintiff not having been diligent in prosecuting these claims. Tr. at 12:5-13:10; *see also MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389, 391 (2d Cir. 2006). There are other issues such as timeliness but in the absence of Genius even attempting to address those issues, it is difficult for Plaintiff to respond though he notes it is now more than four years since he filed this case and there is a two-year limitations period for §16(b) actions. 15 U.S.C. §78p(b).

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.,* 906 F.3d 215, 218 (2d Cir. 2018), cited by Genius (Memo. at 10) – without mentioning that the decision is based upon Rule 17 – is not on point because *Klein* allowed realignment in a §16(b) action where the plaintiff had lost Article III standing to pursue the claims. *AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*, 9 F. App'x 53, 54 (2d Cir. 2001), also cited by Genius (Memo. at 12), is similarly not on point because Rule 17 was used to assume control over §16(b) claims assigned as part of a bankruptcy reorganization, in which the plaintiff had similarly lost standing.[4]

### C.  Genius Cannot Utilize State Law Principles to Supplant Plaintiff's Primary Right to Prosecute and Settle This §16(b) Claim

Genius apparently seeks to rely on Nevada state law for its purported authority to propose a settlement in this action based upon the purported exercise of business judgment informed by the Litigation Committee's deliberations. *See* Memo. at 13-14. The most direct statement of why it cannot do so is a matter of hornbook law, explaining that while "[i]n derivative actions, the

---

[4]    *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324-26 (10th Cir. 1984), which Genius cites as approving Section 16(b) settlement negotiated by one of the plaintiffs and approved by a special litigation committee over the objections of other stockholders, does not stand for the proposition that Genius can settle a plaintiff's claims with or without *any* plaintiff either by way of intervention under Rule 24 or through realignment under Rule 17.

12

general rule is that the board of directors, in the exercise of good faith and reasonable business judgment, can determine whether the best interests of the entity and its stockholders would be served by engaging in litigation[, t]he express language of Section 16(b) renders this general rule inapplicable to Section 16(b) suits." Arnold S. Jacobs, 5A *Disclosure & Remedies Under the Sec. Laws* §4:182 at text accompanying nn.10-11 (Dec. 2025 Update) (citing *Pellegrino*, *supra*; *Levner v. Saud*, 903 F. Supp. 452, 455 n.2 (S.D.N.Y. 1994), *judgment aff'd*, 61 F.3d 8 (2d Cir. 1995)).

*Burks* is on point in refusing to allow the business judgment rule – including through the use of a special litigation committee – to affect claims under the express private right of action created by 15 U.S.C. §80a-35(b), because doing so would pose a "significant threat to an[ ] identifiable federal policy or interest[.]" 441 U.S. at 479. *Burks* places §16(b) actions within the scope of those express federal private rights of action which are not governed by state law principles including a board's exercise of business judgment. 441 U.S. at 484 & n.13.

*Magida v. Cont'l Can Co.*, 231 F.2d 843, 846-47 (2d Cir. 1956), also precludes Genius from taking control of the case from Plaintiff. Although the Court viewed the case as distinguishable (Tr. at 8:11-18), Plaintiff respectfully submits that *Magida* also represents a case in which a corporate issuer attempted to seize control and terminate albeit through a majority vote of shareholders. The Second Circuit held that the corporate issuer could not do so because after board refusal a plaintiff-shareholder's right to act "cannot be estopped by corporate acts." *Id.* at 846-47; *see also Mendell ex rel. Viacom, Inc. v. Gollust*, 909 F.2d 724, 729 (2d Cir. 1990), *aff'd sub nom. Gollust v. Mendell*, 501 U.S. 115 (1991). Accordingly, courts addressing the issue consistently hold the business judgment rule does not apply to settling §16(b) actions. *See, e.g., Pellegrino v. Nesbit*, 203 F.2d 463, 466-67 (9th Cir. 1953); *Segen v. Comvest Venture Partners,*

13

*LP*, 2005 WL 1320875, at *4 (D. Del. June 2, 2005) (rejecting an attempt to use the business judgment rule to dismiss a §16(b) claim).

The business judgment rule being inconsistent with the express private right of action provided by §16(b) actions is also evident in Congress allowing shareholders to intervene in a §16(b) action instituted by the issuer where the company is not diligently prosecuting the claim. 15 U.S.C. §78p(b). Thus, the company's duty is not merely to determine diligently whether prosecution of the suit should continue, but, rather, the company has a duty diligently to prosecute the suit." *Pellegrino*, 203 F.2d at 467. This is because "the opportunity for evasion of the statutory policy is obvious" and that deferring to directors "would ***frustrate the apparent congressional intent***, in providing for stockholder action, to create statutory safeguards against complete control by corporate management of Sec. 16(b) suits." *Id*. at 466-67.

Instead, absent judicial approval, an issuer-negotiated settlement without court approval functions as a dollar-for-dollar setoff. *See, e.g., Lewis v. Wells*, 325 F. Supp. 382, 386 (S.D.N.Y. 1971); *Volk v. Zlotoff*, 285 F. Supp. 650, 657 (S.D.N.Y. 1968); *Blau v. Hodgkinson*, 100 F. Supp. 361, 370 (S.D.N.Y. 1951). Genius's effort to distinguish those cases as involving unquestioned liability represents a distinction without a meaningful difference because even in cases of certain liability business judgment considerations can still be present in terms of such matters as the cost of continued litigation, the distraction to management and the need to maintain good relationships with corporate constituencies. *See, e.g.*, *Burks,* 441 U.S. at 474 (discussing business judgment considerations which would otherwise motivate litigation decisions).

**D.    Even if State Law Were to Apply, Genius Has Not Carried Its Burden of Demonstrating That the Board Properly Exercised Its Business Judgment**

Even if state law does apply – and it clearly does not – Nevada law only allows a board to settle a stockholder derivative claim is premised on the business judgment rule. *See, e.g.*, *Matter*

14

*of DISH Network Deriv. Litig.*, 133 Nev. 438, 443 (2017).[5] Nevada follows New York in requiring directors seeking to impose their business judgment to stockholder derivative claim must establish they acted independently and conducted a good-faith, thorough investigation. *Matter of DISH Network Deriv. Litig.*, 133 Nev. at 445 (citing *Auerbach v. Bennett*, 47 N.Y.2d 619, 631-34 (1979)). "This burden is a heavy one" and the "facts must be viewed in the light most favorable to the non-moving party." *William J. Jenack Est. Appraisers & Auctioneers, Inc. v. Rabizadeh*, 22 N.Y.3d 470, 475 (2013) (citations omitted).

Genius has not even sought such a determination from this Court. And, if it had, notwithstanding Morris's stating during the May 4 status conference that Genius would provide a robust record supporting the Motion, the record consists of a sworn statement about finances by Genius's CFO, and another declaration by Jaffa suggesting the committee met four times, without including any relevant minutes of meetings or other analyses purportedly conducted by the Board or the Committee – of which Jaffa is not a member. *See* Dkt. 360-1. Jaffa's declaration fails **in its entirety** because it does not establish first-hand knowledge of the meetings, conversations, and memoranda referenced, causing it to have no probative value and making it inadmissible hearsay under FRE 801(c). However, even assuming *arguendo* that Jaffa's declaration is admissible, it still fails to demonstrate either independence or good faith, especially because there is ample evidence to the contrary.

### 1. Genius Makes No Showing of Independence

Genius asserts that "the settlement was negotiated directly by the independent, empowered managers of the Company…." Memo. at 14. Plaintiff assumes that the reference to "managers" is intended to be to the corporate directors or, at the very least, the members of the Committee, who

---

[5] Genius is incorporated in Nevada (Dkt. 232-32 at 1), so Nevada law would control relevant State law issues in this case. *Kamen v. Kemper Fin'l Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

are authorized under Nevada law to make corporate decisions. However, there is no factual showing of the independence of any director. Instead, Jaffa's declaration only mentions Jeffrey Schlesinger and Anthony Thomopoulos as members of the Litigation Committee who addressed the Board. ¶¶3, 11, 12. That is insufficient for the Court to find the Litigation Committee or the Board (which retained ultimate authority to decide) carried its heavy burden of independence by "a yardstick that must be 'like Caesar's wife'—'above reproach.'" *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004). Indeed, traditionally that burden is met by directors filing declarations establishing their independence. *See Matter of DISH Network Derivative Litig.*, 133 Nev. at 445 ("Based on the evidence before it, the district court ultimately found that the SLC was independent").

### 2. Genius Fails to Demonstrate Good Faith

A substantial showing of a good faith investigation necessary to warrant dismissal also has not been made because, as an initial matter, the Company's submission is shy on details. Thus, although Jaffa references an April 6 memo to the Committee discussing the litigation, Genius and Jaffa declined to include any such memo and, for that matter, any minutes of meetings in which the matter was purportedly considered. Those materials are routinely presented to courts when a Board or special litigation committee is attempting to establish that it acted in good faith. *See, e.g.*, *Joy v. North*, 692 F.2d 880, 893 (2d Cir.1982), cert. denied, 460 U.S. 1051 (1983) (reversing an order placing a SLC's report under seal and explaining "We simply do not understand the argument that derivative actions may be routinely dismissed on the basis of secret documents. We cannot say what the effect on investor confidence would be if special litigation committees were routinely allowed to do their work in the dark of night."); *In re Par Pharm., Inc. Derivative Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990) (a SLC's failure "to document in any manner its procedures, reasoning or conclusions" is fatal to its motion for judgment); *Brinckerhoff v. JAC Holding Corp.*,

16

263 A.D.2d 352, 353, 692 N.Y.S.2d 381, 382 (1st Dep't 1999) (a SLC report that is "a mere two pages in length with respect to the subject transaction, and failed to document the special committee's procedures, reasoning and conclusions, thus effectively insulating its investigation from scrutiny by the courts" is entitled to no deference).

Moreover, Morris's representing SEG in this litigation creates such an obvious conflict that there is no reasonable possibility that good faith could ever be established. As the Court observed, "if you are thinking about putting the settlement together, ***the first thing you would not want to do is to hire a law firm that had previously represented SEG***, given the allegations the plaintiffs are raising in this case, where SEG is right in the middle of it." Tr. at 16:4-11 (emphasis added). As discussed above, Morris's irreconcilable conflict is confirmed by SEG's own testimony stating that this action is an existential threat to its entire business. This is consistent with the Delaware Supreme Court holding that "professional advisors have the ability to influence directors who are anxious to make the right decision but who are often *in terra cognito*" and sometimes "the selection of professional advisors for the Special Committee doesn't give comfort; it raises questions." *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997).[6] "[T]he circumstances surrounding the retaining of the Special Committee's advisors, as well as the advice given, cast serious doubt on the effectiveness of the Special Committee." *Id.* at 429. As a result, the Delaware Supreme Court reversed the Chancery Court's finding of fairness because the record showed that "[f]rom its inception, the Special Committee failed to operate in a manner which would create the appearance of objectivity in" its decisions. *Id.* at 430.

Genius attempted to explain away Morris's obviously problematic representation as being intended "to leverage [Morris's] knowledge [and] familiarity with the factual background of the

---

[6]    Genius concedes the Court should look to Delaware courts for guidance on corporate law issues. Memo. at 12 n.5.

case" for efficiency purposes. *Id.* at 16:12-17. That contention cannot withstand even gentle scrutiny because:

(i)     it fails to explain why Vinson & Elkins was sidelined with respect to settlement and indemnification issues even though Michael Charlson is experienced at precisely the type of investigation one would expect a litigation committee to perform (Abraham Decl. ¶27), and is knowledgeable about both the facts of this case and the issues relating to indemnification (Abraham Decl. ¶5 & Exhibit 2);

(ii)    the reason Morris as SEG's counsel knows so much about this case is because SEG is at the center of much of the alleged group conduct and how big a problem the case is for SEG;

(iii)   Kirkland purportedly handled the negotiation "to ensure absolute independence with respect to the decision regarding the terms of the settlement" (*id.* at 16:18-24) – even though elsewhere Genius states that its managers did the actual negotiations (Memo. at 14) – with the Court immediately recognizing that doing so is inconsistent with introducing Kirkland to negotiate in lieu of Mr. Murphy as the Mediator (*id.* at 17:4-18:3); and

(iv)    Genius hiring Mr. Lefkowitz so as to not "incur[] the costs of … additional … mediation, which is extremely expensive" (*id.* at 17:17-20) is confusing because Plaintiff is informed Messrs. Lefkowitz and Murphy bill at comparable rates, and, Mr. Lefkowitz, but not Mr. Murphy, would take significant time to get up to speed, while also ignoring Mr. Charlson's ongoing involvement in this case.

Indeed, the litigation committee investigation in *DISH* is a useful study in contrast because it was "objectively comprehensive by any measure" including 21 interviews, more than 17 formal

18

meetings and multiple information meetings, and the review of hundreds of thousands of pages. 133 Nev. at 450. Similarly, Plaintiff's counsel received a substantial litigation committee report prepared by Mr. Charlson in a Delaware litigation. Abraham Decl. ¶27. Here, in contrast, Genius pays lip service to "substantial analysis and advice" (Memo. at 1) but describes four meetings and two requests for information. Dkt. 360-1 at ¶¶1-12. And, it does so through Jaffa who has been at the forefront of hostility to this action and has taken an active role in crafting the Company's SEC filings in a seeming attempt to depress the stock price. *See* p.3, *supra*.

Also, Genius's submission sworn to by Jaffa and presumably drafted by the Morris firm engages in a classic deceit by stating a fact while omitting to state other facts necessary to make the statements therein not misleading. *E.g.* 15 U.S.C. §§77k(a); 77l(a)(2); 15 U.S.C. §§78j(b), 78r(a) (making such conduct actionable under the federal securities laws); *see also Orchard Hotel LLC v. D.A.B. Grp. LLC*, 172 A.D.3d 530, 531 (1st Dep't 2019) (half-truths can be actionable fraud). Thus, Genius invokes Mr. Murphy's name suggesting that he was involved as a mediator in negotiating the Proposed Settlement (Tr. at 16:25:17:10) when, in fact, as Genius admitted in Court, Mr. Murphy was **not** involved in negotiating the Proposed Settlement. *Id.* at 17:11-13.

The Proposed Settlement is also obviously not the product of good faith because it is not "value maximizing" with respect to the §16(b) claims. Memo. at 12. Instead, Anson had previously made an **opening offer of $35 million** to Plaintiff and CVI had indicated a willingness to settle for $7.5 million (Exhibit 3, Exhibit 9) which combined exceeds the total amount the Proposed Settlement seeks to recover from seven out of the eight Defendants in this action. Indeed, it is hard to understand where Genius opened its bidding considering *its final agreement was an almost $14 million discount to Anson's opening offer to Plaintiff. See* p.5, *supra*.

19

The Committee cannot excuse the failure to know these facts because the Board minutes establishing the Committee directed it "to ascertain the status of settlement efforts." Exhibit 4 at p.7. The Committee also cannot excuse any failure to take these facts into account because Plaintiff specifically informed the Committee of these facts, but Morris only seemed to care about them after he understood that Plaintiff had emails from Mr. Murphy confirming those discussions. Exhibit 14.

The Committee also failed to submit any information to the Court describing what evidence it found or the reasons it found certain evidence unpersuasive, failing to submit to the Court any report or analysis detailing any finding. That does not show a "willingness to deal openly and honestly with all relevant and material information" but, instead, is the "conscious[] omi[ssion]" that undercuts good faith. *Sutherland v. Sutherland*, 968 A.2d 1027, 1030 (Del. Ch. 2008). In circumstances "where there is no meaningful description or analysis of what the evidence uncovered by the investigation showed, it remains possible that the investigation was broad in concept, but shallow in execution, *pro forma* and halfhearted" business judgment deference is unwarranted. *City of Pontiac Gen. Employees' Ret. Sys. v. Bush*, 2021 WL 2588979, at *5-6 (N.D. Cal. June 24, 2021); *see also City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1030-31 (N.D. Cal. 2013) (the failure to provide a copy of the report precluded a finding that the investigation had been undertaken in good faith).

Instead, the Committee appears to have opportunistically focused its analysis on certain Defendants' bogus indemnification and advancement claims as a reason for settlement. Memo. at 3-6. However, that analysis ignores that it "is well settled that an insider found to have violated section 16(b) may not seek indemnification for the ensuing liability." *Jain v. J.P. Morgan Sec., Inc.*, 177 P.3d 117, 121 (Wash. App. 2008). Similarly, under New York law governing the

20

indemnification claims here, any prepayment of attorneys' fees – which Iroquois characterized as an advancement – is also barred because it "would do violence to the federal policy… barring enforcement of an indemnity agreement on behalf of a securities law violator. There is no logic in permitting a wrongdoer to enforce a portion of an indemnity provision." *Donaldson Lufkin & Jenrette Sec. Corp. v. Star Techs., Inc.*, 148 Misc.2d 880, 883, 561 N.Y.S.2d 371 (N.Y. Sup. Ct. 1990), *on reargument*, 150 Misc.2d 126, 567 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991), *aff'd*, 180 A.D.2d 495, 580 N.Y.S.2d 657 (1st Dep't 1992).

Here too, Section 9(k)(iii) of the March 2020 SPA, upon which the claim is based, represents a portion of the overall indemnity provision contained in Section 9(k) and, therefore, may not be enforced either under New York law or as a matter of federal policy upon which *Donaldson Lufkin & Jenrette* is based. That understanding of federal policy was adopted by Congress when it enacted PSLRA to, among other things, limit the rights of indemnification to a party that "prevails in any private action may recover the attorney's fees and costs of that covered person in connection with the action." 15 U.S.C. § 78u-4(f)(2)(B)(ii).

*Citadel Holding Corp. v. Roven*, 603 A.2d 818 (Del. 1992), upon which Iroquois and Empery rely in contending that advancement is allowed even where indemnification is not (Iroquois Cplt. ¶36), is neither controlling nor on point. In *Citadel*, the provision covering advancement "in no way render[ed] the right to advances dependent upon the right to indemnity." *Id.* at 822. Here, in contrast, Section 9(k)(iii) is characterized as an "indemnification" and explicitly dependent upon Section 9(k)(i)'s indemnification rights. *See* March 2020 SPA §9(k)(iii) (referring to "[t]he indemnification required by this Section 9(k).").

21

**E.  Genius Has Otherwise Failed to Make a Record Supporting the Fairness of the Proposed Settlement**

As the Court noted after reviewing the Parties' letters (Dkt. 367, 369, 371, 373), "no clear precedent allow[s] the Company to settle this case without review of this Court." Tr. at 3:9-16. Instead, especially where the terms of a proposed settlement are contested, courts in this District review the fairness of the proposed settlement. *See, e.g.*, *Revive Investing LLC v. FBC Holdings S.A.R.L.*, 2021 WL 56905, at *7 (S.D.N.Y. Jan. 7, 2021), *report and recommendation adopted*, 2021 WL 734976 (S.D.N.Y. Feb. 25, 2021), *as amended* (Feb. 26, 2021) (quoting *FTR Consulting Group, Inc. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*, 2005 WL 2234039, at *2 (S.D.N.Y. Sept. 14, 2005)); *see also Levy ex rel. Mktg. Servs. Grp., Inc. v. General Elec. Cap. Corp.*, 2001 WL 987873, at *5 (S.D.N.Y. Aug. 30, 2001). Indeed, Anson recognized that Plaintiff's claims could only be released upon a showing of fairness. Tr. at 40:2-10. Here, Genius has not made any request of the Court for any fairness hearing. Dkt. 358.

However, even if the Court chose to entertain a motion which has not been made, Genius has only made conclusory statements concerning its rationale – which are, to put it mildly, of questionable veracity – without making any showing by referencing the relative strengths and weaknesses of the claims asserted against each Defendant. The Company's showing is particularly glaring given Morris's statement at the May 4 Status Conference that he would place a robust record before the Court.

Nor will it be sufficient for Genius or Defendants to claim that such a record will eventually be provided. *See, e.g.*, *Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 381 (S.D.N.Y. 2021) (arguments assumed but not developed in an opening memorandum are waived). Instead, a motion must be complete at the time it is made and cannot be completed by additional submissions on reply. *See, e.g.*, *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp.

22

2d 381, 387 (S.D.N.Y. 2010) ("It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden."); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."), *aff'd*, 159 F.3d 1347 (2d Cir. 1998).

Nonetheless, Plaintiff notes that *Revive Investing*, cited by Genius (Memo. at 15 n.6; Dkt. 369 at 1), settled for approximately 30% of short-swing profits. 2021 WL 56905, at *8-9. *Levy v. Gen. Elec. Capital Corp.* – a case litigated by Plaintiff's counsel – settled for 46% of profits even though the defendant had a "high" chance of judgment. 2002 WL 1225542, at *8 (S.D.N.Y. June 4, 2002). Plaintiff's counsel is also independently aware of a §16(b) case in which he acted as counsel to the issuer which settled after summary judgment had been denied involving a single disputed factual issue which settled for more than 50% of short-swing profits. Abraham Decl. ¶28.[7] Here, in contrast, the Proposed Settlement ranges as low as 7% of the lower *Chevron*-profits in the case of Brio and an average of 13.77% for other Defendants, even though that is well below Anson's opening offer. *See* Exhibit 3.

Genius also contends that the Proposed Settlement "fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted." Memo. at 16 n.6. This presumably is based upon the release of the indemnification claims which are either meritless or not yet ripe. *See* p.20-21, *supra*. However, even assuming any merit to the claims – and there is none – it invokes a standard expressly rejected by Judge Hellerstein who, instead, held when

---

[7]    If anything, these facts would independently support Plaintiff's intervention even if Genius had timely acted to file Section 16(b) claims. *Cf. Molybdenum Corp. of Am. v. Int'l Min. Corp.*, 32 F.R.D. 415, 420 (S.D.N.Y. 1963) (allowing intervention to prosecute §16(b) claims alongside an issuer); *Nedick's Stores, Inc. v. Genis*, 34 F.R.D. 235, 237 (S.D.N.Y. 1963) (allowing intervention where the issuer declined to prosecute claims that were not "so obviously unfounded that the proposed intervenor should be denied all opportunity to try them out for the common good of the corporation and its stockholders" and citing the "comprehensive opinion" in *Molybdenum*).

rejecting an earlier settlement proposed by the issuer in *Levy* that "Congress has [] expressed a strong policy in favor of recapturing profits made by corporate insiders from short-swing sales … regardless of collateral business considerations[.]" *Levy*, 2001 WL 987873, at *3; *see also Epstein v. Shindler*, 26 F.R.D. 176, 178-79 (S.D.N.Y. 1960) (counterclaims cannot be brought in §16(b) claims because they might interfere in a recovery).

Moreover, even assuming *arguendo* that the collateral business considerations of Genius ought to be considered in a §16(b) action, the entirety of Genius's contention boils is that:

> [1] is anticipated to be *transformative* for the Company (its entire market cap as of today is only $36.8 million) at a point when it expects to run out of operating capital within *weeks*, not months, and [2] faces indemnity and advancement claims that, if proven, would render it insolvent (indeed, defense costs alone may threaten the same). [3] Plaintiff's counsel has not made a superior offer (or suggested how the Company might obtain one), and [4] no rational businessperson could choose to expose the Company to the risks of trial over the current Settlement terms.

Memo. at 16 n.6.

This analysis, however, fails to mention or otherwise justify the Proposed Settlement under the factors used under either Rule 23(e)(2) or the *Grinnell* factors. *Moses v. New York Times Co.*, 79 F.4th 235, 242-43 (2d Cir. 2023). Perhaps more importantly, Genius's contention ignores the added factor which Courts in this District review in §16(b) settlements of "the congressional purpose to cause disgorgement of short-swing trading profits by corporate insiders[.]" *Revive Investing LLC*, 2021 WL 56905, at *7 (quoting *FTR Consulting Group, Inc.*, 2005 WL 2234039, at *2); *see also Levy*, 2001 WL 987873, at *5). Doing so is particularly appropriate because Congress never acted to restrict Section 16(b) claims, even when adopting the Private Securities Litigation Reform Act of 1995, 109 Stat. 737-765, and has, instead, consistently strengthened §16(b) claims.[8]

---

[8]    In 1964, the Exchange Act was amended to bring the securities of companies trading over-the-counter within §16(b)'s short-swing profit recovery provision. *See* Guy P. Lander, *14A U.S. Sec. Law for Financial Trans.* §11:32 (2d ed. Dec. 2025 Update). In 2000, Congress passed the Gramm-Leach-Bliley

Nonetheless, Plaintiff addresses Genius's contentions in turn.

*First*, Genius does not explain why any amounts received by the Proposed Settlement would be transformative. That statement can also not be seriously credited because Genius has purportedly been experiencing transformative events repeatedly for the past decade. *See* p.2, *supra*. The harsh reality, however, is that Genius has been a massively unprofitable business and has dissipated over $100 million in working capital on those consistently money-losing operations. *See* pp.1-2, *supra*.

It is also difficult to credit the notion the Company will run out of working capital when it has been in the same purportedly precarious financial situation since at least December 2025 when the Company made the same claim to this Court. *See* Dkt. 299. Instead, the most the Company's most recent Form 10-K says could happen is that Genius may have to "curtail or cease operations and be required to realize our assets and discharge our liabilities other than in the normal course of business" (2025 Form 10-K at 9), which may be a good thing given the Company's consistent operating losses.

As for Genius's low market capitalization, that is a function of extraordinarily poor corporate management with a track record of losing hundreds of millions of dollars and the Company in its SEC filings emphasizing the risks of this litigation rather than the potential recovery. *See* p.1-2, *supra*. If the Board truly wanted to engage in a transformative transaction, it would shut down its existing business operations and utilize its enormous tax-loss carryforwards (2025 Form 10-K at F-42) to purchase a functioning profitable business with new management.

---

Act, expanding §16(b)'s reach to cover security-based swap agreements. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 119 n.1 (2d Cir. 2001). In 2002, Sarbanes-Oxley required more rigorous disclosure of insiders' trades. .Jacobs, 1 *Section 16 of the Securities Exchange Act* §3:2. In 2010, The Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress deleted §16(b)'s references to the Gramm-Leach-Bliley Act and added "or a security-based swap" to §16(b)'s third sentence. *Id.*

25

ADD-94

*Second*, the advancement claim filed by Iroquois and Empery which seems to serve as the factual basis for the concern posed by defense costs lacks merit and no such funds will ever have to be paid if the case is either settled against a particular Defendant or if Plaintiff prevails on his claims. *See* pp.20-21, *supra*. The amounts claimed for indemnification are also highly questionable with Iroquois never explaining how it purportedly incurred $5.2 million in "reasonable" defense costs where Anson, which has a far larger exposure, purportedly incurred $2.8 million, and other Defendants substantially less. Memo. at 4 n.3. The Proposed Settlement also does not solve any issues related to Empery's indemnification claim because Empery is not a party to the agreement.

*Third*, as Plaintiff has previously explained, he made Morris aware of superior offers. Abraham Decl. ¶18. Morris, however, only seemed to care about those superior offers when he learned that Plaintiff had written emails from Mr. Murphy describing those offers. Abraham Decl. ¶22 and Exhibit 14.

*Fourth,* any rational businessperson would reject a settlement inferior to what had been previously offered. Similarly, any rational businessperson would either have not acted to depress the Company's stock price before engaging in the October 2025 financing further tying Genius's hands for certain forms of future funding (*see* p.3, *supra*) and, instead, sought to have tapped the very active existing legal funding market before agreeing to a more than 85% discount on claims that are not only trial-ready, but in which trial is imminent.

26

ADD-95

**CONCLUSION**

For the foregoing reasons, the Motion should be denied in its entirety.

Dated: May 20, 2026

By: /s/ Jeffrey S. Abraham
Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email: jabraham@aftlaw.com
        mklein@aftlaw.com

Evan Mandel
Robert Glunt
**MANDEL BHANDARI LLP**
80 Pine Street, 33rd Floor
New York, New York 10005
Telephone: (212) 269-5600
Email: em@mandelbhandari.com
        glunt@mandelbhandari.com

**CERTIFICATE OF COMPLIANCE**

I, Jeffrey S. Abraham, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases, that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,562 words in accordance with the Local Rules. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated: May 20, 2026                    By: /s/ Jeffrey S. Abraham
                                       Jeffrey S. Abraham

ADD-97

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM,<br><br>                    Plaintiff,<br><br>          v.<br><br>ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; RICHARD MOLINSKY, and; GENIUS BRANDS INTERNATIONAL, INC.,<br><br>                    Defendants. | Civil Action No. 1:22-cv-00249-AS |

<u>**DECLARATION OF JEFFREY S. ABRAHAM**</u>

I, Jeffrey S. Abraham, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am a partner of Abraham, Fruchter & Twersky, LLP, counsel to Plaintiff Todd Augenbaum. I submit this declaration in opposition to the judgment sought by Genius Brands International, Inc., n/k/a Kartoon Studios, Inc. ("Genius" or the "Company") (Dkt. 359, the "Motion"; Dkt. 360, the "Memo.").

2.      Exhibit 1 hereto is a true and correct copy of Bradley Woods & Co. Ltd.'s ("Bradley Woods") June 24, 2024 response to a June 10, 2024, subpoena served by Plaintiff. Bradley Woods is a former parent company of the Special Equities Group ("SEG"). Page 8 of the response shows that BW was represented by Aaron Morris and other attorneys at Morris Kandinov LLP.

1

3.      On October 24, 2025, Michael J. Klein of my firm LLP ("Klein") and I attended a half-day in-person mediation between Plaintiff and CVI at Skadden Arps's Manhattan offices, in which David Murphy participated.

4.      On November 5, 2025, together with Mr. Klein, I met with Iroquois's counsel at Latham & Watkins's offices during which Mr. Clark, as Iroquois's incoming counsel, withdrew an earlier settlement offer and, instead, stated that Plaintiff had no clear path to trial.

5.      Exhibit 2 hereto is a true and correct copy of a letter from Michael L. Charlson, as counsel for the Company, to Christopher J. Clark, as counsel for Iroquois, concerning Iroquois's indemnification demand on the Company.

6.      Exhibit 3 hereto is a true and correct copy of an email string containing Anson's December 11, 2025 opening offer of $35 million to settle this litigation, made through Mr. Murphy. Anson's opening offer was subject to a most-favored-nation clause ("MFN") and was described as representing "21% of the claimed damages on a Chevron basis (the 'Settlement Percentage')". At that time, Plaintiff had not yet made any settlement demand on Anson.

7.      Exhibit 4 hereto is a true and correct copy of minutes of a meeting of the Board of Directors of Kartoon Studios, Inc. (the "Board") dated January 30, 2026, provided by Mr. Morris, with the redactions shown on the exhibit.

8.      Exhibit 5 hereto is a true and correct copy of minutes of a meeting of a "Litigation Committee" formed by the Board held on February 2, 2026, provided by Mr. Morris.

9.      Exhibit 6 hereto is a true and correct copy of an email string between me and Aaron Morris, with the subject Augenbaum/Kartoon Studios, spanning from Feb. 6, 2026 to April 20, 2026.

2

10.    Exhibit 7 hereto is an email from Aaron Morris to me, dated February 13, 2026, transmitting the Board's January 30, 2026, minutes that are attached to this Declaration as Exhibit 4, and recognizing the risk of privilege waiver Plaintiff faced if he agreed to the Company's proposed Rule 502(d) stipulation.

11.    Exhibit 8 hereto is a true and correct copy of an email string between Plaintiff's counsel and Mr. Murphy that Plaintiff's counsel initiated on February 24, 2026, faced with settlement talks stagnating. Plaintiff reached out to CVI, which reduced its prior offer, which Plaintiff believes was caused at least in part by the possibility of a potentially better deal from the Litigation Committee.

12.    Exhibit 9 hereto is a true and correct copy of a February 26, 2026, email from the Mediator stating that he believed CVI was still willing to settle the case for $7.5 million, which Plaintiff calculates as 28.1% of CVI's potential *Chevron*-based disgorgement of $26,691,400. *See* Dkt. 232-31 at Table 5.

13.    On March 4, 2026, Mr. Morris told me during a telephone call that he believed the Committee would be retaining Jay Lefkowitz to negotiate for the Committee, while Mr. Morris would remain counsel for the Company.

14.    Exhibit 10 hereto is a true and correct copy of minutes of a meeting of the Litigation Committee held on March 9, 2026, provided by Mr. Morris.

15.    Exhibit 11 hereto is a true and correct copy of an email string from March 10-18, 2026, between me and Mr. Lefkowitz.

16.    During a call on March 11, 2026, Mr. Lefkowitz stated he wanted to speak to Plaintiff's counsel "before [he] dove into" getting up to speed and negotiating.

3

17.    On March 18, 2026, Mr. Lefkowitz stated during a telephone call with me and Mr. Klein that he had only started looking at the summary judgment filings, was actively negotiating with Defendants, and could see reaching a settlement of $40-$50 million. I explained to him that settling at that level was below the range of reasonableness, that lumping Anson together with other Defendants was value-minimizing given the strength of the evidence against Anson, and that Plaintiff had been attempting to engage with Defendants individually to see if agreements could be reached.

18.    On April 20, 2026, Plaintiff's counsel participated in an approximately one-hour telephone conference call with Litigation Committee member Jeffrey Schlesinger as well as Messrs. Jaffa and Morris but which Mr. Lefkowitz did not attend, during which Plaintiff's counsel advised Messrs. Schlesinger, Jaffa, and Morris that Plaintiff had received higher offers from two Defendants than the Litigation Committee was considering accepting from six Defendants.

19.    On April 22, 2026, following an unsuccessful effort to arrange a call with the Mr. Murphy to discuss settlement issues, Mr. Lefkowitz demanded that Plaintiff provide a global counter-offer – rather than ones directed to the individual Defendants' settlement offers – otherwise Genius would move for Court approval.

20.    Exhibit 12 hereto is a true and correct copy of an email string from April 24-28, 2026, between me and Mr. Lefkowitz with the subject Pursuant to Rule 408. No meeting with Mr. Murphy or Mr. Lefkowitz took place.

21.    Exhibit 13 hereto is a true and correct copy of a May 12, 2026, letter from Mr. Chaz Rainey to the Hon. Anar Rathod Patel, J.S.C., in *Empery Asset Master, Ltd., et al. v. Kartoon Studios, Inc.*, Index No. 650906/2026, NYSCEF Doc. No. 24 (Sup. Ct., N.Y. Cnty.).

4

22.    Exhibit 14 hereto is a true and correct copy of an email string from May 11-12, 2026, between me, Mr. Morris, and others with the subject Augenbaum.

23.    Exhibit 15 hereto is a true and correct copy of an email string from April 29-May 3, 2026, between me, Mr. Morris, Mr. Lefkowitz, and others.

24.    On May 14, 2026, Plaintiff made new individual settlement demands.

25.    Empery has informed Plaintiff that it is not interested in settling at this time.

26.    On Monday, May 18, 2026, Plaintiff reached a settlement with L1 Capital for $3,550,000, representing an approximately 50% bump from the amount agreed to by the Litigation Committee.

27.    Michael Charlson was counsel for the special litigation committee in the case of *Sandys ex rel. Zynga, Inc. v. Pincus,* C.A. No. 9512-CB, brought in the Delaware Court of Chancery in which I acted as the plaintiff's counsel. In that case, based upon a review of my files, the special litigation committee's report totaled 329 pages long and attached 195 exhibits divided into seven separate categories.

28.    On March 31, 2004, my firm, representing the bankrupt estate of PurchasePro.com, Inc. ("PurchasePro"), settled the Section 16(b) action of *Levy v. Office Depot, Inc.*, Case No. 01-8529 (S.D. Fl.) for $9.4 million. The settlement amounted to approximately 54% of potential recoverable short-swing insider profits of $17.2 million. The primary, if only, factual issue in the case was whether Office Depot, Inc. was a director of PurchasePro within the meaning of Section 16(b) based upon one of its officers serving as a director of PurhasePro.

Executed on May 20, 2026.                    /s/ Jeffrey S. Abraham
                                             Jeffrey S. Abraham

5

ADD-102

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM, <br><br> Plaintiff, <br><br> v. <br><br> ANSON INVESTMENTS MASTER FUND LP, BRIO CAPITAL MASTER FUND LTD., BRIO SELECT OPPORTUNITIES FUND, LP, CVI INVESTMENTS, INC., EMPERY ASSET MASTER, LTD., EMPERY DEBT OPPORTUNITY FUND, LP, EMPERY TAX EFFICIENT, LP, IROQUOIS MASTER FUND LTD., IROQUOIS CAPITAL INVESTMENT GROUP, LLC, L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND, M3A LP, and RICHARD MOLINSKY, <br><br> Defendants, <br><br> -and- <br><br> KARTOON STUDIOS, INC. <br><br> Nominal Defendant. | Civil Action No. 22-cv-00249-AS |

**NON-PARTY BRADLEY WOODS & CO. LTD.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SUBPOENA *DUCES TECUM***

Pursuant to Rules 26, 34, and 45 of the Federal Rules of Civil Procedure, Non-Party Bradley Woods & Co. Ltd. ("BW"), by and through its undersigned counsel, hereby responds and objects to Plaintiff's Subpoena *Duces Tecum* dated June 10, 2024 (collectively, the "Requests," and each a "Request").

ADD-104

### GENERAL OBJECTIONS

BW generally objects to the Requests on the following grounds, each of which is incorporated by reference into the responses to the individual Requests below. All responses set forth herein are subject to, and without waiver of, these General Objections.

1.    BW objects to the Requests and Instructions to the extent they purport to require BW to conduct anything beyond a reasonable search of information and responsive documents.

2.    BW objects to the Requests and Instructions to the extent they seek the production of documents that are not within BW's possession, custody, or control. BW will not conduct a search for such documents.

3.    BW objects to the Requests to the extent they purport to require the production of information from anyone other than BW. BW makes the Responses and Objections on its own behalf and not on behalf of any other party or non-party.

4.    BW objects to the Requests to the extent that they seek information protected by or that may be protected by the attorney-client privilege, the work-product doctrine, joint defense privilege, common interest privilege, or any other applicable privilege, doctrine, immunity, or protection from disclosure. BW will not intentionally produce any such documents or information, and BW reserves the right to demand the return (or destruction) of any documents or information inadvertently produced.

5.    BW objects to the Requests to the extent they purport to require BW to produce documents in the public domain, including documents filed with the U.S. Securities and Exchange Commission ("SEC") that Plaintiff can reasonably access himself without undue burden or expense.

2

ADD-105

6.      BW objects to the Requests to the extent they seek documents or information that have been or will be produced by any of the Defendants in connection with Plaintiff's ongoing discovery efforts.

7.      BW objects to the Requests (including Requests 1 through 6) to the extent they seek the production of "all Documents" or "all Communications," because such phrases impose obligations beyond those required by federal law, the Federal Rules of Civil Procedure, or the Local Rules. BW thus interprets Requests for "all" documents or communications to mean all responsive, non-privileged documents, not otherwise immune from discovery, within its possession, custody, or control that can be located after a reasonable, good-faith search.

8.      Any statement contained herein that BW will search for and/or produce documents or communications is not an assurance that such documents exist, or are even likely to exist. Rather, BW will conduct a reasonable, good-faith search for such documents, and produce responsive, non-privileged documents and communications identified through that process.

9.      BW's statement that it will produce documents in response to a particular Request is not an admission that the documents are relevant to (a) this action; or (b) any other matter. BW provides these responses without waiving or intending to waive, but rather preserving and intending to preserve, all questions as to the competency, relevance, materiality, privilege, and admissibility of the information produced or disclosed in response to the Requests, or the subject matters thereof, in this or any related or subsequent proceeding, including the trial of this action or any other action. By producing documents in response to any Request, BW also does not intend to waive, and expressly preserves, the right to object to further or additional discovery concerning the subject matter of the Request.

3

10.     These responses and objections reflect BW's present knowledge, information, and belief, and may be subject to change or modification based on further discovery or circumstances that may come to its knowledge. BW reserves the right to amend, supplement, or correct its responses and objections in accordance with Fed. R. Civ. P. 26(e).

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.     BW objects to the definition of the terms "You" and "Your" to the extent they purport to include not only BW, but also "Any person acting on its behalf, including all predecessors and successors." BW will produce documents in its possession, custody, or control, including documents in the possession, custody, or control of its officers and employees in their capacity as such. For the avoidance of doubt, BW will not interpret "You, or "Your" to include its attorneys.

2.     BW objects to Instruction No. 1 with respect to logging of documents withheld on grounds of privilege, work product, or otherwise insofar as it purports to impose obligations beyond those required by Local Rule 26.2 BW will log such documents in accordance with Local Rule 26.2(a), except that BW will not log communications with or documents received from its counsel in connection with this action or the Requests because doing so would be unduly burdensome.

3.     BW objects to Instruction Nos. 2, 4, 5, 6, and 10 insofar as they purport to impose obligations beyond those required by federal law, the Federal Rules of Civil Procedure, and the Local Rules.

4.     BW objects to the manner and form of production specified in Instruction No. 3 and will confer with Plaintiff concerning the manner of production and the form of such documents. BW also objects to Instruction Nos. 3 and 9 insofar as they purport to require

4

documents to "be separately produced for each paragraph of this request, or in the alternative, shall be identified so as to comply with the particular paragraph or paragraphs of the request to which they are responsive"; doing so would be unduly burdensome because (among other reasons) many of the Requests are duplicative and overlapping of one another, so the same document often will be responsive to multiple Requests.

5.     BW is willing to meet and confer with Plaintiff regarding any of the objections or responses contained herein.

**SPECIFIC OBJECTIONS AND RESPONSES**

**1.     All Communications Concerning Any Transaction in Genius Securities in which You acted as a principal, adviser, or placement agent.**

RESPONSE: BW objects to Request No. 1 as overly broad and unduly burdensome insofar as (a) it seeks documents that are not relevant to the subject matter of the action or to the claims or defenses of either party; and (b) it seeks documents that are not relevant to the securities or transactions that are the subject of the Complaint. BW further objects to Request No. 1 insofar as it seeks documents that are protected by or that may be protected by the attorney-client privilege, the work-product doctrine, joint defense privilege, common interest privilege, or any other applicable privilege, doctrine, immunity, or protection from disclosure. Subject to and without waiving the foregoing General and Specific Objections, BW will meet and confer with Plaintiff concerning the relevance of this Request and scope of documents to be produced.

**2.     All Communications Concerning Any actual or proposed amendment to the terms of Genius Securities.**

RESPONSE:  BW objects to Request No. 2 as overly broad and unduly burdensome insofar as (a) it seeks documents that are not relevant to the subject matter of the action or to the claims or defenses of either party; and (b) it seeks documents that are not relevant to the securities or

transactions that are the subject of the Complaint. BW further objects to Request No. 2 insofar as it seeks documents that are protected by or that may be protected by the attorney-client privilege, the work-product doctrine, joint defense privilege, common interest privilege, or any other applicable privilege, doctrine, immunity, or protection from disclosure. Subject to and without waiving the foregoing General and Specific Objections, BW will meet and confer with Plaintiff concerning the relevance of this Request and scope of documents to be produced.

3.    **All Documents or Communications concerning the SPA, the Related Agreements, the Conversion Agreement, and the Leak Out Agreement.**

RESPONSE:  BW objects to Request No. 3 as overly broad and unduly burdensome insofar as (a) it seeks documents that are not relevant to the subject matter of the action or to the claims or defenses of either party; and (b) it seeks documents that are not relevant to the securities or transactions that are the subject of the Complaint. BW further objects to Request No. 3 insofar as it seeks documents that are protected by or that may be protected by the attorney-client privilege, the work-product doctrine, joint defense privilege, common interest privilege, or any other applicable privilege, doctrine, immunity, or protection from disclosure. Subject to and without waiving the foregoing General and Specific Objections, BW will meet and confer with Plaintiff concerning the relevance of this Request and scope of documents to be produced.

4.    **Any Documents summarizing, analyzing or discussing the value of Genius or Genius Securities.**

RESPONSE:  BW objects to Request No. 4 as overly broad and unduly burdensome insofar as (a) it seeks documents that are not relevant to the subject matter of the action or to the claims or defenses of either party; and (b) it seeks documents that are not relevant to the securities or transactions that are the subject of the Complaint.  BW further objects to Request No. 4 insofar as it seeks documents that are protected by or that may be protected by the attorney-client privilege,

6

the work-product doctrine, joint defense privilege, common interest privilege, or any other applicable privilege, doctrine, immunity, or protection from disclosure. Subject to and without waiving the foregoing General and Specific Objections, BW will meet and confer with Plaintiff concerning the relevance of this Request and scope of documents to be produced.

**5.    All Communications You had with Any Defendant Concerning Genius Securities. This request is specifically intended to include Any Communications between Your counsel, on the one hand, and Any counsel for Any Defendant or other Person, on the other hand.**

RESPONSE:  BW objects to Request No. 5 as overly broad and unduly burdensome insofar as (a) it seeks documents that are not relevant to the subject matter of the action or to the claims or defenses of either party; and (b) it seeks documents that are not relevant to the securities or transactions that are the subject of the Complaint. BW further objects to Request No. 5 insofar as it seeks documents that are protected by or that may be protected by the attorney-client privilege, the work-product doctrine, joint defense privilege, common interest privilege, or any other applicable privilege, doctrine, immunity, or protection from disclosure. Subject to and without waiving the foregoing General and Specific Objections, BW will meet and confer with Plaintiff concerning the relevance of this Request and scope of documents to be produced.

**6.    All Communications Concerning this Action. This request is specifically intended to include Any Communications between Your counsel, on the one hand, and Any counsel for Any Defendant or other Person, on the other hand.**

RESPONSE:  BW objects to Request No. 6 as overly broad and unduly burdensome insofar as (a) it seeks documents that are not relevant to the subject matter of the action or to the claims or defenses of either party; and (b) it seeks documents that are not relevant to the securities or transactions that are the subject of the Complaint. BW further objects to Request No. 6 insofar as it seeks documents that are protected by or that may be protected by the attorney-client privilege, the work-product doctrine, joint defense privilege, common interest privilege, or any other

7

applicable privilege, doctrine, immunity, or protection from disclosure. Subject to and without waiving the foregoing General and Specific Objections, BW will meet and confer with Plaintiff concerning the relevance of this Request and scope of documents to be produced.

**7.    Documents sufficient to identify Your policies for the retention or destruction of Documents.**

RESPONSE:  BW objects to Request No. 7 as overly broad and unduly burdensome insofar as it seeks documents that are not relevant to the subject matter of the action or to the claims or defenses of either party. Subject to and without waiving the foregoing General and Specific Objections, BW will meet and confer with Plaintiff concerning the relevance of this Request and scope of documents to be produced.

Dated: June 24, 2024

By:  */s/Jonathan R. Voegele*

**MORRIS KANDINOV LLP**
Aaron T. Morris (5675178)
Andrew W. Robertson (4288882)
Jonathan R. Voegele
305 Broadway, 7th Floor
New York, NY 10007
332.910.5229
aaron@moka.law
andrew@moka.law
jonathan@moka.law

*Attorneys for Non-Party Bradley Woods & Co. Ltd.*

8

ADD-111

# EXHIBIT 2

FILED: NEW YORK COUNTY CLERK 01/06/2026 03:04 PM

NYSCEF DOC. NO. 11

INDEX NO. 650077/2026

RECEIVED NYSCEF: 01/06/2026

# Vinson&Elkins

Michael L. Charlson  mcharlson@velaw.com
**Tel** +1.415.979.6910  **Fax** +1.415.704.3264

November 12, 2025

**Via Electronic and U.S. Mail**

Christopher J. Clark
Clark Smith Villazor LLP
666 Third Avenue, 21st Floor
New York, New York 10017

> Re:  *Augenbaum v. Anson Investments Master Fund LP, et al.*
> **Indemnification Demand for Iroquois Capital Group, LLC and**
> **Iroquois Master Fund Ltd.**

Dear Mr. Clark:

I write on behalf of Kartoon Studios, Inc., f/k/a Genius Brands International, Inc., ("Kartoon Studios" or the "Company") in response to your November 7, 2025 letter (the "November 7 Letter"), which you sent on behalf of Iroquois Capital Group, LLC and Iroquois Master Fund (together "Iroquois"). After review of the November 7 Letter, and for at least the reasons noted below, the Company's position is that it has no obligation to indemnify Iroquois in connection with the amended complaint (the "Complaint") filed by Todd Augenbaum in the lawsuit pending in the United States District Court for the Southern District of New York and styled *Augenbaum v. Anson Investments Master Fund LP, et al.* Case No. 22-cv-00249 (the "Action"). As you know, plaintiff in the Action alleges that Iroquois violated Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78p(b); plaintiff's experts have calculated that Iroquois realized improper profits of at least $35.8 million.

The Company disagrees that Section 16(b) violations, however innocent, constitute indemnifiable conduct. There exists a long line of case law holding that indemnification for Section 16(b) violations is impermissible as a matter of public policy. For example, in *Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.,* the federal district court in Maryland considered a stock purchase agreement that included an indemnity provision that covered "any claim or litigation commenced or threatened by . . . any shareholder of [the issuer company] that arises out of . . . [the agreement] and the transaction contemplated thereby." 639 F. Supp. 409, 414 (D. Md. 1986), *appeal dismissed,* 801 F.2d 393 (4th Cir. 1986). The court quoted Section 29(a) of the Exchange Act, 15 U.S.C. §78cc(a), an anti-waiver provision providing that contractual provisions that purport to waive compliance with any provision of, or rule or regulation promulgated under, the Act are void. *Id.* at 418-19. The court went on to hold that indemnification would "frustrate the public policy behind" the short-swing profit prohibition of Section 16(b). *Id.* at 419. Likewise, the United States Court of Appeals for the Tenth Circuit held, in *First Golden Bancorporation v. Weiszmann,*

**Vinson & Elkins LLP** Attorneys at Law
Austin Dallas Denver Dubai Dublin Houston London
Los Angeles New York Richmond San Francisco Tokyo Washington

555 Mission Street, Suite 2000
San Francisco, CA 94105
**Tel** +1.415.979.6900 **Fax** +1.415.651.8798 velaw.com

FILED: NEW YORK COUNTY CLERK 01/06/2026 03:04 PM INDEX NO. 650077/2026
NYSCEF DOC. NO. 11                                                RECEIVED NYSCEF: 01/06/2026

Case 1:22-cv-00249-AS    Document 388-2    Filed 05/20/26    Page 3 of 4

V&E

Christopher J. Clark
November 12, 2025
Page 2

that indemnification for securities law violations generally contravenes public policy and with these policy concerns being applicable to Section 16(b) cases. 942 F.2d 726, 729 (10th Cir. 1991).

Decisions from the United States District Court for the Southern District of New York are in accord. Rejecting a demand for indemnification in a Section 16(b) context, the court in *Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC,* held that indemnification for Section 16(b) violations would "frustrate the public policy behind the statute because liable parties would not have to return their short-swing profits to the [issuer company]." 286 F. Supp. 2d 279, 283 n.6 (S.D.N.Y. 2003). *See also, e.g., In re XO Communications, Inc.,* 330 B.R. 394, 441 (Bankr. S.D.N.Y. 2005) ("indemnification by the issuing corporation would run counter to public policy underlying Section 16(b)"); *Deephaven Cap. Mgmt., LLC v. Schnell,* No. 06-844 (JRT/FLN), 2007 WL 101821, at *3 (D. Minn. Jan. 8, 2007) ("indemnity for section 16(b) violations would undermine the deterrent purpose of section 16(b) by allowing a wrongdoer to recoup its disgorged profits"); *Jain v. J.P. Morgan Sec., Inc.,* 177 P.3d 117, 121 (Wash. App. 2008) ("It is well settled that an insider found to have violated section 16(b) may not seek indemnification for the ensuing liability.").

While courts base their prohibition of Section 16(b) indemnification on public policy considerations, the holdings of these cases are entirely logical. Indemnification for Section 16(b) violations would mean that profits improperly realized—profits that are supposed to be disgorged by the offending trader—would instead by round-tripped back to that trader. Indeed, beyond just retaining its improperly realized profits, the trader would presumably receive back more—specifically its costs of defense. It simply makes no sense that an investor who violates Section 16(b) could affirmatively benefit from that violation to the detriment of the issuer, not merely because the issuer would not receive the disgorged improper profits as Section 16(b) specifically contemplates, but also because the issuer would be responsible for the legal expenses for all of (a) the defendant investor, (b) the plaintiff shareholder's counsel, and (c) itself. Such a result would render the trading restrictions in Section 16(b) a nullity.

Even if indemnification for Section 16(b) violations were legally permissible, the indemnification language that you invoke in the November 7 Letter—language from Section 9 of the Securities Purchase Agreement dated March 11, 2020 (the "SPA")—does not extend to Section 16(b) claims. The Company respectfully disagrees with the assertions in the November 7 Letter that Mr. Augenbaum's allegations "arise out of, relate to, and result from the execution, delivery, performance and enforcement of the SPA and related transaction documents" or that the Action "squarely falls within the Company's indemnity and advancement obligations" under the SPA. The alleged Section 16(b) violations are not about Iroquois' decision to purchase Company securities pursuant to the SPA. Rather, liability, if there is any, would result from Iroquois' decisions to *dispose* of Company securities within the six-month period prohibited under the statute. These decisions by Iroquois to dispose of Company securities were matters that the Company did not (and did not purport to) control and with which the Company had no involvement. Your reference to indemnification for "transactions contemplated" by the SPA, when read in context, refers to

FILED: NEW YORK COUNTY CLERK 01/06/2026 03:04 PM
NYSCEF DOC. NO. 11

INDEX NO. 650077/2026

RECEIVED NYSCEF: 01/06/2026

**V&E**

Christopher J. Clark
November 12, 2025
Page 3

Iroquois' purchase of Company securities. It cannot reasonably be read to concern later decisions to sell those securities, made independently of the Company.

Without belaboring matters further, the Company rejects Iroquois' demand and reserves all rights, remedies, and defenses, particularly in light of the threats you put forward before you abruptly terminated our brief telephone discussion on November 12. Without limiting the generality of this reservation, the Company also rejects that Iroquois, as one of eight sets of defendants engaged in what we understand to be a joint defense of the Action, could have incurred "reasonable fees, costs, and expenses" to date of the (unsupported) $5.23 million demand amount set forth in the November 7 Letter.

Very truly yours,

Michael L. Charlson

ADD-115

# EXHIBIT 3

 Outlook

---

**Re: Anson offer**

---

**From** David Murphy <dmurphy@phillipsadr.com>
**Date** Thu 12/11/2025 9:31 AM
**To** Jeffrey S. Abraham <JAbraham@aftlaw.com>

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jeff,

In a mediation session, but I should add that Anson has room to negotiate.  This is by no means the best, much less final, offer.

**David M. Murphy**  (bio)
   Mediator ◇ Arbitrator ◇  Independent Panelist
     Phillips ADR Enterprises LLC (PADRE)
        New York ◇  Corona del Mar
          917-446-0233 (New York)

---

**From:** David Murphy
**Sent:** Thursday, December 11, 2025 9:25:52 AM
**To:** Jeffrey Abraham <jabraham@aftlaw.com>
**Subject:** Anson offer

Jeff,

Anson is prepared to settle the Augenbaum claim for a payment of $35 million to the company.   The terms would need to include:

1. Full general release from the company and Augenbaum
2. Dismissal of the pending litigation with prejudice
3. Any payment of attorneys fees to Abraham Fruchter to be paid by the company in its sole discretion
4. Most favored nation – i.e., in the event of any settlement with any other defendant at less than 21% of the claimed damages on a Chevron basis (the "Settlement Percentage"), Augenbaum will pay to Anson the difference between $35 million and the amount that represents the Settlement Percentage paid by the other defendant.
5. Other standard terms including confidentiality and non-disparagement.

**David M. Murphy**  (bio)
   Mediator ◇ Arbitrator ◇  Independent Panelist
     Phillips ADR Enterprises LLC (PADRE)

ADD-117

New York  ◇  Corona del Mar

917-446-0233 (New York)

ADD-118

# EXHIBIT 4

ADD-119

**KARTOON STUDIOS, INC.**
(a Nevada corporation)
(the "Company")

**MINUTES OF A SPECIAL MEETING
OF THE COMPANY'S BOARD OF DIRECTORS**

**DATE:**    January 30, 2026
**TIME:**    10 a.m. PT
**PLACE:**   Conference Call

**DIRECTORS PRESENT:**

1. Mr. Andy Heyward

2. Gov. Gray Davis (Telephone)

3. Mr. Anthony Thomopoulos (Telephone)

4. Ms. Margaret Loesch (Telephone)

5. Jeff Schlesinger (Telephone)

**OTHERS PRESENT:**

Michael Jaffa, Chief Operating Officer
Brian Parisi, Chief Financial Officer

**CALL TO ORDER**

A meeting of the Company's Board of Directors (the "Board") was held at the date, time and place set forth above. After confirming that all could hear and be heard, Andy Heyward called the meeting to order and announced that a quorum of the Board was present and that the meeting, having been duly noticed and convened, was ready to proceed with its business.

**SECTION 16(b) LITIGATION AND RELATED MATTERS**







### FORMATION OF LITIGATION COMMITTEE

After discussion, the following resolutions were presented to the Board for consideration and approval:

* * *

***WHEREAS***, the Company is the nominal defendant and the real party in interest in the pending litigation captioned *Augenbaum v. Anson Investments Master Fund LP, et al.*, Case No. 1:22-cv-00249 (S.D.N.Y.) (the "Section 16(b) Litigation"), which asserts claims under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), against certain institutional investors (the "Defendants") seeking disgorgement of alleged short-swing profits, with any recovery payable to the Company;

*WHEREAS*, the Court denied the Defendants' motion to dismiss in January 2024 and motion for summary judgment in September 2025, and the Section 16(b) Litigation is now scheduled for trial beginning June 8, 2026;

*WHEREAS*, certain Defendants have made indemnification and advancement demands on the Company pursuant to Section 9(k) of the Securities Purchase Agreement dated March 11, 2020 (the "SPA"), which contains provisions potentially requiring the Company to indemnify such investors for claims arising out of the SPA, including derivative actions brought on behalf of the Company, and potentially to make periodic payments of attorneys' fees and other expenses as they are incurred;

*WHEREAS*, on January 6, 2026, Iroquois Master Fund Ltd. and Iroquois Capital Investment Group filed a complaint against the Company in the Supreme Court of the State of New York, Index No. 650077/2026 (the "Iroquois Litigation"), seeking declaratory relief and damages for breach of contract based on the Company's alleged failure to advance approximately $5.2 million in attorneys' fees and expenses;

*WHEREAS*, the Board has determined that it is necessary and appropriate to conduct an independent and robust evaluation of (i) the value of the Company's claim in the Section 16(b) Litigation, risks and benefits of continued prosecution, and the feasibility of reaching a value-maximizing resolution of the claim; and (ii) the Company's potential exposure to indemnity claims by Defendants to the Section 16(b) Litigation, including with respect to the Iroquois Litigation and potential future indemnity litigation, and the effect of any such obligations on the Company's potential net recovery in the Section 16(b) Litigation;

*WHEREAS*, the Bylaws of the Company provide that the Board may designate one or more committees, each committee to consist of one or more directors of the Company;

*WHEREAS*, the Board deems it advisable and in the best interests of the Company and its stockholders to form a litigation committee (the "Litigation Committee") consisting of independent and disinterested directors to investigate, review, and further evaluate the pending Section 16(b) Litigation and the Iroquois Litigation, including with respect to the value of the Company's claim, the potential liability of the Company for indemnification and advancement claims, and potential strategic alternatives available to the Company;

*WHEREAS*, the Board deems it advisable and in the best interests of the Company and its stockholders that the Litigation Committee be empowered to engage directly with the parties to the Section 16(b) Litigation and their counsel in furtherance of the objectives set forth above;

*WHEREAS*, the Board has reviewed the background, relationships, affiliations and all other potential factors weighing on the independence of directors Jeffrey Schlesinger and Anthony D. Thomopoulos (collectively, the "Litigation Committee Members"), and has determined that

both Litigation Committee Members have no potential financial or other interest in, association with, relationship to, or connection of any kind to the Section 16(b) Litigation or the Iroquois Litigation, any party thereto, any counsel thereto, or any other person with any material interest of any kind relating to the litigations and the parties thereto, and thus both Litigation Committee Members are entirely independent and disinterested with respect to the claims asserted in the Section 16(b) Litigation and the Iroquois Litigation;

*WHEREAS*, the Board has likewise reviewed and discussed the experience and competencies of the Litigation Committee Members, and has determined that both Litigation Committee Members have extensive and substantial business experience weighing in favor of their selection to staff the committee, including that Mr. Schlesinger has more than three decades of operational, strategic, financial, and deal-making expertise from multiple senior executive roles, including President of all international television sales at Warner Bros. and Mr. Thomopoulos likewise is a veteran senior executive with a distinguished business career, including serving as President of the Broadcast Group of ABC, overseeing all network divisions including News and Sports, and serving as Chairman of United Artists Pictures;

*WHEREAS*, in light of the foregoing, and after weighing all relevant factors and exercising their independent business judgment, the Board has determined that it is advisable and in the best interests of the Company and its stockholders to form the Litigation Committee and appoint the Litigation Committee Members.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board hereby establishes the Litigation Committee for the purpose of evaluating the status of the Section 16(b) Litigation, the status of the Iroquois Litigation, the potential value of the Company's claim and likelihood of success at trial, the potential exposure to related indemnification and advancement claims, and the Company's potential strategic options in connection with all of the foregoing;

**RESOLVED FURTHER**, that the Board hereby appoints Jeffrey Schlesinger and Anthony D. Thomopoulos to serve as co-Chairs of the Litigation Committee;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, delegated full power and authority to:

(i)     investigate, review, and evaluate the claim asserted in the Section 16(b) Litigation, including the merits, prior judicial rulings, procedural posture, potential recovery for the Company, and costs, benefits and probabilities of continued prosecution;

(ii)    investigate, review, and evaluate the Defendants' indemnification and advancement claims under the SPA, including the legal basis (if any) for such claim, any distinction between advancement and indemnification obligations, the exposure and defense costs associated with the Iroquois Litigation, and the potential effect

of any such obligations on the Company's net recovery in the Section 16(b) Litigation;

(iii)    engage in discussions with the parties to the Section 16(b) Litigation to ascertain the status of settlement efforts, anticipated material issues for the parties at trial, and the feasibility and value of potential resolutions favorable to the Company;

(iv)    evaluate and make recommendations to the Board as to whether continued prosecution, settlement, or other disposition of the claim asserted in the Section 16(b) Litigation, taking into account all relevant factors, is in the best interests of the Company and its stockholders; and

(v)    submit for the Board's consideration any specific proposal(s) for the potential settlement or prosecution of the Section 16(b) Litigation and/or settlement or defense of the Iroquois Litigation consistent with the Litigation Committee's objectives set forth above; and

**RESOLVED FURTHER**, that any proposal with respect to the prosecution or settlement of the Section 16(b) Litigation or the Iroquois Litigation shall require approval by the Board following presentation and recommendation by the Litigation Committee;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, authorized and empowered to retain independent legal counsel, financial advisors, and any other consultants, experts or other resources as the Litigation Committee may deem, in its sole discretion, necessary or appropriate to assist the Litigation Committee in the discharge of its duties and objectives set forth herein, and that the reasonable fees and expenses of such parties shall be paid by the Company;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, authorized to engage directly with the parties to the Section 16(b) Litigation and the Iroquois Litigation and their respective counsel, and the court, where appropriate, on behalf of the Company as may be deemed appropriate in connection with its mandate;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, authorized to adopt such rules and regulations relating to the conduct of its internal affairs as the Litigation Committee deems advisable, including setting the notice requirements for any meeting of the Litigation Committee;

**RESOLVED FURTHER**, that the officers, directors, employees, and agents of the Company are, and each individually is, hereby authorized and directed to make available to the Litigation Committee, and any of its advisors, agents, counsel, and designees, any and all documents and information that the Litigation Committee deems necessary to carry out its duties and to fully cooperate with the Litigation Committee's investigation;

**RESOLVED FURTHER**, that each officer of the Company is hereby authorized and empowered, for and on behalf of the Company, to take or cause to be taken any and all such actions and to enter into, execute and deliver any and all such acknowledgments, agreements, certificates, contracts, instruments, notices, statements and other documents as may be required or as any such officer may deem necessary, advisable or appropriate to effectuate and carry out the purposes and intent of the foregoing resolutions; and

**RESOLVED FURTHER**, that all actions heretofore taken by any officer or director of the Company in connection with the matters contemplated by the foregoing resolutions, if any, are hereby ratified, confirmed, approved and adopted as actions on behalf of the Company.

\* \* \*

Upon motion duly made and seconded, the foregoing resolutions were unanimously approved and adopted by the Board.

**ADJOURNMENT**

There being no further business to come before the Board, the meeting was adjourned.

Michael Jaffa
Secretary

ADD-127

# EXHIBIT 5

**KARTOON STUDIOS, INC.**
(a Nevada corporation)
(the "Company")

## MINUTES OF AN AD HOC MEETING OF THE
## LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS

**DATE:**       February 2, 2026
**TIME:**       1:00 p.m. PT
**PLACE:**      Conference Call

### DIRECTORS PRESENT:

Jeff Schlesinger, Co-Chair
Tony Thomopoulos, Co-Chair

### OTHERS PRESENT:

Aaron Morris, Morris Kandinov LLP

### AD HOC MEETING

A meeting of the Litigation Committee (the "Committee") was held on the above date at the above time by conference call. Mr. Schlesinger began by stating that the Committee had been duly formed by the Board on January 30, 2026 and, in coordination with Michael Jaffa, the Company's Chief Operating Officer, the Committee had determined to retain Morris Kandinov LLP as special counsel in connection with the *Augenbaum* litigation and the work of the Committee. Aaron Morris of the Morris Kandinov firm was present at the meeting and responded to numerous questions from the Committee as to the representation and the *Augenbaum* litigation generally.

First, the Committee requested an overview of the history and procedural status of the *Augenbaum* litigation. Mr. Morris provided an overview of the *Augenbaum* litigation to date, and a discussion ensued regarding the trial court's recent ruling on summary judgment and the trial scheduled for June 2026. Mr. Morris noted that his firm had previously represented a third-party witness in connection with a subpoena served during discovery in the *Augenbaum* litigation, and thus his firm already was well apprised of the procedural history and nature of the litigation. The Committee acknowledged that fact and determined that the prior representation did not pose a conflict or other reason precluding the firm from representing the Company and the Committee, and that the firm's prior involvement would minimize initial expenses.

Second, the Committee inquired as to the nature of the Section 16(b) claim asserted in *Augenbaum*, the measure of proof required to prevail on such a claim at trial, and the evidentiary

record submitted by the parties in connection with summary judgment. Mr. Morris provided an overview of the key factual disputes in the case, the evidentiary record noted by the Court in providing its summary judgment ruling, and the Plaintiff's burden of proof at trial. A discussion ensued about the forthcoming trial and the associated risks and potential recovery for the Company. During the discussion, the Committee requested that Mr. Morris provide additional analysis as to the maximum recoverable damages asserted by Plaintiff's counsel, the actual accounting profit realized by each Defendant, and an analysis of a reasonable value of the claim under different trial scenarios and for settlement purposes.

Third, the Committee inquired about the indemnity demands that had been made on the Company by certain of the Defendants and the current status of such demands. Mr. Morris provided an overview of the current claims for advancement, the fact that the Company had not made payments in connection with those demands in the recent months, and the Company's potential exposure to such claims and potential defenses. Mr. Morris noted that Iroquois was the first Defendant to file a lawsuit regarding indemnity, but that it was likely others would follow. A discussion ensued as to the likely defense costs of such litigation. Discussion then turned to scenarios under which the Company may or may not owe such indemnity, including potential indemnity exposure if the Plaintiff were not successful at proving the Section 16(b) claim at trial. Mr. Thomopoulos inquired as to what insurance coverage, if any, may be available for such indemnity obligations. A discussion between the Committee members ensued. The Committee then asked Mr. Morris to prepare further analysis as to the claims and defenses with respect to indemnity, insurance, and the different scenarios under which the Company may or may not owe such indemnity to Defendants.

Discussion then turned to the goals of the Committee in the near term. Mr. Schlesinger outlined the business considerations relevant to the Company in connection with the *Augenbaum* litigation and the method by which the Committee could develop an understanding of prior settlement discussions between the parties and the status of current discussions, if any. The Committee discussed the fact that there was a prior mediation but the Company was not invited to participate. The mediator was David Murphy of Phillips ADR. Discussion then turned to the identity of the attorneys for Plaintiff and Defendants and the best method to initiate discussions with these parties. Mr. Morris stated that he would report to the Committee in the coming days as to the best representatives of the parties so that the Committee may engage with them directly.

**ADJOURNMENT**

There being no further business to come before the Committee, the meeting was adjourned.

_____
Michael Jaffa
Secretary

ADD-131

ADD-132

# EXHIBIT 6

 Outlook

---

**Re: Augenbaum/Kartoon Studios**

---

**From** Aaron Morris <aaron@moka.law>

**Date** Mon 4/20/2026 10:57 AM

**To** Jeffrey S. Abraham <JAbraham@aftlaw.com>

**Cc** Michael Klein <mklein@aftlaw.com>; Michael Jaffa <mjaffa@kartoonstudios.com>; Jay Lefkowitz <lefkowitz@kirkland.com>; Andrew Robertson <andrew@moka.law>

---

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

In light of your repeated refusals to cooperate as to a basic non-waiver agreement, we will proceed as you propose and limit sharing of materials or communications that may implicate privilege. With that limitation, we continue to invite you, as we have for months, to engage with the company regarding the litigation and trial.

Schedules permitting, I expect Jeff Schlesinger to join the call at 2:30pm. K&E has been handling settlement communications and, to respect confidentiality, I do not propose to discuss the content of settlement talks you may have had or that the company has had. Rather, this discussion will focus on the company's financial condition, the potential resolution on the table, and the material considerations around trying the claims in the alternative.

As to my firm, I've advised you from the outset and on multiple occasions that we represent the company and you have the minutes from the board and committee reflecting our scope, which is to aid in evaluating the litigation as directed. I am not aware of what you are asking beyond that.

I will send a calendar invite around for today.

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

aaron@moka.law

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Monday, April 20, 2026 at 10:15 AM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Klein <mklein@aftlaw.com>, Michael Jaffa <mjaffa@kartoonstudios.com>, Jay Lefkowitz <lefkowitz@kirkland.com>, Andrew Robertson <andrew@moka.law>
**Subject:** Re: Augenbaum/Kartoon Studios

Dear Aaron,

I assume based upon your email that you are no longer demanding that Plaintiff enter into a Rule 502(d) stipulation.  If that is not the case, please let me know.

I am available at 2:30 p.m. but before any such call, can you please respond to my prior question concerning the role of Morris Koadinov in this matter as well as whether any members of the Litigation Committee will be on the call.  Also, are you looking to inform me of settlement discussions the Company is attempting to conduct or do you want to know about the status of settlement discussions Plaintiff has had since Judge Subramanian issue his decision denying all the parties summary judgment motions?

Sincerely yours,
Jeff Abraham

Sincerely yours,
Jeff Abraham

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



**From:** Aaron Morris <aaron@moka.law>
**Sent:** Monday, April 20, 2026 9:20 AM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>; Michael Jaffa <mjaffa@kartoonstudios.com>; Jay Lefkowitz <lefkowitz@kirkland.com>; Andrew Robertson <andrew@moka.law>
**Subject:** Re: Augenbaum/Kartoon Studios

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Could you please provide me with your availability today? The agenda will be discussion of the company's financial condition and the status of settlement discussions.

Thank you.

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

aaron@moka.law

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Friday, April 17, 2026 at 2:53 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Klein <mklein@aftlaw.com>, Michael Jaffa <mjaffa@kartoonstudios.com>, Jay Lefkowitz <lefkowitz@kirkland.com>, Andrew Robertson <andrew@moka.law>
**Subject:** Re: Augenbaum/Kartoon Studios

Dear Aaron,

Plaintiff requested copies of certain basic minutes relating to the formation and functioning of the "Litigation Committee." Genius initially refused to produce asserting a claim of privilege upon which the Company based its demand that Plaintiff enter into a Rule 502(d) stipulation prior to reviewing those materials. Plaintiff is puzzled as to why Genius having now determined after having "closely reviewed" the minutes that there is no issue of privilege waiver, continues to demand that Plaintiff enter into a Rule 502(d) stipulation.

As I previously explained, I have been practicing law for almost 40 years, have been involved in settling dozens of Section 16(b) and shareholder derivative actions, and have never previously encountered a request as counsel for Plaintiff (or in any other capacity) to enter into a Rule 502(d) stipulation. Nor have I found any of the proposed rationales for doing so compelling, especially since Plaintiff is already informed that the Litigation Committee intends to seek approval of a proposed settlement pegged at a total value of $50 million assuming all the Defendants signed on to the proposed settlement. If the Litigation Committee feels any material it would otherwise share is privileged, then it should not share those materials. The Company or the Committee remain free, as you previously suggested, to ask the Court to enter an Order pursuant to Rule 502(d).

Your assertion that the Committee or the Company responded to Plaintiff's February 6 email is also disingenuous. Our correspondence is documented in this email string, demonstrates that Plaintiff has not received any substantive response to that or the questions in my February 10 email.

I am also sorry that you do not appreciate Plaintiff raising your firm having a potential – if not actual – conflict in appearing on behalf of the Litigation Committee (or the Company) in this action. However, the Litigation Committee's March 9th minutes reflect that Defendants raised the same question. Indeed, the minutes state that the Litigation Committee will take action with respect to any proposed settlement "without the advice of Morris Koadinov" demonstrating that the potential conflict is very real.

ADD-136

Plaintiff is nonetheless amenable to scheduling a call at a mutually convenient time provided that you are willing to: (i) share an agenda of the proposed subjects to be discussed in the call; and (ii) explain the precise role of Morris Koadinov in this matter.

I look forward to hearing from you and hope all is well.

Very truly yours,
Jeff Abraham

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Thursday, April 16, 2026 4:12 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>; Michael Jaffa <mjaffa@kartoonstudios.com>; Jay Lefkowitz <lefkowitz@kirkland.com>; Andrew Robertson <andrew@moka.law>
**Subject:** Re: Augenbaum/Kartoon Studios

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Thanks for the response.

As to the committee's minutes and materials, I have stated from the outset an intention to share all such materials pursuant to a Rule 502(d) agreement, which you have refused without substantive explanation. Rule 502(d) is designed for circumstances such as these to allow open engagement without the risk of waiver of privilege on either side. You are currently litigating a claim that belongs to the company. The company has an interest in candidly discussing it with you. Can you explain why you have repeatedly refused to enter into a non-waiver agreement or whether you have an alternative proposal?

Notwithstanding the above, we have closely reviewed the minutes requested and determined that nothing therein subjects the company to a potential waiver of privilege. To be clear, by

providing these minutes, the company does not waive, and expressly reserves, all rights, privileges and protections.

As to your questions in the March 3 email, you are incorrect that you received no response. I responded by email and we had a subsequent call. Many if not all of those questions were premature when posed, but we should plan to revisit them as part of a broader discussion of an actual potential resolution of this matter.

As to my firm's involvement, I don't appreciate the insinuation that our prior representation in connection with a third-party subpoena to SEG (a provider to the company) could somehow jeopardize my work for the company now. In any event, the prior representation was fully disclosed, does not pose a conflict, and the company has had the benefit of multiple additional advisors throughout this process, including at Vinson & Elkins and Kirkland & Ellis.

My suggestion is that we schedule a follow-up call this week. I am available at your convenience.

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

aaron@moka.law

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Monday, April 13, 2026 at 4:05 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Klein <mklein@aftlaw.com>, Michael Jaffa <mjaffa@kartoonstudios.com>, Jay Lefkowitz <lefkowitz@kirkland.com>
**Subject:** Re: Augenbaum/Kartoon Studios

Dear Aaron,

It has been more than two months since you first emailed me on February 6, 2026, stating that you were retained by a newly created Litigation Committee of the Board of Kartoon Studios.  I responded to your email that same day by requesting the board resolutions creating the Committee and the minutes authorizing the Committee to hire Morris Koadinov as counsel.

After initially declining to provide those minutes and resolutions unless Plaintiff entered into a Rule 502(d) agreement based on a claim of privilege, on February 13th you sent over a heavily redacted set of minutes evidencing the Board having formed a Litigation Committee. In that email, you stated that "[t]he Committee's subsequent retention of my firm will be reflected in minutes that are not yet finalized.  **Upon receipt I will provide them to you as well**."  (Emphasis added).

On March 3rd, Plaintiff wrote to you requesting the Committee's position with respect to certain potential settlement-related issues. Neither the Company nor the Committee has

responded to that email.  You subsequently informed me that you would not be representing the Committee but, instead, would be representing the Company (seemingly in addition to Michael Charlson of Vinson & Elkins) and, instead, Jay Lefkowitz of Kirkland & Ellis would be representing the Committee.  At that time, you once again asked that Plaintiff sign the 502(d) agreement with Plaintiff once again declining your request.

I had two separate telephone conversations with Jay — who never even asked me to sign a 502(d) agreement — concerning settlement issues.  Plaintiff's current understanding from our last conversation with Jay is that the Company plans to propose a settlement of $50 million.  Plaintiff considers that amount woefully inadequate given both the relative strength of this case as well as post-summary judgment discussions Plaintiff has had with certain Defendants through David Murphy who is the mediator the parties have employed in this action.

Plaintiff doesn't see any reason to have a discussion regarding settlement with the Company since it: (i) has been consistently hostile to Plaintiff's claims  going so far as to submit a declaration in support of Defendants' position in connection with the summary judgment briefing (s*ee* ECF No. 232-1) and a brief contesting certain of Plaintiff's allegations (*see* ECF No. 250) ; (ii) previously proposed to utilize the net proceeds of any settlement to compensate Defendants for their litigation expenses in a manner which Plaintiff believes is contrary to the restriction imposed by  15 U.S.C. §78u-4(f)(2)(B)(ii) and New York law (*see Donaldson Lufkin & Jenrette Sec. Corp. v. Star Techs., Inc.*, 148 Misc.2d 880, 883, 561 N.Y.S.2d 371 (N.Y. Sup. Ct. 1990), *on reargument*, 150 Misc.2d 126, 567 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991), *aff'd*, 180 A.D.2d 495, 580 N.Y.S.2d 657 (1st Dep't 1992)); and (iii) has to Plaintiff's understanding already decided to endorse a proposed settlement that Plaintiff believes is inadequate.

Plaintiff also, as I previously explained to you, continues to be concerned about the Committee's retention of Morris Kandinov which has a conflict in this case based upon representing Special Equity Group (ECF No. 232-16) which views Defendants, who are repeat clients of SEG, as "friends and family."  *See* ECF No. 226-1 at Exhibit 15. A further conflict exists based upon SEG, based upon the Company's latest Form 10-K filing, seeking indemnification for hundreds of thousands of dollars in legal fees which seems to be at least partially in dispute, and which the Company describes as "excessive."  *See* 2025 Form 10-K at F-48.

Plaintiff sees no reason to meet with the Committee just to allow you to check off a box before going to the Court and seeking approval of a proposed settlement, especially given

the Committee demanding that Plaintiff enter into a 502(d) agreement.  Plaintiff, however, is willing to meet if the discussions are more substantive and are preceded by a response to Plaintiff's March 3rd email and some explanation as to why the Company believes that David Murphy, a very well experienced mediator the parties have retained in this action, is not adequate to the task.  In addition, prior to any meeting, Plaintiff asks that you honor your previously agreement to provide the Committee's minutes reflecting Morris Koadinov's appointment as counsel. Any such minutes should also reflect any subsequent appointment of Jay Lefkowitz as counsel and your subsequently being re-engaged by the Committee.

I look forward to hearing from you and apologize for not responding to you earlier, but I have just returned to the office today from Passover vacation.

Sincerely yours,

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Wednesday, April 8, 2026 12:49 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>; Michael Jaffa <mjaffa@kartoonstudios.com>; Jay Lefkowitz <lefkowitz@kirkland.com>
**Subject:** Re: Augenbaum/Kartoon Studios

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

I'm following up on our prior emails, points below, and conversation on March 4. The Committee has continued interest in discussing the *Augenbaum* matter directly with you. I expect

schedules would permit a virtual meeting next week. Could you please let us know whether you are willing to meet and, if so, a date that would work for you?

Further, as to the Rule 502(d) non-waiver agreement we previously proposed, my understanding from our call is that Mr. Augenbaum will not participate as a signatory, but will you agree not to oppose its entry if the Company seeks it unilaterally? At bottom, the agreement is intended to facilitate an open dialogue between you, as Mr. Augenbaum's counsel, and the Company without the risk of waiver of privilege as to either party (including, for example, discussion of the information you've requested below).

Happy to discuss at your convenience.

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Tuesday, March 3, 2026 at 1:55 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** RE: Augenbaum/Kartoon Studios

Dear Aaron,

I don't know when you are returning from vacation, but I think there are certain issues which it would be helpful to discuss with the Company (or the committee you represent) in connection with settlement negotiations and which would be helpful for you to think about in advance of any meeting we might have.

*First*, any Defendant looking to settle this case will almost certainly want to know that the Company is on board with any settlement Plaintiff is negotiating.  Therefore, it could help facilitate that process, if you would let me know what the Company considers to be the minimum recovery that it would consider reasonable from each of the eight Defendants.

*Second*, any Defendant settling the case is also likely to ask for a release from the Company.  Often, parties ask for broad releases covering potentially more than the claims at issue in the action.  Please let me know whether there are any limits on the scope of a release which the Company is willing to provide.  Relatedly, please let me know whether the Company will be seeking a reciprocal release from any settling Defendant and, if so, the scope of any such release.

*Third*, please let me know whether the Company is amenable to a settlement provision keeping the terms of any settlement confidential subject to the need to make any required federal securities law disclosures and any necessary disclosures to the Court.

*Fourth*, given the Company having previously moving to have the case captioned amended such that it is a nominal defendant, please let me know whether the Company believes that a notice and hearing for any settlement is required by Fed. R. Civ. P. 23.1 or

whether the requirements for the approval of attorneys' fees contained in Local Rule 23.1 apply.

*Fifth*, please let me know whether the Company objects to Plaintiff's counsel holding any settlement funds in escrow pending either the final approval or effectuation of the terms of any settlement and, if so, whether it has a preferred escrow agent.

In addressing these questions to you, Plaintiff does not intend to concede that forming the Litigation Committee was appropriate or necessary given the procedural history and posture of this action. Instead, this letter simply reflects the reality that the Company has chosen you to interact with Plaintiff's counsel and the practical reality that many, if not most, Defendants are likely to seek a release of claims from the Company in connection with any settlement.

I look forward to hearing from you.

Sincerely yours,
Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



ABRAHAM, FRUCHTER & TWERSKY, LLP

---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Tuesday, February 24, 2026 7:33 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Subject:** FW: Augenbaum/Kartoon Studios

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Apologies, I'm juggling while in British Columbia heliskiing… I thought I would have more downtime than I've had but weather has been great and they are running the choppers all day long. We should connect soon but there's no immediate urgency. Tell me how your schedule looks later in the week and early next week.

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Tuesday, February 24, 2026 at 2:13 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>, Michael Klein <mklein@aftlaw.com>, Robert Glunt <glunt@mandelbhandari.com>, Evan Mandel <em@mandelbhandari.com>
**Subject:** RE: Augenbaum/Kartoon Studios

Aaron,

Following up.  I guess today didn't work for you.  In the meantime, tomorrow morning is no longer good for me.  If you want to talk at another time, let me know.

Jeff

**Jeffrey S. Abraham**

Abraham, Fruchter & Twersky LLP

450 Seventh Avenue, 38th Floor

New York, NY 10123

Tel: (212) 279-5050

Fax: (212) 279-3655



**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Sent:** Friday, February 20, 2026 4:00 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>; Michael Klein <mklein@aftlaw.com>; Robert Glunt <glunt@mandelbhandari.com>; Evan Mandel <em@mandelbhandari.com>
**Subject:** Re: Augenbaum/Kartoon Studios

It should

Get Outlook for iOS

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Friday, February 20, 2026 1:50:43 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>; Michael Klein <mklein@aftlaw.com>; Robert Glunt <glunt@mandelbhandari.com>; Evan Mandel <em@mandelbhandari.com>
**Subject:** Re: Augenbaum/Kartoon Studios

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Sorry for the delay, I had a few things pull me away this week. I will look into the tolling agreement issue, minutes, and let's discuss next week. I'm on west coast time next week, does anything 9:30AM to 11AM ET Tuesday or Wednesday work for you for a 10 min call?

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Friday, February 20, 2026 at 12:17 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>, Michael Klein <mklein@aftlaw.com>, Robert Glunt <glunt@mandelbhandari.com>, Evan Mandel <em@mandelbhandari.com>
**Subject:** Re: Augenbaum/Kartoon Studios

Aaron,

Are those minutes available yet?  Also, is there an actual tolling agreement into which Iroquois entered into with the Company?  If so, can you shoot it over to me?

What days work for you next week?

Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Friday, February 13, 2026 9:51 AM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>; Michael Klein <mklein@aftlaw.com>
**Subject:** Re: Augenbaum/Kartoon Studios

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Thanks for sending the *Ferko* case, which I've reviewed. I see the risk of privilege waiver on your side that you are flagging, but I think we are fully addressing here under the Rule 502(d) agreement, which is bilateral. Moreover, as "suspenders" to this belt, I would suggest that we require defendants to expressly consent to this order and note that in our filing with the Court. I would expect them to agree because they don't really have a basis to object and would appear to the judge as needlessly uncooperative. As to Rule 408, I agree that settlement communications would be covered, but I see that issue as separate to the potential waiver of attorney-client privilege for our respective clients.

As to the resolutions establishing the Committee, I am attaching the minutes with redactions until we resolve the potential privilege issues we have been discussing. The Committee's subsequent retention of my firm will be reflected in minutes that are not yet finalized. Upon receipt, I will provide them to you as well.

If easier, feel free to call me at the number below.

Aaron

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Wednesday, February 11, 2026 at 10:36 AM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>, Michael Klein <mklein@aftlaw.com>
**Subject:** RE: Augenbaum/Kartoon Studios
Dear Aaron,

Look at *Ferko v. Nat'l Ass'n For Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 403 (E.D. Tex. 2003) which holds that communication between a plaintiff and a corporate nominal defendant are because a plaintiff in shareholder derivative action shares with a nominal corporate defendant is not protected by the common interest privilege or any extension of the attorney-client privilege or work-product doctrine. *See Ferko v. Nat'l Ass'n For Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 403 (E.D. Tex. 2003). *Ferko* seems on point because Genius has taken a hostile position towards Plaintiff's claims starting from responding to Plaintiff's demand by asserting that the claim was meritless which even figured as an exhibit in Defendants' motion to dismiss (ECF No. 96-6) continuing through at least summary judgment briefing in which Michael Jaffa's declaration quite pointedly is Exhibit 1. ECF No. 232-1.

Also, in this case, Plaintiff only knows you as counsel for SEG. Therefore, it doesn't make sense for Plaintiff to have any conversation with you until you show us the board resolution establishing the "Litigation Committee" and appointing your firm as counsel for that committee. This is not my first rodeo and I have seen many such Board resolutions provided without any privilege being asserted. I understand that any investigation and legal advice might be privileged but the simple board resolutions Plaintiff is seeking are not within that category.

I am also rather concerned about signing any stipulation of the sort you suggested because I'm not the smartest guy in the room and am concerned about being sandbagged. This especially true here because I am completely at sea with how anything you could show me with respect to the underlying facts of the case is not already covered by the confidentiality agreement Judge Subramanian entered in this case. To the extent our conversations touch on other matters, Rule 408 would seem to adequately assure the Company of confidentiality. Nonetheless, I have no intention of disclosing anything you tell me to Defendants because Plaintiff obviously considers their position as hostile in this litigation.

Sincerely yours,
Jeff


**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Tuesday, February 10, 2026 6:42 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>; Michael Klein <mklein@aftlaw.com>
**Subject:** Re: Augenbaum/Kartoon Studios

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Thanks for your email. Assume that it is our intention to provide the information requested in the bullets below, but could we please schedule a call to discuss your final bullet on case law? We are of the opinion that Rule 502(d) was designed to enable this kind of dialogue. We'd be happy to look at any of your cases in advance of that call.

I'm traveling all day tomorrow but could schedule something in the afternoon Thursday or any time Friday.

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Tuesday, February 10, 2026 at 5:02 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>,
Michael Klein <mklein@aftlaw.com>
**Subject:** RE: Augenbaum/Kartoon Studios
Dear Aaron,

I have some concerns about this draft stipulation but before we get there, Plaintiff needs to understand the nature of your request and ensure that Plaintiff's information will be properly handled. To that end, I'd appreciate if you could help me better understand what the Committee has in mind by responding to the following questions:

- For what purpose does the committee want to discuss our "strategic thinking" in this litigation?
- What role does the committee or company believe that it has in this litigation?
- What actions, if any, does the committee or Company intend to take?
- Who will be provided with information turned over to the committee?
- What discussions has the committee or Company had with defendants or their representatives?
- What assurances does Plaintiff have that confidential information will not be provided to the defendants or their representatives?
- Based on Plaintiff's review of the caselaw, there appears to be substantial risk that any information provided to the committee or the Company will lose privilege protections. Do you have a different view? Do you have authority for that position?

We're certainly happy to discuss these issues to ensure that everything proceeds appropriately and in a fashion that protects the rights of Plaintiff, and the Company.

Sincerely yours,
Jeff Abraham


**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



**From:** Aaron Morris <aaron@moka.law>
**Sent:** Friday, February 6, 2026 7:23 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>
**Subject:** Re: Augenbaum/Kartoon Studios

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Yes, and I'd like to be in a position to share those materials as well as others in the future. I am attaching a Rule 502(d) agreement that would allow the company to share these materials without the risk of waiving the attorney-client privilege.

Please let me know your comments and we will get on file promptly.

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Friday, February 6, 2026 at 1:50 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>
**Subject:** RE: Augenbaum/Kartoon Studios
Dear Aaron,

As an initial matter, can you please provide me with the minutes and the Board resolution if there is one creating the Litigation Committee and authorizing the Litigation Committee to hire Morris Kandinov.

Sincerely yours,
Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



**From:** Aaron Morris <aaron@moka.law>
**Sent:** Friday, February 6, 2026 10:12 AM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>
**Subject:** Augenbaum/Kartoon Studios

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

ADD-148

I hope all is well with you. My firm has been retained in connection with the creation of a Litigation Committee by the Board of Directors of Kartoon Studios. The Committee's mandate is to evaluate the ongoing *Augenbaum* litigation and report its findings and recommendations to the Board. In that regard, the Committee has been authorized by the Board to engage directly with the other parties to the litigation. The Committee has reviewed the procedural history of the litigation and is currently analyzing the risks and benefits to the Company under various potential outcomes.

In the coming weeks, at your convenience, could we please arrange a time to speak regarding the status of the case, the upcoming trial, and Plaintiff's strategic thinking? Perhaps we could speak initially, and then if you are willing, we could arrange a time to speak directly with the members of the Committee (Jeff Schlesinger and Tony Thomopoulos)? Let me know your thoughts.

I'm traveling today but could make any day except for Wednesday next week work.

-Aaron

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

ADD-149

# EXHIBIT 7

 Outlook

---

### Re: Augenbaum/Kartoon Studios

---

**From** Aaron Morris <aaron@moka.law>

**Date** Fri 2/13/2026 9:52 AM

**To**  Jeffrey S. Abraham <JAbraham@aftlaw.com>

**Cc**  Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>; Michael Klein <mklein@aftlaw.com>

📎 1 attachment (339 KB)

2026-1-30 Minutes of the Board of Directors of Kartoon Studios, Inc_Redacted.pdf;

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Thanks for sending the *Ferko* case, which I've reviewed. I see the risk of privilege waiver on your side that you are flagging, but I think we are fully addressing here under the Rule 502(d) agreement, which is bilateral. Moreover, as "suspenders" to this belt, I would suggest that we require defendants to expressly consent to this order and note that in our filing with the Court. I would expect them to agree because they don't really have a basis to object and would appear to the judge as needlessly uncooperative. As to Rule 408, I agree that settlement communications would be covered, but I see that issue as separate to the potential waiver of attorney-client privilege for our respective clients.

As to the resolutions establishing the Committee, I am attaching the minutes with redactions until we resolve the potential privilege issues we have been discussing. The Committee's subsequent retention of my firm will be reflected in minutes that are not yet finalized. Upon receipt, I will provide them to you as well.

If easier, feel free to call me at the number below.

Aaron

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Wednesday, February 11, 2026 at 10:36 AM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>, Michael Klein <mklein@aftlaw.com>
**Subject:** RE: Augenbaum/Kartoon Studios

Dear Aaron,

Look at *Ferko v. Nat'l Ass'n For Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 403 (E.D. Tex. 2003) which holds that communication between a plaintiff and a corporate nominal defendant are because  a plaintiff in shareholder derivative action shares with a nominal corporate defendant is not protected by the common interest privilege or any extension of the attorney-client privilege or work-product doctrine.  *See Ferko v. Nat'l Ass'n For Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 403 (E.D. Tex. 2003).  *Ferko* seems on point because Genius has taken a hostile position towards Plaintiff's claims starting from responding to Plaintiff's demand by asserting that the claim was meritless which even figured as an exhibit in Defendants' motion to dismiss (ECF No. 96-6) continuing through at least summary judgment briefing in which Michael Jaffa's declaration quite pointedly is Exhibit 1.  ECF No. 232-1.

Also, in this case, Plaintiff only knows you as counsel for SEG.  Therefore, it doesn't make sense for Plaintiff to have any conversation with you until you show us the board resolution establishing the "Litigation Committee" and appointing your firm as counsel for that committee. This is not my first rodeo and I have seen many such Board resolutions provided without any privilege being asserted.  I understand that any investigation and legal advice might be privileged but the simple board resolutions Plaintiff is seeking are not within that category.

I am also rather concerned about signing any stipulation of the sort you suggested because I'm not the smartest guy in the room and am concerned about being sandbagged.  This especially true here because I am completely at sea with how anything you could show me with respect to the underlying facts of the case is not already covered by the confidentiality agreement Judge Subramanian entered in this case.  To the extent our conversations touch on other matters, Rule 408 would seem to adequately assure the Company of confidentiality.  Nonetheless, I have no intention of disclosing anything you tell me to Defendants because Plaintiff obviously considers their position as hostile in this litigation.

Sincerely yours,
Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



5/18/26, 9:32 PM      Case 1:22-cv-00249-AS     Document 388-7   Filed 05/20/26    Page 4 of 6
Genius Brands - Michael Klein Outlook

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Tuesday, February 10, 2026 6:42 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>; Michael Klein <mklein@aftlaw.com>
**Subject:** Re: Augenbaum/Kartoon Studios

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Thanks for your email. Assume that it is our intention to provide the information requested in the bullets below, but could we please schedule a call to discuss your final bullet on case law? We are of the opinion that Rule 502(d) was designed to enable this kind of dialogue. We'd be happy to look at any of your cases in advance of that call.

I'm traveling all day tomorrow but could schedule something in the afternoon Thursday or any time Friday.

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

aaron@moka.law

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Tuesday, February 10, 2026 at 5:02 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>, Michael Klein <mklein@aftlaw.com>
**Subject:** RE: Augenbaum/Kartoon Studios

Dear Aaron,

I have some concerns about this draft stipulation but before we get there, Plaintiff needs to understand the nature of your request and ensure that Plaintiff's information will be properly handled. To that end, I'd appreciate if you could help me better understand what the Committee has in mind by responding to the following questions:

- For what purpose does the committee want to discuss our "strategic thinking" in this litigation?
- What role does the committee or company believe that it has in this litigation?
- What actions, if any, does the committee or Company intend to take?
- Who will be provided with information turned over to the committee?
- What discussions has the committee or Company had with defendants or their representatives?
- What assurances does Plaintiff have that confidential information will not be provided to the defendants or their representatives?
- Based on Plaintiff's review of the caselaw, there appears to be substantial risk that any information provided to the committee or the Company will lose privilege protections. Do you have a different view? Do you have authority for that position?

We're certainly happy to discuss these issues to ensure that everything proceeds appropriately and in a fashion that protects the rights of Plaintiff, and the Company.

Sincerely yours,
Jeff Abraham

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Friday, February 6, 2026 7:23 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>
**Subject:** Re: Augenbaum/Kartoon Studios

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Yes, and I'd like to be in a position to share those materials as well as others in the future. I am attaching a Rule 502(d) agreement that would allow the company to share these materials without the risk of waiving the attorney-client privilege.

Please let me know your comments and we will get on file promptly.

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Date:** Friday, February 6, 2026 at 1:50 PM
**To:** Aaron Morris <aaron@moka.law>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>, Andrew Robertson <andrew@moka.law>
**Subject:** RE: Augenbaum/Kartoon Studios
Dear Aaron,

As an initial matter, can you please provide me with the minutes and the Board resolution if there is one creating the Litigation Committee and authorizing the Litigation Committee to hire Morris Kandinov.

Sincerely yours,

Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Friday, February 6, 2026 10:12 AM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Jaffa <mjaffa@kartoonstudios.com>; Andrew Robertson <andrew@moka.law>
**Subject:** Augenbaum/Kartoon Studios

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

I hope all is well with you. My firm has been retained in connection with the creation of a Litigation Committee by the Board of Directors of Kartoon Studios. The Committee's mandate is to evaluate the ongoing *Augenbaum* litigation and report its findings and recommendations to the Board. In that regard, the Committee has been authorized by the Board to engage directly with the other parties to the litigation. The Committee has reviewed the procedural history of the litigation and is currently analyzing the risks and benefits to the Company under various potential outcomes.

In the coming weeks, at your convenience, could we please arrange a time to speak regarding the status of the case, the upcoming trial, and Plaintiff's strategic thinking? Perhaps we could speak initially, and then if you are willing, we could arrange a time to speak directly with the members of the Committee (Jeff Schlesinger and Tony Thomopoulos)? Let me know your thoughts.

I'm traveling today but could make any day except for Wednesday next week work.

-Aaron

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

ADD-155

# EXHIBIT 8

 Outlook

---

### Re: CVI/Skadden -- Revised Offer

---

**From** David Murphy <dmurphy@phillipsadr.com>

**Date**  Tue 2/24/2026 5:44 PM

**To**    Jeffrey S. Abraham <JAbraham@aftlaw.com>

**Cc**    Michael Klein <mklein@aftlaw.com>

---

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Ok, in a mediation so I don't realize that was authorized.   Will convey, Jeff.

**David M. Murphy**  (bio)
  Mediator ◇ Arbitrator ◇  Independent Panelist
  Phillips ADR Enterprises LLC (PADRE)
      917-446-0233 (CT & NYC)

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Sent:** Tuesday, February 24, 2026 5:42:31 PM
**To:** David Murphy <dmurphy@phillipsadr.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** RE: CVI/Skadden -- Revised Offer

I thought I wrote to you before in my 3:09 p.m. email that we're running a blue light special today so you can convey the $10 million demand.

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



---

**From:** David Murphy <dmurphy@phillipsadr.com>
**Sent:** Tuesday, February 24, 2026 5:39 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re: CVI/Skadden -- Revised Offer

5/18/26, 8:48 PM   Case 1:22-cv-00249-AS   Document 388-8   Filed 05/20/26   Page 3 of 7

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

It means that I am quite certain that 10m would be accepted were I to propose it, Jeff.   I don't know if they would do 7-8m, but the best way to find out is to counter at 10m and let me explore that with them.   Obviously only if you are interested.

**David M. Murphy**  (bio)
Mediator ◇ Arbitrator ◇ Independent Panelist
Phillips ADR Enterprises LLC (PADRE)
917-446-0233 (CT & NYC)

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Sent:** Tuesday, February 24, 2026 5:15:35 PM
**To:** David Murphy <dmurphy@phillipsadr.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** RE: CVI/Skadden -- Revised Offer

Does this mean we're done? Or that the prior effort failed?

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



**From:** David Murphy <dmurphy@phillipsadr.com>
**Sent:** Tuesday, February 24, 2026 5:14 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re: CVI/Skadden -- Revised Offer

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Yes, but I pushed and pushed and pushed and that wasn't viable.  It was a hard no, so I didn't make it.

**David M. Murphy**  (bio)
Mediator ◇ Arbitrator ◇ Independent Panelist
Phillips ADR Enterprises LLC (PADRE)
917-446-0233 (CT & NYC)

**From:** Jeffrey S. Abraham <<u>JAbraham@aftlaw.com</u>>
**Sent:** Tuesday, February 24, 2026 3:09:19 PM
**To:** David Murphy <<u>dmurphy@phillipsadr.com</u>>
**Cc:** Michael Klein <<u>mklein@aftlaw.com</u>>
**Subject:** RE: CVI/Skadden -- Revised Offer

I'm pretty sure we were discussing a double blind at $10 million. I went back and checked my emails and found one you sent on December 11, 2025 which I am pasting in below. Regardless, this might be a time for a blue light special and I will drop my demand to $10 but I think I think it is fair to get the facts straight.

Jeff


Jeff,

As I said, Skadden's offer of $7 million dropped any demand for an MFN, so the devilish details (at least to CVI) are academic.   I will convey your more to $16m.   Thank you.

David


**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



**From:** David Murphy <<u>dmurphy@phillipsadr.com</u>>
**Sent:** Tuesday, February 24, 2026 3:01 PM
**To:** Jeffrey S. Abraham <<u>JAbraham@aftlaw.com</u>>
**Cc:** Michael Klein <<u>mklein@aftlaw.com</u>>
**Subject:** Re: CVI/Skadden -- Revised Offer

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All points well taken, with one exception.  They never said 7m.  I told you previously if I were to make a double-blind mediator's recommendation at 7ish, I was reasonably confident Susan's client would accept it.  Perhaps that is remains true:  a $5 million offer is consistent with that landing spot.

That said, Susan told me this morning that her client has incurred material additional expense since then; the passage of time is not neutral; and her client is offering to give up a litigable and now larger claim to indemnification as part of this offer. What is the Company's position on this since the Company would be getting and giving a release here whatever the final number?

If you want to try to land this right now for 7-8m, consider a counter at 10m. If not, I understand.

Best,

David

**David M. Murphy** (bio)
Mediator ◇ Arbitrator ◇ Independent Panelist
Phillips ADR Enterprises LLC (PADRE)
917-446-0233 (CT & NYC)

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Sent:** Tuesday, February 24, 2026 11:57:12 AM
**To:** David Murphy <dmurphy@phillipsadr.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** RE: CVI/Skadden -- Revised Offer

David,

I am still refining the research, but the first principle is that any agreement to indemnify a party for Section 16(b) claims is void both as a matter of public policy and as a waiver which is void ab initio based upon Section 29(a) of the Exchange Act. Section 29(b) then makes the entire contract void and although that provision is not often invoked federal courts act based upon principles of equity in determining whether any provision of the contract will continue to be enforceable.

Also, I note that Section 9(k) of the SPA does not clearly reference Section 16(b) claims and should be interpreted in a manner that would prevent a finding that the parties intended to enter a contract violating where, as here, there exists a perfectly reasonable alternative interpretation that does not involve violating the law. I also note though it does not make sense to get into detail here on certain differences between the indemnification provision contained in the SPAs for the registered direct offerings as well as the doctrine of severability can be applied when the underlying agreement upon which the purportedly severable provision depends (9(k)(iii) directly cross-references 9(k)(i)) is void ab initio.

Finally, I did not mention the Company forming a Litigation Committee but if that what Susan thinks will rule the day, she should consider the possibility that either Judge Subramanian will not go along with Defendants' scheme or, better yet, he will accept the settlement of the claims by the Company while allowing Plaintiff to pursue the case to trial treating the settlement as a floor beneath which recovery cannot go.

It's very hard to make a counter to such a lowball offer which if I was an intemperate person or in a bad mood I would call a Fuck You offer since it is even lower than the $7 million level I

understood CVI to be at in our prior discussions. I am, however, always open to your thoughts.

Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



ABRAHAM, FRUCHTER & TWERSKY, LLP

---

**From:** David Murphy <dmurphy@phillipsadr.com>
**Sent:** Tuesday, February 24, 2026 11:22 AM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re: CVI/Skadden -- Revised Offer

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Understood, Jeff.   Do you want other make a counter?   What, may I ask, makes you confident that the newly formed SLC will not wrest control over the resolution of these claims given that the Company faces such large indemnification exposure?


**David M. Murphy, Esq.**  (bio)
Mediator ◇ Arbitrator ◇ Independent Panelist
Phillips ADR Enterprises LLC (PADRE)
New York ◇ Corona del Mar
917-446-0233 (New York)


On Feb 24, 2026, at 10:25 AM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:

David,

I see you've marked this email high importance so I owe you the courtesy of a prompt response.

Susan's offer is almost certainly the product of my having reached out to her late last week to tell her I have maximum flexibility to settle the case before February 27th.  However, flexibility should not be confused with panic or a bargain basement sale.  CVI's offer is rejected but in the spirit of always looking on the bright side of life, if I lost my mind or and accepted that offer, the MFN would not be a problem.

I am guessing that the new intransigence and stalling of meaningful settlement talks is based upon the latest machinations of Iroquois and Empery filing complaints for advancement of legal

fees as well as other related maneuvering by Genius. I am confident – and you can tell Susan – that those efforts will fail.

Sincerely,
Jeff

**Jeffrey S. Abraham**

Abraham, Fruchter & Twersky LLP

450 Seventh Avenue, 38th Floor

New York, NY 10123

Tel: (212) 279-5050

Fax: (212) 279-3655

<image001.jpg>

---

**From:** David Murphy <dmurphy@phillipsadr.com>
**Sent:** Tuesday, February 24, 2026 9:15 AM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Subject:** CVI/Skadden -- Revised Offer
**Importance:** High

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Privileged & Confidential
For Settlement Purposes Only
Subject to Written Confidentiality Agreement

Jeff,

Susan Salzstein called me this morning to relay her call with you and to pass along an offer from her client.   CVI is willing to settle with you for $5 million. As part of any settlement, CVI will drop any request for an MFN; CVI will waive its contractual right to indemnification by the Company for its considerable legal fees and expenses to date; but CVI will need a full release from the Company and you.   If you are interested in a settlement at this price point, Skadden says that this can be ready to present to the court for approval within a few days.

Best regards,

David

**David M. Murphy, Esq.**  (bio)
Mediator ◇ Arbitrator ◇ Independent Panelist
Phillips ADR Enterprises LLC (PADRE)
New York ◇ Corona del Mar
917-446-0233 (New York)

ADD-162

# EXHIBIT 9

 Outlook

**Query re CVI**

From David Murphy <dmurphy@phillipsadr.com>
Date Thu 2/26/2026 4:18 PM
To   Jeffrey S. Abraham <JAbraham@aftlaw.com>

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jeff,

I'm in a mediation in another case, but I believe that if I were to propose a settlement at the middle of $5m and $10m (ie, $7.5 million), CVI will agree to it subject to the following conditions and reducing it to a writing:

1. No admission of liability
2. Jeff obtains issuer's consent to settlement terms within reasonable time frame
3. Jeff, shareholder, and issuer will keep terms confidential, no use of CVI's name without its written consent, subject to carveouts for nonnegotiable reporting obligations
4. Further to confidentiality: CVI, shareholder, and issuer will seek FRCP 41(a) dismissal of CVI with prejudice; CVI retains option to terminate settlement if court will not dismiss CVI unless settlement terms are publicly disclosed; settlement terminates if court refuses to dismiss or rejects settlement
5. General releases from shareholder and issuer in favor of CVI and related parties
6. CVI releases issuer from indemnity obligations; CVI releases shareholder and Jeff in respect of this litigation (except for MFN, below)
7. Payment following expiration of appeal period after dismissal; releases effective upon payment
8. MFN (Susan said:  "given that we are getting a once-in-a-lifetime deal we don't see this as a problem, but we can discuss").

Other terms to be negotiated.  Skadden anticipates that it could sign a term sheet or equivalent letter tomorrow "if that is what Jeff needs to comply with his deal with his co-counsel."

Let me know?

**David M. Murphy** (bio)
   Mediator ◇ Arbitrator ◇ Independent Panelist
   Phillips ADR Enterprises LLC (PADRE)
       917-446-0233 (CT & NYC)

# EXHIBIT 10

**KARTOON STUDIOS, INC.**
(a Nevada corporation)
(the "Company")

**MINUTES OF AN AD HOC MEETING OF THE
LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS**

**DATE:**      March 9, 2026
**TIME:**      10:00 a.m. PT
**PLACE:**     Conference Call

**DIRECTORS PRESENT:**

Jeff Schlesinger, Co-Chair
Tony Thomopoulos, Co-Chair

**OTHERS PRESENT:**

Michael Jaffa, Chief Operating Officer
Aaron Morris, Morris Kandinov LLP

**AD HOC MEETING**

A meeting of the Litigation Committee (the "Committee") was held on the above date at the above time by conference call. Mr. Schlesinger began by requesting an update regarding the work of Morris Kandinov in gathering and organizing the litigation record in the *Augenbaum* matter for review by the Committee as well as efforts to engage with the parties regarding a potential resolution. Mr. Morris advised the Committee that his firm continued to aggregate relevant materials and expects to provide additional memoranda in the coming weeks, including with respect to the arguments and evidence likely to feature at trial and the indemnity claims by certain defendants. Mr. Morris stated that he had initial calls with counsel for plaintiff, Jeffrey Abraham, regarding, among other things, the Committee's request to speak directly with Mr. Abraham regarding the pending litigation and a non-waiver agreement permitting the Committee to share its materials. Mr. Abraham initially declined to enter into a non-waiver agreement or commit to a meeting, but discussions remain ongoing. Mr. Abraham also requested certain information regarding the Company's positions relating to settlement as well as indemnity, which Mr. Morris stated would need to be addressed in future conversations with Mr. Abraham.

Discussion then turned to initial engagement with the defendants in the *Augenbaum* matter. Mr. Morris stated that he had an initial conversation with David Murphy of Phillips ADR, who had handled a prior mediation between the parties. Mr. Murphy was restricted by confidentiality obligations from discussing any prior settlement communications between the parties but agreed to inform counsel for defendants that the Committee had been formed to evaluate, among other

things, the potential to resolve the claims in the *Augenbaum* litigation prior to trial. In response, Defendants indicated, through Mr. Murphy, a willingness to engage in such discussions but questioned whether Morris Kandinov, which previously represented Special Equities Group in connection with a non-party subpoena in *Augenbaum*, could appropriately handle such negotiations. Mr. Morris reminded the Committee that it had previously considered whether the firm's prior engagement presented a conflict of interest and had determined that it did not. Nevertheless, following the initial engagement with defendants, Mr. Jaffa had explored the desirability of retaining separate counsel to handle such negotiations with the *Augenbaum* parties, including Jay Lefkowitz of Kirkland & Ellis who has handled a range of prominent securities and shareholder disputes, including claims under Section 16(b). Subject to the Committee's approval, Mr. Lefkowitz had agreed to represent the Committee in connection with negotiations. A discussion ensued.

After substantial discussion of the circumstances and relevant factors, including the inefficiencies and expense of retaining separate counsel against the advantages of Mr. Lefkowitz's expertise in this area, the apparent unwillingness of defendants to discuss resolution in the absence of separate counsel, and the potential that counsel for plaintiff may make similar arguments, the Committee determined to engage Mr. Lefkowitz to handle negotiations, if any, with the *Augenbaum* parties. The Committee determined that Morris Kandinov may continue to represent that Company and support the Committee as may be appropriate with its mandate to fully investigate and evaluate the *Augenbaum* litigation, but that any settlement communications would be handled by Mr. Lefkowitz and any recommendation by the Committee to the Board in regard to settlement would be made directly by the Committee without the advice of Morris Kandinov.

Following this discussion, the following resolutions were presented to the Committee for consideration and approval:

RESOLVED, that the Committee hereby approves the engagement of Jay Lefkowitz of Kirkland & Ellis to represent the Committee in negotiations with the parties to the *Augenbaum* matter;

RESOLVED FURTHER, that the Committee approves Morris Kandinov's continued representation of the Company and support, as needed, of the Committee's mandate, and that the foregoing creates no conflict of interest as to the Committee's work; and

RESOLVED FURTHER, that in the event that the Committee determines to make a recommendation regarding settlement to the Board, it will do so independently and without the advice of Morris Kandinov.

ADD-167

## ADJOURNMENT

There being no further business to come before the Committee, the meeting was adjourned.

Michael Jaffa
Secretary

ADD-168

ADD-169

# EXHIBIT 11

 Outlook

---

**Re:**

---

**From** Lefkowitz, Jay P. <lefkowitz@kirkland.com>

**Date** Wed 3/18/2026 1:41 PM

**To** Jeffrey S. Abraham <JAbraham@aftlaw.com>

**Cc** Michael Klein <mklein@aftlaw.com>

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Short


On Mar 18, 2026, at 11:40 AM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:


It depends how long you expect the call to take.

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

<Outlook-suphyise>

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Wednesday, March 18, 2026 1:39 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re:

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Would 530 work?

On Mar 18, 2026, at 11:35 AM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:

Today is probably easier for me than tomorrow.

Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

<Outlook-g54xmamt>

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Wednesday, March 18, 2026 1:00 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** RE: Re:

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Best times are end of day tomorrow, like 430 or 5 pm.  Could also talk today at same time

**Jay Lefkowitz**
————————————————————————
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 446 4970
**F** +1 212 446 4900
————————————————————————
lefkowitz@kirkland.com

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Sent:** Wednesday, March 18, 2026 12:59 PM
**To:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re: Re:

What times are you thinking?

**Jeffrey S. Abraham**

Abraham, Fruchter & Twersky LLP

450 Seventh Avenue, 38th Floor

New York, NY 10123

Tel: (212) 279-5050

Fax: (212) 279-3655

<image001.jpg>

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Wednesday, March 18, 2026 12:58 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re:

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff -

Have time to connect tomorrow?

Thx. Jay

> On Mar 10, 2026, at 2:48 PM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:
>
> ---
>
> I expect to be done tomorrow at about 3:00.  How does sometime between 3:330 and 4:30 look?
>
> **Jeffrey S. Abraham**
>
> Abraham, Fruchter & Twersky LLP

ADD-173

450 Seventh Avenue, 38th Floor

New York, NY 10123

Tel: (212) 279-5050

Fax: (212) 279-3655

<Outlook-e3yamoff>

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Tuesday, March 10, 2026 4:46 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re:

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Could talk anytime after 6 today.  9 am tomorrow works. Or after your stuff tomorrow.

---

**From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Sent:** Tuesday, March 10, 2026 2:45:53 PM
**To:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re: Re:

Why don't you give me some time slots when you're available and we'll work something out.

Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Tuesday, March 10, 2026 4:44 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** Michael Klein <mklein@aftlaw.com>
**Subject:** Re:

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

10 min.

> On Mar 10, 2026, at 2:38 PM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:
>
> I have a 5:00 call today and have 9:30 a.m. until 3;30 p.m. booked out for a meeting tomorrow.
> How long is "quick" for you?
>
> Jeff
>
> Jeffrey S. Abraham
> Abraham, Fruchter & Twersky LLP
> 450 Seventh Avenue, 38th Floor
> New York, NY 10123
> Tel: (212) 279-5050
> Fax: (212) 279-3655
>
>
> -----Original Message-----
> From: Lefkowitz, Jay P. <lefkowitz@kirkland.com>
> Sent: Tuesday, March 10, 2026 4:34 PM
> To: Jeffrey S. Abraham <JAbraham@aftlaw.com>
> Subject:
>
> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.
>
>
> WARNING: The sender of this email could not be validated and may not match the person in the "From" field.
>
> Jeff - do you have time for a quick call?

Thx.  Jay

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com<mailto:postmaster@kirkland.com>, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

Case 1:22-cv-00249-AS    Document 388-11    Filed 05/20/26    Page 8 of 8

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

ADD-177

# EXHIBIT 12

 Outlook

---

**Re: Pursuant to Rule 408**

---

**From** Lefkowitz, Jay P. <lefkowitz@kirkland.com>

**Date** Tue 4/28/2026 3:00 PM

**To** Jeffrey S. Abraham <JAbraham@aftlaw.com>

**Cc** Michael Klein <mklein@aftlaw.com>

---

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Sorry.  Just asked him to call me.


On Apr 28, 2026, at 2:50 PM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:


Jay,

Did you write to David Murphy yet?  If so, did you forget to copy me?

Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

<image.png>

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Tuesday, April 28, 2026 10:35 AM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** David Murphy <dmurphy@phillipsadr.com>; Michael Klein <mklein@aftlaw.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Pursuant to Rule 408

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Sure.  Call me then.

On Apr 28, 2026, at 10:29 AM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:

Jay

I'm running a few minutes late on another call.  Can we push this off until 11:00?

Thanks,
Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

<image.png>

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Monday, April 27, 2026 8:27 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** David Murphy <dmurphy@phillipsadr.com>; Michael Klein <mklein@aftlaw.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Pursuant to Rule 408

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Great. Thx

On Apr 27, 2026, at 8:26 PM, Jeffrey S. Abraham
<JAbraham@aftlaw.com> wrote:

Let's say 10:30 am

Get Outlook for iOS

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Monday, April 27, 2026 8:00:53 PM
**To:** David Murphy <dmurphy@phillipsadr.com>
**Cc:** Jeffrey S. Abraham <JAbraham@aftlaw.com>; Michael Klein <mklein@aftlaw.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Pursuant to Rule 408

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Ok.  We will speak without you the.   Jeff - let me know what works.

> On Apr 27, 2026, at 7:55 PM, David Murphy <dmurphy@phillipsadr.com> wrote:
>
>
> I'm in all-day mediations every day this week and tomorrow is a bankruptcy case that is likely to go late, unfortunately.
>
> **David M. Murphy**  (bio)
> Mediator ◇ Arbitrator ◇  Independent Panelist
> Phillips ADR Enterprises LLC (PADRE)
> 917-446-0233 (CT & NYC)
>
> ---
>
> **From:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
> **Sent:** Monday, April 27, 2026 6:18:17 PM
> **To:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
> **Cc:** David Murphy <dmurphy@phillipsadr.com>; Michael Klein <mklein@aftlaw.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
> **Subject:** Re: Pursuant to Rule 408
>
> If you want David on the call and he has availability tomorrow I think it might be better to work backwards from his availability

Re: Pursuant to Rule 408 - Michael Klein - Outlook

Get Outlook for iOS

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Monday, April 27, 2026 6:05:33 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** David Murphy <dmurphy@phillipsadr.com>; Michael Klein <mklein@aftlaw.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Pursuant to Rule 408

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Pick a time good for you and David (if he is available too). Brio and Empery.

> On Apr 27, 2026, at 5:57 PM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:
>
>
> What times are you available?
>
> I'm assuming that the two Defendants who are not on board with your proposal are Empery and M3A.  Is that correct?
>
> Jeff
>
> **Jeffrey S. Abraham**
> Abraham, Fruchter & Twersky LLP
> 450 Seventh Avenue, 38th Floor
> New York, NY 10123
> Tel: (212) 279-5050
> Fax: (212) 279-3655
>
> <image.png>
>
> ---
>
> **From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
> **Sent:** Monday, April 27, 2026 5:54 PM

Re: Pursuant to Rule 408 - Michael Klein - Outlook

**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** David Murphy <dmurphy@phillipsadr.com>; Michael Klein <mklein@aftlaw.com>
**Subject:** Re: Pursuant to Rule 408

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

What time should we speak tomorrow?

> On Apr 27, 2026, at 9:36 AM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:
>
> Jay,
>
> I am writing to confirm receipt.  The pre-trial order is due today so it might be better if you want to talk further to wait until tomorrow.
>
> Jeff
>
> **Jeffrey S. Abraham**
> Abraham, Fruchter & Twersky LLP
> 450 Seventh Avenue, 38th Floor
> New York, NY 10123
> Tel: (212) 279-5050
> Fax: (212) 279-3655
>
> <Outlook-flzwfdcx>

**From:** Lefkowitz, Jay P.
<lefkowitz@kirkland.com>
**Sent:** Friday, April 24, 2026 2:54
PM
**To:** Jeffrey S. Abraham
<JAbraham@aftlaw.com>
**Cc:** David Murphy
<dmurphy@phillipsadr.com>
**Subject:** Pursuant to Rule 408

**CAUTION:** This email originated
from outside of the organization. Do
not click links or open attachments
unless you recognize the sender and
know the content is safe.

**WARNING:** The sender of this email
could not be validated and may not
match the person in the "From"
field.

Jeff - trying again with a
better email for you.


Begin forwarded message:


> **From:** "Lefkowitz,
> Jay P."
> <lefkowitz@kirkla
> nd.com>
> **Date:** April 24,
> 2026 at
> 10:58:14 AM EDT
> **To:** "Jeff S.
> Abraham"
> <jabraham@abra
> hamlaw.com>
> **Cc:** David Murphy
> <dmurphy@philli
> psadr.com>
> **Subject:**
> **Pursuant to Rule**
> **408**
>
>
> Jeff — You asked
> about the
> allocation. I can
> share with you

that we have an offer of 50mm, but with everyone but two defendants contributing on a pro rata basis based on their exposure. Since two defendants aren't participating, the offer is correspondingly lower. But if the Court approves the settlement, you are still free to pursue those two.

Please let me know if you are planning to make a new demand. If not, the company will have no alternative but to seek court approval.

Jay

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy

this communication and all copies thereof,

including all attachments.

The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for the
use of the addressee. It is the property of the multi-national
law firm Kirkland & Ellis LLP and/or its affiliated entities.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited and
may be unlawful. If you have received this communication
in error, please notify us immediately by return email or by
email to postmaster@kirkland.com, and destroy this
communication and all copies thereof, including all
attachments.

The information contained in this communication is confidential, may be
attorney-client privileged, may constitute inside information, and is intended
only for the use of the addressee. It is the property of the multi-national law
firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use,
disclosure or copying of this communication or any part thereof is strictly
prohibited and may be unlawful. If you have received this communication in
error, please notify us immediately by return email or by email to
postmaster@kirkland.com, and destroy this communication and all copies
thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client
privileged, may constitute inside information, and is intended only for the use of the
addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its
affiliated entities. Unauthorized use, disclosure or copying of this communication or any part
thereof is strictly prohibited and may be unlawful. If you have received this communication in
error, please notify us immediately by return email or by email to postmaster@kirkland.com,
and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-
national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of
this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this
communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com,
and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

ADD-187

# EXHIBIT 13

ADD-188

FILED: NEW YORK COUNTY CLERK 05/11/2026 08:18 PM INDEX NO. 650906/2026
NYSCEF DOC. NO. 24 RECEIVED NYSCEF: 05/11/2026



+1.310.601.8440                                                                    raineyllp.com

NEW YORK | LONDON* | BEVERLY HILLS

Monday, May 11, 2026

*SENT VIA NYSCEF*

Hon. Anar Rathod Patel, A.J.S.C.
Supreme Court of the State of New York
Commercial Division, Part 45
60 Centre Street, Room 428
New York, NY 10007

Re: **Empery Asset Master, Ltd., et al. v. Kartoon Studios, Inc., Index No. 650906/2026 — Defendant's Proposed Preliminary Conference Order**

Dear Justice Patel:

We represent Defendant Kartoon Studios, Inc. ("Kartoon"). Pursuant to the Court's May 6, 2026 order and Part 45 Practice Rule X.A., Kartoon respectfully submits its proposed Preliminary Conference Order for the May 13, 2026 preliminary conference and pre-motion conference.

The parties conferred regarding the joint statement and proposed Preliminary Conference Order. The parties have reached agreement on the joint statement, which Plaintiffs have indicated they will file. The parties have not reached agreement on the discovery schedule in the proposed Preliminary Conference Order. Plaintiffs have advised that they intend to submit their own proposed schedule.

Kartoon's proposed schedule (attached herewith) is not intended to delay this action. It is a measured schedule for a standard-track Commercial Division case in which the Court has set the May 13 appearance as both a preliminary conference and a pre-motion conference on Kartoon's anticipated dispositive CPLR 3211 motion.

Although Plaintiffs characterize this as a straightforward indemnification matter, the case arises from a multi-year federal Section 16(b) short-swing-profit action, concerns more than $3.5 million in claimed defense fees, and—if it proceeds to discovery—would require examination of the mechanics of a complex set of securities transactions and related transaction documents, as reflected in Plaintiffs' own lengthy complaint package with exhibits.

Commercial Division Rule 11 recognizes that discovery is among the most expensive and time-consuming aspects of commercial litigation and should be proportional and reasonable in light of the complexity of the case and the proof required. The Rules also contemplate early dispositive motion practice before disclosure or after limited-issue disclosure, and Rule 11(g) directs the Court to determine, upon application, whether disclosure should be stayed under CPLR 3214(b) pending a dispositive motion.

ADD-189

Case 1.22-cv-00249-AS    Document 388-13    Filed 05/20/26    Page 3 of 3

Page 2 of 2
To: Hon. Anar Rathod Patel, J.S.C.
May 12, 2026
RE: Empery Asset Master, Ltd., et al. v. Kartoon Studios, Inc., Index No. 650906/2026

Kartoon's anticipated motion may dispose of the action or materially narrow the claims, defenses, and discovery actually needed. Plaintiffs' proposed schedule would nonetheless compress full document discovery, depositions, expert discovery, all discovery, trial readiness, and note-of-issue deadlines into a few months, before the Court has set a motion schedule or addressed the effect of CPLR 3214(b). Kartoon's proposed schedule remains efficient while preserving the statutory stay issue and avoiding unnecessary expense and compressed year-end trial-readiness obligations.

Kartoon respectfully requests that the Court adopt Kartoon's proposed Preliminary Conference Order or address the parties' competing scheduling proposals at the May 13 conference. Kartoon is also separately filing its Commercial Division Rule 10 Certification.

Respectfully submitted,

**Chaz Rainey**
*Licensed in CA, NY, NV, TX, and D.C.*

Enclosures: Proposed Preliminary Conference Order; Rule 10 ADR Certification

ADD-190

# EXHIBIT 14

 Outlook

---

**Re: Augenbaum**

---

**From** Aaron Morris <aaron@moka.law>

**Date** Tue 5/12/2026 11:36 AM

**To**    Jeffrey S. Abraham <Jsalaw@aftlaw.com>; Michael Klein <mklein@aftlaw.com>

**Cc**    Andrew Robertson <andrew@moka.law>; Jay Lefkowitz <lefkowitz@kirkland.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>

---

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

Do not take offense, we do not question your integrity. We just want to see the emails, perhaps we can see them tomorrow.

As to the Committee, you personally advised Jeff Schlesinger during the April 20 call that the offers had been purportedly made, so your assumption below would be incorrect. The Committee certainly learned of all available information.

**Aaron T. Morris**

**MORRIS KANDINOV LLP**

Direct: 332.240.4024

[aaron@moka.law](mailto:aaron@moka.law)

---

**From:** Jeffrey S. Abraham <Jsalaw@aftlaw.com>
**Date:** Tuesday, May 12, 2026 at 4:13 PM
**To:** Aaron Morris <aaron@moka.law>; Michael Klein <mklein@aftlaw.com>
**Cc:** Andrew Robertson <andrew@moka.law>; Jay Lefkowitz <lefkowitz@kirkland.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Augenbaum

Aaron,

In my May 3rd email to Jay, on which you and David Murphy are also copied, Plaintiff described those prior settlement offers and proposals from Anson and CVI. David then objected to any further disclosure of those matters based upon a mediation privilege. Plaintiff has since looked into the matter and does not believe that any privilege aside from Fed. R. Evid. 408 applies because, among other things, the parties never entered into an agreement to keep those particular conversations privileged.

I suppose I should take offense at you questioning my integrity in representing those facts to you. Presumably you did not believe or care about those facts regarding settlement discussions when it chose to go forward with making the motion to stay and approve the

proposed partial settlement.  It is not clear to Plaintiff whether you informed the members of the Litigation Committee or the Board of these facts but judging from your email, Plaintiff will assume you did not do so unless you show me an email or other communication demonstrating that you did, in fact, pass  that information along.

However, rest assured that Plaintiff was being completely truthful and has copies of the relevant emails from David Murphy to prove those facts.  Plaintiff plans on bringing those emails with us to Court tomorrow.


Jeff


**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Tuesday, May 12, 2026 10:48 AM
**To:** Jeffrey S. Abraham <Jsalaw@aftlaw.com>; Michael Klein <mklein@aftlaw.com>
**Cc:** Andrew Robertson <andrew@moka.law>; Jay Lefkowitz <lefkowitz@kirkland.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Augenbaum

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff,

How can we evaluate the assertion without seeing the emails? Do you need some kind of additional agreement with respect to confidentiality?

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

---

**From:** Jeffrey S. Abraham <Jsalaw@aftlaw.com>
**Date:** Monday, May 11, 2026 at 10:46 PM
**To:** Aaron Morris <aaron@moka.law>; Michael Klein <mklein@aftlaw.com>
**Cc:** Andrew Robertson <andrew@moka.law>; Jay Lefkowitz <lefkowitz@kirkland.com>; Goldfine, Jeffrey

Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Augenbaum

We've already told you the substance of what they say.

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Monday, May 11, 2026 4:40 PM
**To:** Jeffrey S. Abraham <Jsalaw@aftlaw.com>; Michael Klein <mklein@aftlaw.com>
**Cc:** Andrew Robertson <andrew@moka.law>; Jay Lefkowitz <lefkowitz@kirkland.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Augenbaum

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

The email reflecting the prior offer(s) from the two defendants.

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024
aaron@moka.law

---

**From:** Jeffrey S. Abraham <Jsalaw@aftlaw.com>
**Date:** Monday, May 11, 2026 at 10:37 PM
**To:** Aaron Morris <aaron@moka.law>; Michael Klein <mklein@aftlaw.com>
**Cc:** Andrew Robertson <andrew@moka.law>; Jay Lefkowitz <lefkowitz@kirkland.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Re: Augenbaum

To which email are you referring?

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



ABRAHAM, FRUCHTER & TWERSKY, LLP

---

**From:** Aaron Morris <aaron@moka.law>
**Sent:** Monday, May 11, 2026 4:33 PM
**To:** Jeffrey S. Abraham <Jsalaw@aftlaw.com>; Michael Klein <mklein@aftlaw.com>
**Cc:** Andrew Robertson <andrew@moka.law>; Jay Lefkowitz <lefkowitz@kirkland.com>; Goldfine, Jeffrey Ross <jeffrey.goldfine@kirkland.com>
**Subject:** Augenbaum

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Jeff/Michael,

Because you have taken the position that defendants opened the door to prior settlement communications, can you please share with the Company the email/writing you referenced? We will hold it as confidential until speaking with you again.

**Aaron T. Morris**
**MORRIS KANDINOV LLP**
Direct: 332.240.4024

aaron@moka.law

ADD-195

# EXHIBIT 15

 Outlook

---

**Re: Re:**

---

**From** Jeffrey S. Abraham <Jsalaw@aftlaw.com>

**Date** Sun 5/3/2026 4:22 PM

**To** Lefkowitz, Jay P. <lefkowitz@kirkland.com>

**Cc** David Murphy <dmurphy@phillipsadr.com>; Michael Klein <mklein@aftlaw.com>; Aaron Morris <aaron@moka.law>

Dear Jay,

You are not writing on a blank slate in this matter. Michael Charlson as counsel for the Company previously wrote to the Court on December 11, 2025, requesting that the Court order a further mediation in which "the Court make clear that Genius should participate substantively in that mediation." ECF No. 299 at 3. The next day – before Plaintiff had the opportunity to correct the many factual inaccuracies contained in the December 11th letter – the Court *sua sponte* declined to enter any Order requiring the Company's participation. Instead, the Court noted that it was "happy to facilitate discussions if everyone is on board" while noting that "the participants and nature of those discussions are up to the parties." *Id*.

The December 11th letter itself followed Anson taking a major equity stake in the Company in an October 2025 financing referred to in letter without identifying Anson as the investor. It also followed a meeting at which Mr. Charlson threatened Plaintiff that the Company was considering a range of options to force through a settlement on its preferred terms.

At the time of the December 11th letter, Plaintiff was actively engaged in settlement discussions with CVI being facilitated by David Murphy who was a very experienced and in-demand mediator who was agreed upon by all parties. Not long after that, Anson made an unsolicited opening offer of $35 million – translating into an overall settlement amount according to Plaintiff's calculations of approximately $82 million and was also below the overall settlement value being discussed with CVI, which exceeded $100 million. After consulting with Mr. Murphy, Plaintiff made a demand which Anson found unsatisfactory and declined to further engage at that time.

Shortly thereafter, a series of events started to unfold related to claims for indemnification filed by Iroquois and Empery. First, Michael Charlson, who had represented the Company for over five years in this action, including dealing with the meritless claims for advancement and indemnification, disappeared from the case with a solo practitioner from California taking his place. Then, the Company established a "Litigation Committee" to address those indemnification claims and making a settlement recommendation. The Litigation Committee then oddly chose Aaron Morris, counsel for Special Equity Group, as its counsel

despite, among other things, SEG having a disputed indemnification claim with the Company in which the Company viewed the bills submitted by SEG for the work of Mr. Morris's firm as "excessive" as disclosed in the Company's most recent Form 10-K annual report.

After both Plaintiff and apparently certain Defendants were also concerned about Mr. Morris having a conflict, you appeared as counsel to negotiate with the parties, being engaged sometime after March 9, 2026. On our first telephone call on March 11, 2026, I inquired why you would be interested in a matter which you claimed would not generate much attorneys' fees to which you responded that you watched a lot of cartoons when you were a child. Count me skeptical, but I find that explanation hard to believe with the more likely explanation being that you are doing someone at or connected to Anson (or some other Defendant) a solid.

During our March 11th phone call you floated a $30 million overall settlement, after which I informed you that would be below the opening settlement offers of two Defendants. When we spoke again on March 18th, you advised me you have had a chance to speak with all of the defendants about how to calculate damages. You explained the percentage of any settlement would likely be larger than any Cornerstone average because of this case's posture, and Defendant's view of the case is that maximum damages are around $350 million. You said you can see pulling together a settlement of $40-$50 million, and I advised you I had more than that on the table from two of the defendants (which you advised me they denied). You asked for a rough indication of what Plaintiff was looking for, and I said this is a strong strict liability claim for over $350 million using the lower range of damages. You advised that you had started reading the summary judgment papers but not finished reviewing them, and that you thought Defendants might agree to pay $50 million and you could see the Company taking the position that is a good settlement and then seeking approval from Judge Subramanian. I also advised you that I believed collective negotiations were unproductive because the strength of claims differs among Defendants, and you disagreed.

On April 20th, I participated in an approximately one-hour telephone conversation with Jeffrey Schlesinger, one of the Litigation Committee's members, Michael Jaffa, the Company's general counsel, and Aaron Morris explaining, among other things, why a $50 million settlement would be inadequate.

On April 22nd, you contacted me again to tell me that the Company would move for approval of a proposed $50 million proposed settlement, albeit with only six of the eight Defendants. You later informed me that Empery and Brio were the Defendants who would not be participating in the Company's proposed settlement. The net effect is that the Company will be proposing to settle this case with six Defendants for about $2 million more than Anson's opening offer, which was expressly not its last-and-best offer.

On the April 22nd call, I informed you that this case is strongest against Anson and that Plaintiff would be pleased to proceed to a trial against Anson, Brio and Empery. At the same time, Plaintiff is more than happy to engage with any or all of the five other Defendants

(CVI, Iroquois, M3A, L1, and Richard Molinsky). A key problem is that the Company's opening proposal is well below where settlement discussions with CVI had previously been, which provides an indicative range for a fair settlement as a little bit more than double the $50 million suggested by the Company.

The other problem with the construct for settlement discussions the Company is seeking to impose on Plaintiff is that you are not a mediator. Similarly, the Company, which you claim to represent, has not been a neutral party in this action given that it has been consistently and actively hostile to Plaintiff's claim with Anson now having a very large equity interest in the Company.

Plaintiff is, as always, interested in a settlement which fairly reflects the value of the claim asserted. Plaintiff would urge the Company not to make a motion to approve the settlement currently being proposed because, as best Plaintiff can tell, any such motion would be frivolous. Instead, a better method would involve David Murphy in the negotiations or having Plaintiff interact directly with Defendants without the overhang of the Company's proposed frivolous motion. Another possibility is to take the Court up on its offer of assistance contained in the December 12th Order to be of assistance with negotiations.

Very truly yours,
Jeff Abraham

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655



---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Thursday, April 30, 2026 10:10 PM
**To:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Cc:** David Murphy <dmurphy@phillipsadr.com>; Michael Klein <mklein@aftlaw.com>
**Subject:** Re:

| CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. |
| --- |

| WARNING: The sender of this email could not be validated and may not match the person in the "From" field. |
| --- |

Jeff - I wanted to give you one last opportunity to make a demand on the defense group that I can convey. Just saying 50 isn't high enough isn't constructive. Unless we can reach an agreement, the company will seek court approval of the reasonable and fair settlement offer it has received next week.

Jay

On Apr 29, 2026, at 11:40 AM, Jeffrey S. Abraham <JAbraham@aftlaw.com> wrote:

Jay,

To be clear, what I said to you is that Susan has always insisted on having any communications relating to potential settlements through David.  Susan is free, of course, to call me and you are free to try to set a time for Susan and I to talk.

Also to be clear, I have carefully explained to both you and Jeff from the Litigation Committee that Plaintiff does not view the strengths or weaknesses of the case against each of the six Defendants in your group as being equal.  Therefore, the concept of negotiating a single precentage for all of them seems highly unlikely to succeed.

As for my schedule, I am in the office tomorrow but I am taking an expert's deposition remotely in another matter starting at 10:00 a.m.  I don't anticipate the deposition taking all day but I am not thoroughly in control of how long the deposition takes.  I can try to arrange a break in the schedule and hopefully my opposing counsel and the deponent will cooperate.

Jeff

**Jeffrey S. Abraham**
Abraham, Fruchter & Twersky LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Tel: (212) 279-5050
Fax: (212) 279-3655

<image.png>

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Wednesday, April 29, 2026 11:25 AM
**To:** David Murphy <dmurphy@phillipsadr.com>
**Cc:** Jeffrey S. Abraham <JAbraham@aftlaw.com>
**Subject:** Re:

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Thanks David.    I want to be clear. Jeff is the one who has said he thinks you are essential to speaking with the defendants on his behalf because he doesn't want to speak with them on his own as he has told me that won't be productive.

From my perspective, I am just trying to see if Jeff has a demand he wants to make to the defense group that I or he or you can convey before the company files a motion next week.

I also think we can carve out some time tomorrow during down time in the Kirkland mediation if you were inclined to take a call.  Jeff and I will obviously be at the office tomorrow.  So maybe you could take a few minutes to speak with Jeff.

Thx.

> On Apr 29, 2026, at 11:18 AM, David Murphy <dmurphy@phillipsadr.com> wrote:
>
>
> Jay,
>
> I've played no role in your recent negotiations.  I have no ability to assess or judge any defendant's capacity to pay.  And I am fully committed to four other full-day mediation sessions this week.   I am not inclined to parachute back into this at the end, after the cake is baked.
>
> I'm always happy to talk with both of you and apologize for being tied up yesterday mediating until 10pm last night.  I am free to talk at 6pm Eastern, but I rather doubt I can add anything to the mix right now.
>
> Best,
>
> David
>
> **David M. Murphy**  (bio)
>     Mediator ◇ Arbitrator ◇ Independent Panelist
>     Phillips ADR Enterprises LLC (PADRE)
>        917-446-0233 (CT & NYC)

---

**From:** Lefkowitz, Jay P. <lefkowitz@kirkland.com>
**Sent:** Wednesday, April 29, 2026 11:03:14 AM
**To:** JAbraham@aftlaw.com <JAbraham@aftlaw.com>; David Murphy <dmurphy@phillipsadr.com>
**Subject:**

David - we are getting ready to file our motion Monday to approve the settlement we have negotiated.  I have asked Jeff to make any final demand he would like to make and he has told me he believes that at least some of the defendants have more capacity than they are telling me.  I think we would benefit from your engagement here if you could spare a few minutes to speak with us and also speak with Jeff and perhaps a couple of the defendants.

Thx. Jay

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com<mailto:postmaster@kirkland.com>, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

ADD-202

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD AUGENBAUM, *derivatively on behalf of Kartoon Studios, Inc.*, <br><br> Plaintiff, <br><br> v. <br><br> ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; and RICHARD MOLINSKY, <br><br> Defendants, <br><br> -and- <br><br> KARTOON STUDIOS, INC., <br><br> Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

KARTOON STUDIOS, INC.'S REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR ENTRY OF JUDGMENT

ADD-203

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... iii

I.      THE COMPANY IS ENTITLED TO THE ENTRY OF JUDGMENT .............................3

        A.      The Company-Negotiated Settlement
                Is Reviewable Only For Self-Dealing ....................................................3

        B.      Plaintiff Does Not Suggest Self-Dealing Or Other Misconduct .............................7

II.     EVEN IF COURT APPROVAL IS REQUIRED, THE
        SETTLEMENT SATISFIES ANY FAIRNESS STANDARD..........................................8

        A.      The Settlement Is Presumptively Fair And Adequate .............................................8

        B.      The Fairness Factors Support The Settlement...........................................................9

III.    PLAINTIFF'S CONDUCT IS INCONSISTENT
        WITH HIS FIDUCIARY DUTY ...................................................................................13

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abrams v. Occidental Petroleum Corp.*,
  47 F.R.D. 301 (S.D.N.Y. 1969)...................................................................................8

*AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*,
  9 F. App'x 53 (2d Cir. 2001)....................................................................................10

*AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*,
  2000 WL 1279807 (S.D.N.Y. Sept. 11, 2000) .........................................................10

*Allred on behalf of Aclaris Therapeutics, Inc. v. Walker*,
  2021 WL 5847405 (S.D.N.Y. Dec. 9, 2021) ............................................................13

*Chechele v. Elsztain*,
  2012 WL 12358221 (S.D.N.Y. Aug. 1, 2012) ...........................................................9

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) .....................................................................................13

*Cotter on behalf of Reading Int'l, Inc. v. Kane*,
  136 Nev. 559 (2020).................................................................................................17

*Donoghue v. Bulldog Invs. Gen. P'ship*,
  696 F.3d 170 (2d Cir. 2012) ......................................................................................8

*Donoghue v. CSX Corp.*,
  2009 WL 750232 (S.D.N.Y. Mar. 9, 2009)...............................................................13

*Dottenheim v. Murchison*,
  227 F.2d 737 (5th Cir. 1955) .....................................................................................9

*FTR Consulting Grp. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*,
  2005 WL 2234039 (S.D.N.Y. Sept. 14, 2005) .........................................................12

*Gibbons v. Morgan*,
  2017 WL 3917041 (S.D.N.Y. Sept. 6, 2017) .............................................................9

*iXL Enters., Inc. v. GE Cap. Corp.*,
  2005 WL 736820 (D. Conn. Mar. 31, 2005).............................................................9

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*,
  906 F.3d 215 (2d Cir. 2018) ......................................................................................8

*Magida v. Cont'l Can Co.*,
  231 F.2d 843 (2d Cir. 1956) ............................................................................................ 8

*In re Match Grp., Inc. Derivative Litig.*,
  315 A.3d 446 (Del. 2024) .............................................................................................. 7

*In re Myovant Scis. Ltd. Section 16(b) Litig.*,
  513 F. Supp. 3d 365 (S.D.N.Y. 2021) .......................................................................... 8

*Nosirrah Mgmt., LLC v. EVmo, Inc.*,
  2023 WL 35028 (S.D.N.Y. Jan. 4, 2023) ..................................................................... 8

*OptimisCorp v. Atkins*,
  2023 WL 3745306 (Del. Ch. June 1, 2023) ............................................................... 17

*Revive Investing LLC v. FBC Holdings S.A.R.L.*,
  2021 WL 56905 (S.D.N.Y. Jan. 7, 2021) .................................................................... 12

*Roth v. Scopia Cap. Mgmt. LP*,
  2017 WL 3242326 (S.D.N.Y. July 28, 2017) ................................................................ 8

*Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC*,
  286 F. Supp. 2d 279 (S.D.N.Y. 2003) .......................................................................... 4

*Steel Partners II, L.P. v. Bell Indus., Inc.*,
  315 F.3d 120 (2d Cir. 2002) .......................................................................................... 8

*Silverman v. Re*,
  194 F. Supp. 540 (S.D.N.Y. 1961) ................................................................................ 6

*Steinberg v. Steinberg*,
  434 N.Y.S.2d 877 (Sup. Ct. 1980) .............................................................................. 17

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ........................................................................................... 12

*Wolf v. Barkes*,
  348 F.2d 994 (2d Cir. 1965) .......................................................................................... 6

*In re XO Commc'ns, Inc.*,
  330 B.R. 394 (Bankr. S.D.N.Y. 2005) .......................................................................... 9

**Statutes**                                                                                    **Page(s)**

17 C.F.R. § 240.13d-5(b)(1)(i) ................................................................................ 11

**Other Authorities**                                                                   **Page(s)**

Arnold S. Jacobs, *An Analysis of Section 16 of the Securities Exchange Act of 1934*,
  32 N.Y.L. Sch. L. Rev. 209 (1987) ..................................................................... 5

Arnold S. Jacobs, *Section 16 of the Securities Exchange Act* (2025)......................... 5

This case presents a classic risk-reward decision by corporate managers: on one hand, the Company has an opportunity to monetize its claims for an amount (now $40.2 million) that meaningfully exceeds its market capitalization, provides urgently needed non-dilutive capital, and avoids the existential risk of losing at trial and facing tens of millions of dollars of indemnity claims in the aftermath; on the other hand, a win at trial could net something north of $300 million, but that success hinges entirely on convincing a jury that Defendants "intentionally agreed to act together" with respect to their trades,[1] which the Company did not witness at the time and is fiercely contested by Defendants. The former amount is guaranteed. The latter amount is speculative and must be discounted substantially to account for the difficulties of a trial where every fact witness will testify that there was no agreement.

Judgments will differ. The Company is not an oracle. But it appointed two of its savviest Board members, Jeff Schlesinger and Tony Thomopoulos, to dig in and make a recommendation. Mr. Schlesinger is the former President of Warner Bros. Worldwide Television Distribution and spent decades negotiating distribution agreements into new markets around the world. Mr. Thomopoulos is a seasoned entertainment industry executive who served as President of the Broadcast Group at ABC. These gentlemen conducted a thorough process to understand the issues in this case and the probabilities at trial, including by speaking directly with Plaintiff's counsel. In parallel, they hired Kirkland & Ellis to determine the highest settlement amount the Company might obtain under the circumstances. The Company was unable to reach a deal as to all Defendants, but what it did negotiate provides transformative capital and goes a long way to eliminating the Company's risk and expenses. On the Committee's recommendation, the Board—

---

[1]    Per the Court's May 15, 2026 proposed jury instructions.

consisting of additional highly accomplished individuals, including a former Governor of California—approved the Settlement as in the best interests of the Company and stockholders.

Todd Augenbaum, on the other hand, owns *a fraction of one share* of the Company's stock. The current value amounts to a small assortment of spare change. He has never spoken to any of the nearly 300 employees of the Company. He is a trust and estates attorney in New York who has agreed to serve as plaintiff for Jeff Abraham in at least six cases across the country.[2] Until now, the Company has known little about him. We now know that he views the Company, and its mission to deliver children's programming around the world, as "massively unprofitable" and its management "extraordinarily poor." Opp.at 25. He would prefer to see the Company "curtail or cease operations," which he claims would be "a good thing," or even better "shut down its existing business operations and utilize its enormous tax-loss carryforwards . . . with new management." Opp. at 25. With no real financial interest or exposure in a trial, Mr. Augenbaum appears content to allow his attorney to play the lottery with the Company's fate on the line.

Mr. Augenbaum is entitled to a view,[3] but the decision is ultimately not his to make. The overwhelming body of case law in this District holds that the Section 16(b) claim is the Company's, and the Company retains the right to litigate or settle its own claims. *See Silverman*

---

[2]    This case plus: *Augenbaum v. BG Capital* Group, C.A. Nos. 04-80665 & 05-80992 (S.D. Fla. 2004) (settling for 37% of maximum liability); *Augenbaum v. New Age Beverages Corp.*, C.A. No. 1:19-cv-02605 (E.D.N.Y. May 2019) (voluntarily dismissed); *In re Bed Bath & Beyond Inc. Section 16(b) Litigation*, C.A. No. 1:22-cv-09327 (S.D.N.Y. 2022) (granting defendants' motion to dismiss); *Miller v. Anderson et al.*, C.A. No. 5:20-cv-1743  (N.D. Ohio 2022) (objected to $180M derivative settlement and lost on the initial objection, reconsideration and appeal); *Augenbaum v. Compass Diversified Holdings*, C.A. No. 8:25-cv-01003 (C.D. Cal. 2025) (voluntarily dismissed).

[3]    The Company requested that Mr. Augenbaum make himself available for the conference but counsel declined, stating: "Plaintiff does not even understand the basis of the request because Mr. Augenbaum's testimony cannot possibly be relevant to the Company's contention that it is free to dismiss Plaintiff's claims without his permission."

2

*v. Re,* 194 F. Supp. 540, 542 (S.D.N.Y. 1961) (permitting issuer to assume control of litigation and noting that "[c]onflicting loyalties are not always limited to the corporation and its insiders"); *Wolf v. Barkes*, 348 F.2d 994, 997 (2d Cir. 1965) ("The corporation's interest in achieving a favorable settlement does not cease because derivative litigation has begun"). Second Circuit case law permits this Court to enter the judgments as requested by the Company, and the Plaintiff has not raised "charges of self-dealing" that would require the Court to review the agreement in equity. *Wolf*, 348 F.2d at 996. In the alternative, as argued in the Company's opening brief, the Settlement satisfies any measure of fairness review the Court may determine to employ. The negotiation process was independent and diligent, the "get" for the Company is reasonable in light of corresponding risks, the amount has increased further as a result of this motion practice, and stakeholders but for Mr. Augenbaum support it. The Company respectfully requests that the Court enter the amended judgments filed herewith.

## I.    THE COMPANY IS ENTITLED TO THE ENTRY OF JUDGMENT

### A.    The Company-Negotiated Settlement Is Reviewable Only For Self-Dealing

Black letter case law in this district holds that a Section 16(b) claim belongs solely and exclusively to the Company. *See, e.g.*, *Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 226 (2d Cir. 2018) ("[T]he issuer of the securities at issue, is the real party in interest in this [Section 16(b)] derivative litigation"); *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012) ("Where, as here, a shareholder plaintiff pursues a § 16(b) claim on behalf of an issuer, the claim 'is derivative in the sense that the corporation is the instrument . . . for the effectuation of the statutory policy.'"); *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 123 (2d Cir. 2002) ("The issuing corporation or, derivatively, a shareholder is entitled to maintain an action seeking to have the profit disgorged to the corporation."); *Magida v. Cont'l Can Co.*, 231

3

F.2d 843, 846 (2d Cir. 1956) ("The action under § 16(b) is derivative in the sense that the corporation is the instrument."); *Abrams v. Occidental Petroleum Corp.*, 47 F.R.D. 301, 308 (S.D.N.Y. 1969) ("Of course, every Section 16(b) claim belongs to the corporation and, when asserted by a stockholder, is a secondary or derivative action.").[4]

As a stockholder, Plaintiff has a *procedural* right to bring the Company's claim, but nothing more. His arguments otherwise are based on two inapplicable decisions that hold only that a Section 16(b) claim is "not derivative for purposes of application of [the] Bankruptcy Code." *In re XO Commc'ns, Inc.*, 330 B.R. 394, 430 (Bankr. S.D.N.Y. 2005) (citing *Schaffer ex rel. Lasersight*, Inc. v. CC Invs., LDC, 286 F. Supp. 2d 279, 282 (S.D.N.Y. 2003)). Those holdings are not only irrelevant but wrong. In *Gibbons v. Morgan*, this Court enforced a prior state-court settlement that released "any claims that could be asserted derivatively on behalf of [the Company]" even though the prior litigation did not assert a Section 16(b) claim (the state court did not even have jurisdiction to hear that claim). 2017 WL 3917041, at *2 (S.D.N.Y. Sept. 6, 2017). The Section 16(b) plaintiff argued, citing *XO*, that the state-court settlement could not release her claims because they were "direct rather than derivative." *Id*. at *5.* The Court rejected that argument because "although an individual stockholder is statutorily empowered to bring suit in certain limited circumstances, that suit is nonetheless brought 'in the name and in behalf of the

---

[4]     If additional authority is required: *In re Myovant Scis. Ltd. Section 16(b) Litig.*, 513 F. Supp. 3d 365, 371 (S.D.N.Y. 2021) (the issuer is "the ultimate plaintiff in interest on whose behalf shareholders can bring a derivative suit under Section 16(b)"); *Nosirrah Mgmt., LLC v. EVmo, Inc.*, 2023 WL 35028, at *3 (S.D.N.Y. Jan. 4, 2023) (the "real party in interest" in Section 16(b) litigation is "the issuer of the securities"); *Roth v. Scopia Cap. Mgmt. LP*, 2017 WL 3242326, at *4 (S.D.N.Y. July 28, 2017) ("Section 16(b) litigation is derivative in nature" and the "substantive right" is the issuer's).

issuer.'" *Id.* As to the contrary language in *XO*, the Court held that the "*XO* court thus used the terms 'direct' and 'derivative' in a completely different sense." *Id.*[5]

Left with no actual law to support his position, Plaintiff resorts to "hornbook law." Opp. at 9. But even the hornbook does not clearly support his position. It is difficult to tell whether, by stating that a Section 16(b) action is "not a derivative action," Mr. Jacobs is referring to the substantive ownership of the claim or the procedural right under the statute to bring the claims after the board's rejection of a demand, which differs from the "general rule" applicable to derivative actions. *See* Arnold S. Jacobs, *Section 16 of the Securities Exchange Act* §3:35 (2025). It appears the latter because he clarifies elsewhere that "the section 16(b) cause of action belongs to the issuer. Thus, a section 16(b) claim does not belong to the issuer's stockholders." *Id.* In any event, Mr. Jacobs authored this section in 1987 before virtually all of the rulings cited above. *See* Arnold S. Jacobs, *An Analysis of Section 16 of the Securities Exchange Act of 1934*, 32 N.Y.L. SCH. L. REV. 209, 572 (1987) (submitted herewith). To the extent that he intended to describe what Plaintiff refers to as a "primary right," he is wrong.

Because the claims ultimately belong to the Company, it retains the right to intervene and prosecute this litigation. *See, e.g., Silverman v. Re*, 194 F. Supp. 540, 542 (S.D.N.Y. 1961) (granting issuer's intervention because the "public policies upon which the Act is based compel the broadest participation in the litigation by the corporation to whom the recovery will inure"); *Qlik Techs.*, 906 F.3d at 228 (permitting intervention and holding that issuer does not waive its

---

[5]    Plaintiff's other citations are equally irrelevant. To the extent that *Dottenheim v. Murchison* suggests that a Section 16(b) claim is anything other than the issuer's claim, it is a Fifth Circuit decision from 1955 and has been usurped by the body of Second Circuit law cited above. 227 F.2d 737, 738 (5th Cir. 1955). Plaintiff also cites *Chechele v. Elsztain*, which supports neither party's position. 2012 WL 12358221, at *2 (S.D.N.Y. Aug. 1, 2012) (declining to require proof of "fairness, adequacy and reasonableness" to approve a Section 16(b) settlement).

interest in a Section 16(b) claim "merely because it had rejected a shareholder's demand"); *cf. iXL Enters., Inc. v. GE Cap. Corp.*, 2005 WL 736820, at *6 (D. Conn. Mar. 31, 2005), *aff'd*, 167 F. App'x 824 (2d Cir. 2006) (rejecting stockholder's intervention in issuer's Section 16(b) action because a stockholder is not entitled to intervention as of right).

The Company likewise retains the right to settle its claims, "subject to normal shareholder redress." *Wolf v. Barkes*, 348 F.2d 994, 997 (2d Cir. 1965). Plaintiff offers no legitimate explanation as to why the Second Circuit would treat a Section 16(b) claim different than the Section 14(a) claim at issue in *Wolf* (Plaintiff does not even mention *Wolf* in his opposition). For example, in *AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*, the company filed a chapter 11 petition automatically staying a pending Section 16(b) litigation brought by a stockholder-plaintiff. 2000 WL 1279807, at *1 (S.D.N.Y. Sept. 11, 2000), *aff'd* 9 F. App'x 53 (2d Cir. 2001). After restructuring, the Section 16(b) claim was assigned to the reorganized company, which then "substitute[d] itself for [plaintiff] in this action and [counsel]." *Id.* Thereafter, the company settled the claims "without participation by [stockholder-plaintiff's] counsel." *AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*, 9 F. App'x 53, 54 (2d Cir. 2001). In that case, the Second Circuit not only did not question the settlement but declined to grant fees to the plaintiff's counsel because they were "extinguished" in restructuring.[6]

Plaintiff advocates for a different, extraordinary rule that finds *no support* in the case law: that a stockholder-plaintiff, by virtue of his procedural right to assert the Company's claim

---

[6]    *Blau*, *Lewis* and *Volk* are inapplicable because they created a limited public policy exception to an issuer's settlement not relevant here. *See* ECF 371 at 2. *Segan*, *Burks*, *Levner*, *Mendell* and *Pellegrino* are not factually analogous. *See* ECF 371 at 1 n.1. As to *Magida*, Plaintiff badly misstated the facts. 231 F.2d 843, 846 (2d Cir. 1956). There, the issuer had declined to pursue the Section 16(b) claim on equitable grounds (it had encouraged the sale in question), but the court did not find that the issuer's prior action contributing to the violation could be used as a defense to a Section 16(b) claim. *Id.*

derivatively, obtains an unbounded veto right as to the Company's litigation decisions that can be exercised even *against the interests of the Company*. Nothing in the statute contemplates that result, and nothing in the Second Circuit's holdings in *Wolf, Qlik*, *Bulldog* or others cited above suggests that the Court would adopt such an absurd infringement of the Company's rights.[7]

### B.    Plaintiff Does Not Suggest Self-Dealing Or Other Misconduct

Plaintiff applies the wrong standard in arguing that the Company "fails to demonstrate either independence or good faith." Opp. at 15. That standard derives from special litigation committee ("SLC") cases (*e.g.*, *DISH Networks*, *Martha Stewart Living*, *Par Pharm*, *Brinckerhoff, Sutherland*) where an admittedly conflicted board of directors formed an SLC of independent directors to neutralize the conflict and regain control of derivative litigation. This is not such a case. *Cf. In re Match Grp., Inc. Derivative Litig.*, 315 A.3d 446, 471-72 (Del. 2024) (committee not independent because one member worked at the company for thirteen years as CFO and remained a director for affiliates). Rather, it is Plaintiff's burden under *Wolf* to show self-dealing in the first instance. He has not done so, nor could he. Plaintiff received in February 2026 the minutes of the Board finding that the members of the Committee are "entirely independent and disinterested with respect to the claims asserted in the Section 16(b) Litigation." ECF 388-10. The remainder of the Board is also independent and disinterested. Jaffa Dec. ¶ 12; *see also* Jaffa Dec. Ex. 11 at 65. In the absence of legitimate criticisms of the Board and its process, Plaintiff quibbles with "why Vinson & Elkins was sidelined" (not true), the rationale for hiring Kirkland & Ellis and the extent to which its negotiations included the mediator, and Morris Kandinov's prior

---

[7]    Indeed, the Second Circuit acknowledged in *Wolf* the dangers of allowing procedural rules to interfere with the substantive rights of the parties and the Supreme Court's "great vigilance" as to the "prohibition in the rule-making statute against abridging, enlarging, or modifying the substantive rights of any litigant.'" *Wolf*, 348 F.2d at 996.

7

representation of non-party Special Equities Group in a discovery matter. Plaintiff also criticizes the scope of materials considered by the Committee despite having no personal knowledge of the scope of the Committee's process because of his own counsel's refusal to enter into a basic privilege agreement. ECF 388-7. None of these criticisms rise to the type of "improper dealings" that the Second Circuit indicated might preclude a Company's settlement of its own claim. 348 F.2d at 998.

## II.    EVEN IF COURT APPROVAL IS REQUIRED, THE SETTLEMENT SATISFIES ANY FAIRNESS STANDARD

### A.    The Settlement Is Presumptively Fair And Adequate

Courts apply a "presumption of fairness, adequacy, and reasonableness" to settlements "reached in arm's length negotiations between experienced, capable counsel." *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *Revive Investing LLC v. FBC Holdings S.A.R.L.*, 2021 WL 56905, at *9 (S.D.N.Y. Jan. 7, 2021) ("procedural fairness of the settlement" supported by "arm's-length negotiations" between "experienced counsel."). Absent evidence challenging the arm's length nature of negotiations, a settlement "enjoys a presumption of fairness." *FTR Consulting Grp. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*, 2005 WL 2234039, at *3 (S.D.N.Y. Sept. 14, 2005).

Here, the Committee consisted of undisputedly independent and disinterested directors who directed experienced counsel at Kirkland & Ellis in negotiating with myriad counsel for Defendants as well as the mediator, David Murphy. Schlesinger Dec. ¶ 6. Through multiple rounds, the Committee, through counsel, negotiated an amount that it believes is favorable and in the Company's best interests. *Id.* Plaintiff argues semantics as to whether Kirkland or the "managers did the actual negotiations," but otherwise does not challenge that the negotiations were at arm's length. *See Revive*, 2021 WL 56905, at *9 (approving settlement where objecting plaintiff provided

8

"nothing except skepticism to refute FBC and shareholder counsel's recounting of the negotiations."). Plaintiff also argues, based on inapplicable cases involving an SLC, that the Committee should have conducted formulaic "interviews" and "formal meetings." Opp. at 18-19. But this litigation is weeks from trial, unlike a typical SLC investigation launched for the purpose of wresting control from a derivative plaintiff following the pleading stage. The Committee had the benefit of the *actual record* as a basis for its evaluation. Schlesinger Dec. ¶¶ 6, 8.

**B.     The Fairness Factors Support The Settlement**

When approving *derivative* settlements of Section 16(b) claims, "some courts in this circuit have applied certain of the factors originally laid out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), for evaluating the substantive fairness of a settlement agreement" whereas "some courts simply frame the standard as whether the settlement in the derivative action was 'fair, reasonable, and adequate.'" *Revive*, 2021 WL 56905, at *7. This Settlement merits approval under any standard.[8]

**Reasonableness.** "When considering the fairness, reasonableness, and adequacy of a proposed settlement, 'the Court is not to substitute its judgment for that of the parties, nor is it to reopen and enter into negotiations with the parties.'" *Allred on behalf of Aclaris Therapeutics, Inc. v. Walker*, 2021 WL 5847405, at *3 (S.D.N.Y. Dec. 9, 2021). In determining that a $50 million valuation of the claims against Defendants was within the range of reasonable outcomes, the Company considered a host of relevant business factors, including the expected challenges of winning at trial, the Company's potential liability and defense costs if it did not prevail at trial, the

---

[8]     Plaintiff incorrectly argues that "Genius has not made any request of the Court for any fairness hearing." Opp. at 22. The Company's motion and opening brief argued that no review is required, but that if the Court disagrees, the Settlement "fairly and adequately serves the interests of the corporation" for the reasons set forth therein. ECF 360 at 16, n. 6. Plaintiff's challenges to that assertion are addressed herein and in the accompanying declarations.

Company's financial condition and need for immediate capital, the possibility that a trial victory would be overturned on appeal, and the fact that even if the Company prevailed at trial, it would not result in immediately available funds because of the likelihood of an appeal.[9] Schlesinger Dec. ¶ 8. The Company understood that $50 million reflected approximately 11% to 15% of the Defendants' potential liability and determined that a guaranteed recovery in that amount was reasonable relative to the difficulties and delay of a trial and was as high as the Settling Defendants were willing to go at that time. *Id.* ¶¶ 6, 7, 10; *see, e.g., Donoghue v. CSX Corp.*, 2009 WL 750232, at *5-6 (S.D.N.Y. Mar. 9, 2009) (8% of maximum recovery in Section 16(b) action); *Revive*, 2021 WL 56905, at *10 (30% of maximum recovery and noting that "[i]t is enough to conclude that the defense was strong enough" to justify a discounted settlement).

Plaintiff argues that, in early December 2025, Defendant Anson Investments Master Fund LP ("Anson") and Defendant CVI Investments, Inc. ("CVI") made offers higher than what they have agreed to pay under the Settlement. Mr. Abraham disclosed the possibility of prior offers from two Defendants on an April 20, 2026 call that included Mr. Schlesinger and Mr. Jaffa. ECF 388 ¶ 18; *see also* Schlesinger Dec. ¶ 9; Jaffa Dec. ¶ 13. Following that call, the Committee asked Kirkland to determine the veracity of the statement but was unable to determine that the offers had been made. *Id*. Mr. Abraham subsequently stated further details regarding the two offers in a May 3, 2026 email (ECF 388-15), although he refused to provide the underlying emails from Defendants (ECF 388-14). Notwithstanding prior negotiations and whether prior offers had been made, the Committee ultimately determined that Defendants were no longer willing to contribute higher amounts and were satisfied with the amounts in the Settlement. Schlesinger Dec. ¶ 9. The

---

[9]     The corporate records of the process and considerations of the Board and Committee are attached as Exhibits 1-10 of the Declaration of Michael Jaffa.

fact that Plaintiff could have obtained higher amounts from two Defendants earlier in the case but rejected those offers is unfortunate, but not relevant to the reasonableness of the Settlement now available.

**Risks Of Establishing Liability.** This Section 16(b) claim depends entirely on the ability to prove coordination between Defendants sufficient to establish a group under the securities laws. *See* 17 C.F.R. § 240.13d-5(b)(1)(i) ("When two or more persons *agree* to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership. . . of all equity securities of that issuer beneficially owned by any such persons."). The Company was not aware of such an agreement between Defendants at the time of the transactions in 2020, and the record in this case includes, at best, contested and circumstantial evidence as to some but not all Defendants against what will likely be the categorical trial testimony of all witnesses that there was no agreement. Schlesinger Dec. ¶ 10. Conscious of the heavy lift at trial, Plaintiff argued to this Court that the jury should be instructed to find a group agreement regardless of whether any Defendant "knew or intended to be members of that group." ECF 335 at 5. But the Court rejected that approach and ruled that group formation requires evidence that "two or more persons intentionally agreed to act together" and that "mere parallel investment activity (*e.g.*, signing the same investment documents or purchasing the same stock at the same time), ordinary business relationships, communications among investors, or awareness of each other's activities . . . is insufficient to establish a group." While Plaintiff's success at trial will inure to the benefit of the Company, the Committee heavily discounted those prospects because of the lack of clear evidence of an agreement. Schlesinger Dec. ¶ 10.

11

**Risks Of Proving Damages.** The Company considered the competing calculations of damages submitted by the parties, which ranged between $332 million and $438 million, but ultimately determined that proving substantial damages was not a material risk in the event that Plaintiff could prove liability under the group theory discussed above. Schlesinger Dec. ¶ 8. The factor is neutral.

**Complexity, Expense And Likely Duration Of The Litigation.** In choosing to settle, the Company considered the difficulty of proving a group agreement in this case (discussed above), the expected defense costs, which Defendants will assert against the Company in the form of advancement and indemnity claims, and the fact that any judgment would likely be appealed, delaying payment to the Company indefinitely. Schlesinger Dec. ¶ 8. Plaintiff argues that "no such funds will ever have to be paid if the case is either settled against a particular Defendant or if Plaintiff prevails on his claims." Opp. at 25. But that misses the point: the Plaintiff is actively opposing the Company's efforts to settle and the Company believes, based on the current record, that prevailing at trial will be exceedingly difficult. More likely, the Company will face post-trial indemnity claims for defense costs incurred by Defendants (tens of millions of dollars) that will require substantial time and resources to defend even with meritorious defenses. Plaintiff argues superficially that the claim "lacks merit" but his counsel has yet to offer to assume the Company's defense.

**Stage Of Proceeding And The Amount Of Discovery Completed.** The Company considered the fact that discovery has been completed and that substantially all anticipated documents that would be used at trial are in the record, providing a substantial basis on which to evaluate the claims and risks of trial. Schlesinger Dec. ¶ 8.

12

**Ability Of Defendants To Withstand A Greater Judgment.** The Company considered, as to Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund LP, the likelihood that the latter would not be able to pay any judgment against it because it has no assets. Schlesinger Dec. ¶ 13. Otherwise, this factor is neutral.

**Reaction Of Other Shareholders.** Following the disclosure of the Settlement on the public docket, the Company contacted two large individual stockholders to determine whether those stockholders support or oppose the Settlement. Each supports the Settlement. *See* Declarations of John Rockey and Henry Ike. No stockholders have objected or expressed concern. Jaffa Dec. ¶ 15.

**Disgorgement of Profits.** Some courts consider a "potential eighth factor" for Section 16(b) settlements: "the congressional purpose to cause disgorgement of short-swing trading profits by corporate insiders." *Revive*, 2021 WL 56905, at *7. Here, Defendants—who individually are not "insiders"—are voluntarily disgorging a substantial sum of money under a contested group liability theory that no party anticipated at the time of the transactions. If public policy is advanced by a meaningful disgorgement of profits under such circumstances, this factor supports the Settlement.

## III.     PLAINTIFF'S CONDUCT IS INCONSISTENT WITH HIS FIDUCIARY DUTY

Mr. Augenbaum owes duties of care and loyalty to the Company in connection with this action. *OptimisCorp v. Atkins*, 2023 WL 3745306, at *9–11 (Del. Ch. June 1, 2023) ("Derivative stockholder plaintiffs enforcing the company's rights owe the company and their fellow stockholders the duties of care and loyalty."); *Steinberg v. Steinberg*, 434 N.Y.S.2d 877, 878 (Sup. Ct. 1980) (a derivative-plaintiff "makes herself a fiduciary [and] must therefore demonstrate that she will fairly and adequately represent the interests of the shareholders and the corporation, and that she is free of adverse personal interest or animus."); *Cotter on behalf of Reading Int'l, Inc. v.*

*Kane*, 136 Nev. 559, 566 (2020) (derivative-plaintiff not adequate where "his personal interests []

outweigh[ed] the shareholders' interests"). Mr. Augenbaum's statements that the Company should

"shut down its existing business operation," coupled with his efforts to obstruct the Company's

efforts to monetize its claims, create serious questions whether he is satisfying his fiduciary

obligations. The Company appreciates the efforts of Plaintiff thus far in the litigation. However, if

Mr. Augenbaum continues to act against the Company's survival, the Company reserves the right

to intervene or take other action to protect the interests of its stockholders and stakeholders.

Respectfully submitted,

By: /s/ Aaron T. Morris

**MORRIS KANDINOV LLP**
Aaron T. Morris (#5675178)
Andrew W. Robertson (#4288882)
305 Broadway, 7th Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law

Counsel for Kartoon Studios, Inc.

14

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| TODD AUGENBAUM,<br><br>Plaintiff,<br><br>v.<br><br>ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; and RICHARD MOLINSKY,<br><br>Defendants,<br><br>-and-<br><br>KARTOON STUDIOS, INC.,<br><br>Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

**DECLARATION OF MICHAEL JAFFA**

| | |
|---|---|
| STATE OF CALIFORNIA | ) |
| | ) SS: |
| COUNTY OF LOS ANGELES | ) |

I, MICHAEL JAFFA, declare under penalty of perjury as follows:

1.      I am the Chief Operating Officer, General Counsel and Corporate Secretary at Kartoon Studios, Inc. (the "Company"). In those capacities, I have personal knowledge as to the

following corporate actions and records. I confirm that I have personal knowledge as to the facts set forth in my May 5, 2026 declaration (ECF 360-1).

2.     On January 30, 2026, the Company's Board of Directors (the "Board") convened a special meeting to discuss the above-captioned action (the "Action"), and the Board determined unanimously to form a Litigation Committee (the "Committee"). Attached as **Exhibit 1** are the minutes from that meeting.

3.     On February 2, 2026, the Committee met. Attached as **Exhibit 2** are the minutes from that meeting.

4.     On February 13, 2026, at the Committee's request, the Committee received a memorandum from counsel regarding the history and background of the Action. Attached as **Exhibit 3** is a copy of that memorandum.

5.     On March 9, 2026, the Committee met. Attached as **Exhibit 4** are the minutes from that meeting.

6.     On March 27, 2026, at the Committee's request, the Committee received a memorandum from counsel regarding Defendants' claims for indemnification and advancement under the Securities Purchase Agreement at issue in the Action. Attached as **Exhibit 5** is a copy of that memorandum.

7.     Also on March 27, 2026, the Committee met. Attached as **Exhibit 6** are the minutes from that meeting.

8.     On April 6, 2026, at the request of the Committee, the Committee received a memorandum from counsel regarding the legal principles, evidentiary record, and central disputes in the Action. Attached as **Exhibit 7** is a copy of that memorandum.

9.     On April 10, 2026, the Committee met. Attached as **Exhibit 8** are the minutes from that meeting.

10.    On April 16, 2026, the Committee met. Attached as **Exhibit 9** are the minutes from that meeting.

11.    On April 20, 2026, the full Board met to receive an update and recommendation from the Committee, after which the Board approved a settlement with certain of the Defendants in the Action. Attached as **Exhibit 10** are the minutes from that meeting.

12.    To the best of the Company's knowledge, and based on diligent inquiry, no member of the Board is a party to this Action or otherwise has financial or personal interests in the outcome of this Action other than with respect to their roles and duties as directors of the Company. Further, as to each of the non-management directors, consisting of six of the seven members of the Board,[1] no such director has any financial, personal, or other relationships of any kind with any Defendant, Special Equities Group, or any affiliates or family members of the foregoing.

13.    On April 20, 2026, I participated in a telephone call with Plaintiff's counsel, Mr. Abraham, along with Jeff Schlesinger and counsel from Morris Kandinov. During that call, Mr. Abraham stated, in sum and substance, that two of the Defendants had previously made settlement offers higher than the amounts those Defendants would contribute under the proposed settlement. Following the call, the Committee directed Kirkland & Ellis to determine the basis for Mr. Abraham's statements regarding the prior offers but was unable to confirm that the offers were made.

---

[1] The non-management directors are Governor Joseph "Gray" Davis, Margaret Loesch, Jeffrey Schlesinger, Lynne Segall, Anthony D. Thomopoulos, Cynthia Turner-Graham, MD. The management director is Andy Heyward, CEO and Chairman of the Board.

ADD-224

14. Attached as Exhibit 11 is a copy of the Company's most recent annual report (Form 10-K) filed with the Securities and Exchange Commission on March 31, 2026.

15. As of the date of this declaration, and to the best of the Company's knowledge, no stockholder has expressed an objection or concern with the proposed settlement.

I declare under penalty of perjury that the foregoing is true and correct.

*Michael Jaffa*
Michael Jaffa (May 25, 2026 14:22:41 PDT)

Michael Jaffa

ADD-225

# EXHIBIT 1

**KARTOON STUDIOS, INC.**
(a Nevada corporation)
(the "Company")

**MINUTES OF A SPECIAL MEETING
OF THE COMPANY'S BOARD OF DIRECTORS**

**DATE:**     January 30, 2026
**TIME:**     10 a.m. PT
**PLACE:**    Conference Call

**DIRECTORS PRESENT:**

1. Mr. Andy Heyward

2. Gov. Gray Davis (Telephone)

3. Mr. Anthony Thomopoulos (Telephone)

4. Ms. Margaret Loesch (Telephone)

5. Jeff Schlesinger (Telephone)

**OTHERS PRESENT:**

Michael Jaffa, Chief Operating Officer
Brian Parisi, Chief Financial Officer

**CALL TO ORDER**

A meeting of the Company's Board of Directors (the "Board") was held at the date, time and place set forth above. After confirming that all could hear and be heard, Andy Heyward called the meeting to order and announced that a quorum of the Board was present and that the meeting, having been duly noticed and convened, was ready to proceed with its business.

**SECTION 16(b) LITIGATION AND RELATED MATTERS**

Mr. Jaffa was asked to provide an update to the Board as to the pending litigation captioned *Augenbaum v. Anson Investments Master Fund LP, et al.*, Case No. 1:22-cv-00249 (S.D.N.Y.) (the "Section 16(b) Litigation"). Mr. Jaffa noted that: (i) the Section 16(b) Litigation asserts claims under Section 16(b) of the Securities Exchange Act of 1934 (sometimes called the short-swing profit rule) against certain institutional investors (the "Defendants") who are alleged to have

acquired and disposed of certain of the Company's securities in 2020 in violation of the statute; (ii) the Section 16(b) Litigation is derivative in nature, meaning that the claim belongs to the Company and any recovery would be payable exclusively to the Company; (iii) the Court denied the Defendants' motion to dismiss the Amended Complaint in January 2024; (iv) the Court denied the Defendants' motion for summary judgment in September 2025; and (v) a trial has been scheduled for June 8, 2026 with a final pre-trial conference scheduled for June 1, 2026.

Mr. Jaffa provided additional detail regarding the recent summary judgment ruling. Mr. Jaffa noted that both sides had moved for summary judgment and both motions were denied. The Court found that there is a triable question of fact as to whether the Defendants agreed to act together as a "group" within the meaning of Section 13(d) of the Exchange Act, which is a predicate to the liability theory plaintiff has alleged under Section 16(b). Mr. Jaffa explained that the plaintiff presented virtually no evidence of direct communication or coordination between the Defendants, but the Court found disputes of material fact precluding summary judgment based on communications between individual Defendants and their placement agent, an internal memo purportedly referencing a joint call between two Defendants, and the exchange of various drafts of transactional documents between a subset of the Defendants, the placement agent, and respective counsel. The Court concluded, under the applicable summary judgment standard, that this evidence could support an inference that Defendants agreed to act as a group. Mr. Jaffa further noted that the Court also made certain rulings on the parties' experts. The next procedural stage is a trial, which has been scheduled for June 8, 2026.

Discussion then turned to indemnification claims made against the Company by the Defendants in the Section 16(b) Litigation. Mr. Jaffa noted that, as previously considered by the Board, the Defendants have demanded indemnity as to their ongoing legal expenses in connection with the Section 16(b) Litigation as well as for any liability ultimately incurred in the litigation. Defendants purport to rely on Section 9(k) of the March 11, 2020 Securities Purchase Agreement ("SPA"), which states that the "Company shall defend, protect, indemnify and hold harmless each Buyer and each other holder of the Securities . . . from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith . . . and including reasonable attorneys' fees and disbursements (the 'Indemnified Liabilities'), incurred by any Indemnitee as a result of, or arising out of, or relating to . . . (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company)." Mr. Jaffa further noted that Defendants purport to rely on Section 9(k)(iii) of the SPA, which states that "[t]he indemnification required by this Section 9(k) shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Liabilities are incurred." While the Company has denied and contested its obligations to provide any indemnity or advancement of expenses to Defendants in connection with the Section 16(b) Litigation, Defendants have argued that even if they are not entitled to indemnity as to any ultimate liability, they are entitled at a minimum to advancement and

reimbursement of all costs incurred as a result of the Litigation, which is expected to be substantial at this stage of the Litigation.

Mr. Jaffa advised the Board that one lawsuit has been filed already against the Company by one of the Defendants to enforce the SPA's advancement provisions. On January 6, 2026, Iroquois Master Fund Ltd. and Iroquois Capital Investment Group filed a complaint against the Company in New York Supreme Court, Index No. 650077/2026 (the "Iroquois Litigation"). The Iroquois Litigation asserts claims for declaratory relief and breach of contract and alleges that the Company has failed to advance approximately $5.2 million in attorneys' fees and expenses incurred by the Iroquois entities in defending the Section 16(b) Litigation as of September 2025. The case has not yet been assigned to a judge. The Company is continuing to evaluate the claims and its options in responding to the complaint.

A discussion ensued as to the Section 16(b) Litigation and the Iroquois Litigation, including the nature and extent of the Company's potential liability in the Iroquois Litigation; the likelihood of other Defendants filing similar lawsuits; the implications of such additional litigation to the Company; the estimated scale of the Company's current potential indemnity liabilities to all Defendants; the estimated scale of the Company's future potential indemnity liabilities if the matter proceeds to trial; the potential monetary benefits to the Company of a settlement or favorable resolution of the Section 16(b) Litigation; and the likelihood of a favorable result for the Company at trial and factors that may render it difficult for the plaintiff to prevail at trial.

Mr. Jaffa noted that the parties in the Section 16(b) Litigation had previously attended a mediation with David Murphy of Phillips ADR, but the mediation did not result in a resolution of the matter. Mr. Jaffa further noted that the Company, as the real party in interest and owner of the claim being litigated, is entitled to directly engage in the potential resolution of the Litigation, including discussing and negotiating any potential settlement with the parties. Mr. Jaffa discussed whether the Board may wish to consider forming a committee to facilitate such direct discussions with the parties with the objective of achieving a value-maximizing outcome for the Company and its stockholders, taking into account both the potential recovery for the Company and the potential exposure to indemnification and advancement liabilities. Mr. Jaffa noted that the Company had submitted a letter to the Court on December 11, 2025 requesting that the Court instruct the parties to further mediation in 2026. While the Court declined to order mediation, it stated, in relevant part, that "the Company is now on record as to its views, which everyone should consider. If in light of those expressed views the Court can be of assistance, please let us know by way of a joint letter or motion on consent."

Further discussion ensued regarding the status of the litigations; the risks and options available to the Company in connection with the Section 16(b) Litigation and the Iroquois Litigation, including the magnitude of the Company's potential exposure for indemnity obligations under the SPA; the potentially catastrophic risk to the Company in view of those obligations in the

event that the plaintiff does not prevail at trial; the probability of such a failure at trial; the fact that the Company would incur, at a minimum, substantial defense costs of its own in the Iroquois Litigation and potentially other indemnity actions filed by other Defendants; and the anticipated scale of such defense costs. The Board further discussed the potential value of the Section 16(b) claim to the Company; the wherewithal of Defendants to pay such amounts whether by settlement or judgment; the likelihood that Defendants would engage in meaningful settlement discussions; the Company's current cash position, balance sheet and anticipated expenses and liabilities for FY 2026; and the Company's near-term strategic objectives.

Following extensive discussion between the members of the Board regarding the foregoing topics and related business factors relevant to the Company, the Board determined unanimously to form a Litigation Committee to further analyze the Company's litigation positions, explore potential settlement structures that could be value maximizing for the Company, test the potential to reach a resolution in the near term, and advise the Board with respect to the foregoing and recommended next steps. The Board discussed and acknowledged that forming a Litigation Committee is expected to be beneficial to the Company because the Committee would be properly resourced and better positioned to: (i) evaluate in detail the current status of the Company's claims in the Section 16(b) Litigation, the likelihood of success, and the potential net recovery after accounting for any offsetting expenses, indemnification and advancement obligations; (ii) evaluate the Company's position in the Iroquois Litigation, the strength of its defenses and the likelihood, if any, of exposure under the SPA to indemnity claims; (iii) engage directly in discussions with the parties to the Section 16(b) Litigation to explore the feasibility of a global resolution favorable to the Company; and (iv) recommend whether the Company should take action with respect to the Section 16(b) Litigation and, if so, what actions would be in the best interests of the Company and its stockholders.

## FORMATION OF LITIGATION COMMITTEE

After discussion, the following resolutions were presented to the Board for consideration and approval:

* * *

*WHEREAS*, the Company is the nominal defendant and the real party in interest in the pending litigation captioned *Augenbaum v. Anson Investments Master Fund LP, et al.*, Case No. 1:22-cv-00249 (S.D.N.Y.) (the "Section 16(b) Litigation"), which asserts claims under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), against certain institutional investors (the "Defendants") seeking disgorgement of alleged short-swing profits, with any recovery payable to the Company;

*WHEREAS*, the Court denied the Defendants' motion to dismiss in January 2024 and motion for summary judgment in September 2025, and the Section 16(b) Litigation is now scheduled for trial beginning June 8, 2026;

*WHEREAS*, certain Defendants have made indemnification and advancement demands on the Company pursuant to Section 9(k) of the Securities Purchase Agreement dated March 11, 2020 (the "SPA"), which contains provisions potentially requiring the Company to indemnify such investors for claims arising out of the SPA, including derivative actions brought on behalf of the Company, and potentially to make periodic payments of attorneys' fees and other expenses as they are incurred;

*WHEREAS*, on January 6, 2026, Iroquois Master Fund Ltd. and Iroquois Capital Investment Group filed a complaint against the Company in the Supreme Court of the State of New York, Index No. 650077/2026 (the "Iroquois Litigation"), seeking declaratory relief and damages for breach of contract based on the Company's alleged failure to advance approximately $5.2 million in attorneys' fees and expenses;

*WHEREAS*, the Board has determined that it is necessary and appropriate to conduct an independent and robust evaluation of (i) the value of the Company's claim in the Section 16(b) Litigation, risks and benefits of continued prosecution, and the feasibility of reaching a value-maximizing resolution of the claim; and (ii) the Company's potential exposure to indemnity claims by Defendants to the Section 16(b) Litigation, including with respect to the Iroquois Litigation and potential future indemnity litigation, and the effect of any such obligations on the Company's potential net recovery in the Section 16(b) Litigation;

*WHEREAS*, the Bylaws of the Company provide that the Board may designate one or more committees, each committee to consist of one or more directors of the Company;

*WHEREAS*, the Board deems it advisable and in the best interests of the Company and its stockholders to form a litigation committee (the "Litigation Committee") consisting of independent and disinterested directors to investigate, review, and further evaluate the pending Section 16(b) Litigation and the Iroquois Litigation, including with respect to the value of the Company's claim, the potential liability of the Company for indemnification and advancement claims, and potential strategic alternatives available to the Company;

*WHEREAS*, the Board deems it advisable and in the best interests of the Company and its stockholders that the Litigation Committee be empowered to engage directly with the parties to the Section 16(b) Litigation and their counsel in furtherance of the objectives set forth above;

*WHEREAS*, the Board has reviewed the background, relationships, affiliations and all other potential factors weighing on the independence of directors Jeffrey Schlesinger and Anthony D. Thomopoulos (collectively, the "Litigation Committee Members"), and has determined that

both Litigation Committee Members have no potential financial or other interest in, association with, relationship to, or connection of any kind to the Section 16(b) Litigation or the Iroquois Litigation, any party thereto, any counsel thereto, or any other person with any material interest of any kind relating to the litigations and the parties thereto, and thus both Litigation Committee Members are entirely independent and disinterested with respect to the claims asserted in the Section 16(b) Litigation and the Iroquois Litigation;

*WHEREAS*, the Board has likewise reviewed and discussed the experience and competencies of the Litigation Committee Members, and has determined that both Litigation Committee Members have extensive and substantial business experience weighing in favor of their selection to staff the committee, including that Mr. Schlesinger has more than three decades of operational, strategic, financial, and deal-making expertise from multiple senior executive roles, including President of all international television sales at Warner Bros. and Mr. Thomopoulos likewise is a veteran senior executive with a distinguished business career, including serving as President of the Broadcast Group of ABC, overseeing all network divisions including News and Sports, and serving as Chairman of United Artists Pictures;

*WHEREAS*, in light of the foregoing, and after weighing all relevant factors and exercising their independent business judgment, the Board has determined that it is advisable and in the best interests of the Company and its stockholders to form the Litigation Committee and appoint the Litigation Committee Members.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board hereby establishes the Litigation Committee for the purpose of evaluating the status of the Section 16(b) Litigation, the status of the Iroquois Litigation, the potential value of the Company's claim and likelihood of success at trial, the potential exposure to related indemnification and advancement claims, and the Company's potential strategic options in connection with all of the foregoing;

**RESOLVED FURTHER**, that the Board hereby appoints Jeffrey Schlesinger and Anthony D. Thomopoulos to serve as co-Chairs of the Litigation Committee;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, delegated full power and authority to:

(i)     investigate, review, and evaluate the claim asserted in the Section 16(b) Litigation, including the merits, prior judicial rulings, procedural posture, potential recovery for the Company, and costs, benefits and probabilities of continued prosecution;

(ii)    investigate, review, and evaluate the Defendants' indemnification and advancement claims under the SPA, including the legal basis (if any) for such claim, any distinction between advancement and indemnification obligations, the exposure and defense costs associated with the Iroquois Litigation, and the potential effect

of any such obligations on the Company's net recovery in the Section 16(b) Litigation;

(iii)    engage in discussions with the parties to the Section 16(b) Litigation to ascertain the status of settlement efforts, anticipated material issues for the parties at trial, and the feasibility and value of potential resolutions favorable to the Company;

(iv)    evaluate and make recommendations to the Board as to whether continued prosecution, settlement, or other disposition of the claim asserted in the Section 16(b) Litigation, taking into account all relevant factors, is in the best interests of the Company and its stockholders; and

(v)    submit for the Board's consideration any specific proposal(s) for the potential settlement or prosecution of the Section 16(b) Litigation and/or settlement or defense of the Iroquois Litigation consistent with the Litigation Committee's objectives set forth above; and

**RESOLVED FURTHER**, that any proposal with respect to the prosecution or settlement of the Section 16(b) Litigation or the Iroquois Litigation shall require approval by the Board following presentation and recommendation by the Litigation Committee;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, authorized and empowered to retain independent legal counsel, financial advisors, and any other consultants, experts or other resources as the Litigation Committee may deem, in its sole discretion, necessary or appropriate to assist the Litigation Committee in the discharge of its duties and objectives set forth herein, and that the reasonable fees and expenses of such parties shall be paid by the Company;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, authorized to engage directly with the parties to the Section 16(b) Litigation and the Iroquois Litigation and their respective counsel, and the court, where appropriate, on behalf of the Company as may be deemed appropriate in connection with its mandate;

**RESOLVED FURTHER**, that the Litigation Committee be, and hereby is, authorized to adopt such rules and regulations relating to the conduct of its internal affairs as the Litigation Committee deems advisable, including setting the notice requirements for any meeting of the Litigation Committee;

**RESOLVED FURTHER**, that the officers, directors, employees, and agents of the Company are, and each individually is, hereby authorized and directed to make available to the Litigation Committee, and any of its advisors, agents, counsel, and designees, any and all documents and information that the Litigation Committee deems necessary to carry out its duties and to fully cooperate with the Litigation Committee's investigation;

ADD-233

**RESOLVED FURTHER**, that each officer of the Company is hereby authorized and empowered, for and on behalf of the Company, to take or cause to be taken any and all such actions and to enter into, execute and deliver any and all such acknowledgments, agreements, certificates, contracts, instruments, notices, statements and other documents as may be required or as any such officer may deem necessary, advisable or appropriate to effectuate and carry out the purposes and intent of the foregoing resolutions; and

**RESOLVED FURTHER**, that all actions heretofore taken by any officer or director of the Company in connection with the matters contemplated by the foregoing resolutions, if any, are hereby ratified, confirmed, approved and adopted as actions on behalf of the Company.

\* \* \*

Upon motion duly made and seconded, the foregoing resolutions were unanimously approved and adopted by the Board.

**ADJOURNMENT**

There being no further business to come before the Board, the meeting was adjourned.

Michael Jaffa
Secretary

ADD-234

# EXHIBIT 2

ADD-235

**KARTOON STUDIOS, INC.**
(a Nevada corporation)
(the "Company")

**MINUTES OF AN AD HOC MEETING OF THE**
**LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS**

**DATE:**     February 2, 2026
**TIME:**     1:00 p.m. PT
**PLACE:**    Conference Call

**DIRECTORS PRESENT:**

Jeff Schlesinger, Co-Chair
Tony Thomopoulos, Co-Chair

**OTHERS PRESENT:**

Aaron Morris, Morris Kandinov LLP

**AD HOC MEETING**

A meeting of the Litigation Committee (the "Committee") was held on the above date at the above time by conference call. Mr. Schlesinger began by stating that the Committee had been duly formed by the Board on January 30, 2026 and, in coordination with Michael Jaffa, the Company's Chief Operating Officer, the Committee had determined to retain Morris Kandinov LLP as special counsel in connection with the *Augenbaum* litigation and the work of the Committee. Aaron Morris of the Morris Kandinov firm was present at the meeting and responded to numerous questions from the Committee as to the representation and the *Augenbaum* litigation generally.

First, the Committee requested an overview of the history and procedural status of the *Augenbaum* litigation. Mr. Morris provided an overview of the *Augenbaum* litigation to date, and a discussion ensued regarding the trial court's recent ruling on summary judgment and the trial scheduled for June 2026. Mr. Morris noted that his firm had previously represented a third-party witness in connection with a subpoena served during discovery in the *Augenbaum* litigation, and thus his firm already was well apprised of the procedural history and nature of the litigation. The Committee acknowledged that fact and determined that the prior representation did not pose a conflict or other reason precluding the firm from representing the Company and the Committee, and that the firm's prior involvement would minimize initial expenses.

Second, the Committee inquired as to the nature of the Section 16(b) claim asserted in *Augenbaum*, the measure of proof required to prevail on such a claim at trial, and the evidentiary

record submitted by the parties in connection with summary judgment. Mr. Morris provided an overview of the key factual disputes in the case, the evidentiary record noted by the Court in providing its summary judgment ruling, and the Plaintiff's burden of proof at trial. A discussion ensued about the forthcoming trial and the associated risks and potential recovery for the Company. During the discussion, the Committee requested that Mr. Morris provide additional analysis as to the maximum recoverable damages asserted by Plaintiff's counsel, the actual accounting profit realized by each Defendant, and an analysis of a reasonable value of the claim under different trial scenarios and for settlement purposes.

Third, the Committee inquired about the indemnity demands that had been made on the Company by certain of the Defendants and the current status of such demands. Mr. Morris provided an overview of the current claims for advancement, the fact that the Company had not made payments in connection with those demands in the recent months, and the Company's potential exposure to such claims and potential defenses. Mr. Morris noted that Iroquois was the first Defendant to file a lawsuit regarding indemnity, but that it was likely others would follow. A discussion ensued as to the likely defense costs of such litigation. Discussion then turned to scenarios under which the Company may or may not owe such indemnity, including potential indemnity exposure if the Plaintiff were not successful at proving the Section 16(b) claim at trial. Mr. Thomopoulos inquired as to what insurance coverage, if any, may be available for such indemnity obligations. A discussion between the Committee members ensued. The Committee then asked Mr. Morris to prepare further analysis as to the claims and defenses with respect to indemnity, insurance, and the different scenarios under which the Company may or may not owe such indemnity to Defendants.

Discussion then turned to the goals of the Committee in the near term. Mr. Schlesinger outlined the business considerations relevant to the Company in connection with the *Augenbaum* litigation and the method by which the Committee could develop an understanding of prior settlement discussions between the parties and the status of current discussions, if any. The Committee discussed the fact that there was a prior mediation but the Company was not invited to participate. The mediator was David Murphy of Phillips ADR. Discussion then turned to the identity of the attorneys for Plaintiff and Defendants and the best method to initiate discussions with these parties. Mr. Morris stated that he would report to the Committee in the coming days as to the best representatives of the parties so that the Committee may engage with them directly.

## ADJOURNMENT

There being no further business to come before the Committee, the meeting was adjourned.

Michael Jaffa
Secretary

**ADD-238**

ADD-239

# EXHIBIT 3

**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

_____

**MEMORANDUM**

**TO:**         Litigation Committee of Kartoon Studios, Inc. (the "Company")

**RE:**         Background Matters Relating To *Augenbaum v. Anson Investments Master Fund LP, et al.*, No. 1:22-cv-00249

**DATE:**       February 13, 2026

At the request of the Committee, we have prepared the following outline of selected background information relating to the *Augenbaum* matter. This outline is not intended to be exhaustive but rather addresses with additional specificity areas of discussion during the Committee's meeting on February 2, 2026.

## I.    THE SECURITIES PURCHASE AGREEMENT

In early 2020 (*i.e.*, at the outset of COVID-19), the Company required near-term financing to avoid defaulting on prior debts. The Company hired Special Equities Group ("SEG") to assist in raising capital. In January 2020, the Company and SEG negotiated a Securities Purchase Agreement (the "SPA") with certain institutional investors (the "Investors") through which the Company would ultimately issue (i) $13.750 million in senior convertible notes; and (ii) warrants to purchase approximately 65.5 million shares of common stock exercisable at $0.21/share (after stockholder approval). Through the SPA, the Company raised $11 million, with $7 million in upfront cash and $4 million in promissory notes payable by the Investors. The transaction closed on March 17, 2020. A chart of the Investor participants is below.

| Investor[1] | Note Amount | Convert | Warrants | % of Total |
|---|---|---|---|---|
| Anson | $3,750,000 | 17,857,143 | 17,857,143 | 27.3% |
| Empery | $1,875,000 | 8,928,571 | 8,928,571 | 13.6% |
| Brio | $1,750,000 | 8,333,333 | 8,333,333 | 12.7% |
| CVI | $1,250,000 | 5,952,381 | 5,952,381 | 9.1% |
| Iroquois | $1,250,000 | 5,952,381 | 5,952,381 | 9.1% |
| M3A | $1,250,000 | 5,952,381 | 5,952,381 | 9.1% |
| L1 Capital | $750,000 | 3,571,429 | 3,571,429 | 5.5% |

_____

[1] This list includes non-insider participants. The remainder of the SPA allocation was to insider parties who were not named in litigation.

Page 1

| Investor[1] | Note Amount | Convert | Warrants | % of Total |
|---|---|---|---|---|
| Robert Molinsky | $106,250 | 505,952 | 505,952 | 0.8% |

After the March 2020 closing, the price of the Company's stock began to rise precipitously, driven by the theory that changes caused by COVID-19 would be favorable for the Company's business. The Company capitalized on this price increase through a series of registered direct offerings. Some Investors participated in these offerings and others did not. A chart of the registered directs during the period is below.

| Date | Shares | Price | Gross | SPA Investors |
|---|---|---|---|---|
| March 22, 2020 | 4,000,000 | $0.2568 | $1,027,200 | Anson, Brio |
| May 7, 2020 | 8,000,000 | $0.35 | $2,800,000 | Anson, Brio, CVI, Empery, Iroquois, L1 Capital, M3A, Molinsky |
| May 8, 2020 | 12,000,000 | $0.454 | $5,448,000 | Anson, Brio, CVI, Empery, Iroquois, L1 Capital, Molinsky |
| May 18, 2020 | 7,500,000 | $1.20 | $9,000,000 | Anson, Brio, CVI, Empery, Iroquois, L1 Capital, Molinsky |
| May 28, 2020 | 20,000,000 | $1.50 | $30,000,000 | Anson, Brio, CVI, Empery, Iroquois, L1 Capital, Molinsky |

In early May 2020, an Investor requested that the Company consider early registration of the shares issuable under the SPA in light of the increase in stock price. The Company ultimately agreed to the registration of certain of the note and warrant shares in exchange for early payment of the $4 million promissory notes as well as consent from certain of the Investors required to conduct the registered offerings listed above, which raised capital for the Company.

On June 4, 2020, the Company filed a registration statement for approximately 60 million shares, 31 million of which were issued in connection with the exercise of the SPA warrants by the Investors. On June 23, 2020, the Company entered into conversion agreements for the SPA notes and agreed to register the newly issued shares. On June 26, 2020, the Company filed a registration statement for approximately 59.5 million shares issued upon the conversion of the notes.

In connection with the registrations, the Company required Investors to enter into "leak-out" agreements that limited open-market sales for a certain period after registration, to no more than 30% of the daily trading volume *only* when the stock price was trading below a specified price (90 days and $1.65 in the first instance and 30 days and $2.00 in the second). The leak-out agreements were required by the Company to mitigate the effect of the Investors' sales on the Company's stock price, but because the Company's stock price never approached the price floors during the period, the restrictions never applied.

Following the registrations, the Investors sold the shares obtained through the SPA at various points and some Investors continued to buy and sell shares of the Company. We do not have access to trading data showing the actual proceeds received by the Investors, but the statutory profit calculations submitted by Plaintiff and Defendants are shown below.

## II.     THE *AUGENBAUM* LITIGATION

On January 11, 2022, Todd Augenbaum (the "Plaintiff"), a shareholder of the Company, filed a complaint in the U.S. District Court for the Southern District of New York against the Investors listed above (the "Defendants") and the Company as a nominal defendant. *See Augenbaum v. Anson Investments Master Fund LP, et al.*, No. 1:22-cv-00249 (S.D.N.Y.). The action asserts a claim under Section 16(b) of the Securities Exchange Act of 1934, which applies to so-called "short-swing" trading by insiders and other persons who beneficially own more than 10% of a company's outstanding stock. Section 16(b) prohibits such persons from profiting on purchases and sales of stock within a six-month period. The statutory remedy is disgorgement calculated by a "lowest price in, highest price out" matching method, which may result in damages under the statute that exceed actual accounting profits or losses.

Although none of the Investors individually owned more than 10% of the Company's shares, the Plaintiff alleges that the Investors formed a "group" within the meaning of Section 13(d) of the Exchange Act, and thus their holdings and trading should be considered in the aggregate for purposes of Section 16(b). The Investors' combined holdings exceeded 10% of the Company's outstanding shares and the acquisitions in March 2020 and sales thereafter fell within a six-month period, thus exposing them, in Plaintiff's view, to Section 16(b) liability.

On March 30, 2023, the Court dismissed the original complaint, and Plaintiff filed an Amended Complaint on May 1, 2023. On January 24, 2024, the Court denied the Defendants' motion to dismiss, and the case proceeded to discovery. Following discovery, including extensive document discovery and deposition testimony, both parties filed cross-motions for summary judgment. On September 30, 2025, the Court denied all summary judgment motions, finding triable questions of fact as to whether the Defendants agreed to act as a group within the meaning of Section 13(d). The Court scheduled a trial for June 1, 2026.

In connection with summary judgment, Plaintiff and Defendants retained experts to, among other things, calculate statutory disgorgement under Section 16(b). Plaintiff's expert submitted the following calculations:

| Defendant | Model 1 | % | Model 2 | % |
|---|---|---|---|---|
| Anson | $157,405,689 | 43.4% | $191,461,246 | 43.7% |
| Brio | $35,620,470 | 9.8% | $44,675,078 | 10.2% |
| CVI | $26,691,400 | 7.4% | $33,661,360 | 7.7% |
| Empery | $57,606,534 | 15.9% | $59,862,827 | 13.7% |
| Iroquois | $35,835,237 | 9.9% | $45,077,693 | 10.3% |
| L1 Capital | $16,455,209 | 4.5% | $21,247,023 | 4.8% |

| Defendant | Model 1 | % | Model 2 | % |
|---|---|---|---|---|
| M3A | $30,239,943 | 8.3% | $38,352,497 | 8.8% |
| Robert Molinsky | $3,224,737 | 0.9% | $3,961,979 | 0.9% |
| **Total** | **$363,079,218** | **100.0%** | **$438,299,703** | **100.0%** |

Defendants retained an expert to opine on the calculations above and contends that the properly calculated amounts are as follows:

| Defendant | Model 1 (Adj.) | % | Model 2 (Adj.) | % |
|---|---|---|---|---|
| Anson | $141,670,289 | 42.6% | $150,432,534 | 43.9% |
| Empery | $56,097,875 | 16.9% | $51,255,868 | 15.0% |
| Brio | $33,065,665 | 9.9% | $35,018,512 | 10.2% |
| Iroquois | $31,894,274 | 9.6% | $33,300,964 | 9.7% |
| CVI | $25,891,187 | 7.8% | $26,153,287 | 7.6% |
| M3A | $25,255,229 | 7.6% | $26,650,120 | 7.8% |
| L1 Capital | $15,447,874 | 4.6% | $16,284,807 | 4.8% |
| Molinsky | $3,223,602 | 1.0% | $3,342,167 | 1.0% |
| **Total** | **$332,545,995** | **100.0%** | **$342,438,259** | **100.0%** |

Based on the parties' briefing at summary judgment, it appears that a key issue at trial will be proof of group coordination under the securities laws, including:

- Whether participation in a financing transaction like the SPA can constitute group activity under the securities laws;

- Whether participating in the leak-out agreements could constitute group activity; and

- Whether other record evidence in the case demonstrates coordination, including (i) a document that plaintiff suggests demonstrates a "joint call" between two of the Investors, which is disputed by testimony; (ii) a draft term sheet sent by one Investor to the Company's placement agent, SEG, which was thereafter forwarded to a different Investor; (iii) communications sending drafts of deal documents from one Investor to counsel for another; and (iv) separate communications between SEG and individual Investors regarding deal terms, participants or economics.

Our review of the claims and defenses at trial is only beginning and we will provide further analysis to the Committee at future meetings.

ADD-244

**APPENDIX**

**TIMELINE OF SELECTED EVENTS**

| Date | Event | Stock Price† |
|------|-------|--------------|
| Mar. 11, 2020 | Company enters into SPAs with each Investor. | $2.40 |
| Mar. 17, 2020 | PIPE closes and raises $7M cash with notes for additional $4M. Cash proceeds used, in part, to repay $2.9M in prior secured notes. | $2.25 |
| Mar. 22, 2020 | First registered direct: 4M shares for $1.03M gross. | $2.75 |
| May 7, 2020 | Second registered direct: 8M shares for $2.8M gross. | $8.35 |
| May 8, 2020 | Third registered direct: 12M shares for $5.45M gross. | $5.80 |
| May 15, 2020 | Stockholders approve PIPE; conversion and warrant prices reduced. | $15.00 |
| May 18, 2020 | Fourth registered direct: 7.5M for $9M gross. | $13.80 |
| May 28, 2020 | Fifth registered direct: 20M shares for $30M gross. Company agrees to register warrant shares. | $18.10 |
| June 4, 2020 | Company files registration statement for ~31M shares from warrant exercises (60.1M total shares registered). | $68.60 |
| June 10, 2020 | SEC declares June 4 registration statement effective. | $45.10 |
| June 23, 2020 | Company enters into conversion agreements and agrees to register conversion shares by June 26. | $31.30 |
| June 26, 2020 | Company files registration statement for conversion shares. | $24.50 |
| July 6, 2020 | SEC declares June 26 registration effective. | $26.60 |
| Jan. 11, 2022 | Augenbaum files complaint in S.D.N.Y. asserting Section 16(b) claim. | $10.60 |

† Closing prices from Bloomberg (TOON US Equity). Prices are adjusted for the 1-for-10 reverse stock split.

Page 5

ADD-245

# EXHIBIT 4

**KARTOON STUDIOS, INC.**
(a Nevada corporation)
(the "Company")

**MINUTES OF AN AD HOC MEETING OF THE
LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS**

**DATE:**    March 9, 2026
**TIME:**    10:00 a.m. PT
**PLACE:**    Conference Call

**DIRECTORS PRESENT:**

Jeff Schlesinger, Co-Chair
Tony Thomopoulos, Co-Chair

**OTHERS PRESENT:**

Michael Jaffa, Chief Operating Officer
Aaron Morris, Morris Kandinov LLP

**AD HOC MEETING**

A meeting of the Litigation Committee (the "Committee") was held on the above date at the above time by conference call. Mr. Schlesinger began by requesting an update regarding the work of Morris Kandinov in gathering and organizing the litigation record in the *Augenbaum* matter for review by the Committee as well as efforts to engage with the parties regarding a potential resolution. Mr. Morris advised the Committee that his firm continued to aggregate relevant materials and expects to provide additional memoranda in the coming weeks, including with respect to the arguments and evidence likely to feature at trial and the indemnity claims by certain defendants. Mr. Morris stated that he had initial calls with counsel for plaintiff, Jeffrey Abraham, regarding, among other things, the Committee's request to speak directly with Mr. Abraham regarding the pending litigation and a non-waiver agreement permitting the Committee to share its materials. Mr. Abraham initially declined to enter into a non-waiver agreement or commit to a meeting, but discussions remain ongoing. Mr. Abraham also requested certain information regarding the Company's positions relating to settlement as well as indemnity, which Mr. Morris stated would need to be addressed in future conversations with Mr. Abraham.

Discussion then turned to initial engagement with the defendants in the *Augenbaum* matter. Mr. Morris stated that he had an initial conversation with David Murphy of Phillips ADR, who had handled a prior mediation between the parties. Mr. Murphy was restricted by confidentiality obligations from discussing any prior settlement communications between the parties but agreed to inform counsel for defendants that the Committee had been formed to evaluate, among other

things, the potential to resolve the claims in the *Augenbaum* litigation prior to trial. In response, Defendants indicated, through Mr. Murphy, a willingness to engage in such discussions but questioned whether Morris Kandinov, which previously represented Special Equities Group in connection with a non-party subpoena in *Augenbaum*, could appropriately handle such negotiations. Mr. Morris reminded the Committee that it had previously considered whether the firm's prior engagement presented a conflict of interest and had determined that it did not. Nevertheless, following the initial engagement with defendants, Mr. Jaffa had explored the desirability of retaining separate counsel to handle such negotiations with the *Augenbaum* parties, including Jay Lefkowitz of Kirkland & Ellis who has handled a range of prominent securities and shareholder disputes, including claims under Section 16(b). Subject to the Committee's approval, Mr. Lefkowitz had agreed to represent the Committee in connection with negotiations. A discussion ensued.

After substantial discussion of the circumstances and relevant factors, including the inefficiencies and expense of retaining separate counsel against the advantages of Mr. Lefkowitz's expertise in this area, the apparent unwillingness of defendants to discuss resolution in the absence of separate counsel, and the potential that counsel for plaintiff may make similar arguments, the Committee determined to engage Mr. Lefkowitz to handle negotiations, if any, with the *Augenbaum* parties. The Committee determined that Morris Kandinov may continue to represent that Company and support the Committee as may be appropriate with its mandate to fully investigate and evaluate the *Augenbaum* litigation, but that any settlement communications would be handled by Mr. Lefkowitz and any recommendation by the Committee to the Board in regard to settlement would be made directly by the Committee without the advice of Morris Kandinov.

Following this discussion, the following resolutions were presented to the Committee for consideration and approval:

RESOLVED, that the Committee hereby approves the engagement of Jay Lefkowitz of Kirkland & Ellis to represent the Committee in negotiations with the parties to the *Augenbaum* matter;

RESOLVED FURTHER, that the Committee approves Morris Kandinov's continued representation of the Company and support, as needed, of the Committee's mandate, and that the foregoing creates no conflict of interest as to the Committee's work; and

RESOLVED FURTHER, that in the event that the Committee determines to make a recommendation regarding settlement to the Board, it will do so independently and without the advice of Morris Kandinov.

ADD-248

**ADJOURNMENT**

    There being no further business to come before the Committee, the meeting was adjourned.

Michael Jaffa
Secretary

ADD-249

ADD-250

# EXHIBIT 5

ADD-251

**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

_____

**MEMORANDUM**

**TO:**       Litigation Committee of Kartoon Studios, Inc. (the "Company")

**RE:**       Chronology of Indemnification Claims Relating to
              _Augenbaum v. Anson Investments Master Fund LP, et al._, No. 1:22-cv-00249

**DATE:**     March 27, 2026

At the request of the Committee, the following is a summary of the indemnification claims asserted by certain of the defendants in the _Augenbaum_ matter, each of which participated in the March 2020 Securities Purchase Agreement (the "SPA") with the Company.

## I.    INDEMNIFICATION PROVISIONS

The SPA contained the following provisions (in relevant part), which defendants have argued require the Company to indemnify defendants for liability incurred in _Augenbaum_ and to periodically advance defense costs in the interim:

(k) Indemnification.

(i) In consideration of each Buyer's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless each Buyer and each other holder of the Securities and all of their stockholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing Persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or

1

document contemplated hereby or thereby, (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities, (iii) any disclosure made by such Buyer pursuant to Section 4(i) or (iv) the status of such Buyer or holder of the Securities as an investor in the Company pursuant to the transactions contemplated by the Transaction Documents. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.

. . . .

(iii) The indemnification required by this Section 9(k) shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Liabilities are incurred.

(iv) The indemnity agreements contained herein shall be in addition to (x) any cause of action or similar right of the Indemnitee against the indemnifying party or others, and (y) any liabilities the indemnifying party may be subject to pursuant to the law.

SPA, Ex. A at § 9(k) (emphasis added).

## II.     INITIAL DEMANDS FOR INDEMNIFICATION

**Empery Demand.** On April 15, 2022, Schulte Roth & Zabel LLP, on behalf of Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, and Empery Tax Efficient, LP ("Empery"), made a demand on the Company's counsel, pursuant to § 9(k) of the SPA, for indemnification and advancement of expenses in connection with the *Augenbaum* matter. Empery argued that the *Augenbaum* action arose from Empery's status as an investor under the SPA and therefore the claims fell within the scope of contractual indemnification. Empery acknowledged a carve-out for claims arising from "any violations . . . of state or federal securities laws," but argued that Section 16(b) "seeks disgorgement of alleged profits" and is not a securities violation. Empery further argued that it was entitled to advancement because § 9(k)(iii) requires "periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or are incurred."

**Company Rejects Empery's Demand.** On April 22, 2022, the Company, through counsel at Vinson & Elkins, rejected Empery's indemnification demand. The rejection rested on two principal grounds. First, the Company argued that indemnification for Section 16(b) liability is impermissible as a matter of public policy, citing applicable case law finding that indemnification for such liability would undercut the purpose of the statute and contravene the anti-waiver provisions of Section 29(a) of the Exchange Act. Second, the Company contended that the SPA's indemnification language does not extend to Section 16(b) claims because the alleged violations resulted from the investor's independent decisions to dispose of the Company's securities, not from their participation in the SPA.

**CVI Demand.** On April 22, 2022, Skadden, Arps, Slate, Meagher & Flom LLP, on behalf of CVI Investments, Inc. ("CVI"), made a demand for advancement on the Company's counsel pursuant to § 9(k). CVI noted that it had "been named as a defendant" in *Augenbaum* "in

2

connection with the securities acquired pursuant to the SPAs" and thus requested "periodic payments of amounts as and when bills are received or are incurred."

**Company Rejects CVI's Demand.** On April 26, 2022, the Company, through counsel, rejected CVI's demand on the same grounds as the Empery rejection, citing case law holding that public policy precludes indemnification of Section 16(b) liability and arguing that such a claim would fall outside of the scope of indemnification under the SPA.

**Empery Proposes To Waive Indemnity In Exchange For Advancement.** On May 24, 2022, Empery responded to the Company's rejection of its demand and argued a distinction between indemnification for disgorgement liability under Section 16(b) and advancement of interim defense costs. Empery acknowledged that indemnification for disgorged profits may implicate public policy concerns, but argued that indemnification for reasonable legal fees does not, citing an authority stating that if a Section 16(b) claim ultimately fails, indemnification of costs is clearly permissible. Further, Empery argued that the Section 16(b) claim is covered by the indemnification language in the SPA because, citing the plaintiff's allegations, it is based on an alleged group formed by purchase of the Company's securities and Empery was named as a defendant because it was among the "signatories to the Transaction Documents." Based on the above, Empery offered to waive its claim for indemnity as to any ultimate Section 16(b) liability if the Company agreed to advance defense costs pursuant to the SPA. Empery offered an undertaking to return the advanced funds in the event that it is ultimately found liable.

**CVI Reaffirms Demand For Indemnity And Advancement.** On June 2, 2022, CVI sent a short letter to the Company's counsel reaffirming its indemnification demand. Like Empery, the CVI letter drew a distinction between indemnification and advancement of interim costs, stating that "in contending that public policy or Section 29(a) prevent indemnification, the Response conflates indemnification for ultimate disgorgement under Section 16(b), and advancement/indemnification for legal fees incurred in defending against unmeritorious Section 16(b) claims." CVI did not offer to waive indemnity in exchange for advancement.

## III. TOLLING AND STANDSTILL AGREEMENTS

**Empery Agrees To A Standstill Agreement.** On August 22, 2022, the Company and Empery entered into a Standstill Agreement pursuant to which the Company agreed to pay Empery's then-current defense costs of $407,581.93. The agreement provides, in relevant part, that the payment would be made without prejudice to the Company's arguments that it does not owe indemnification or advancement obligations and the parties would defer further efforts to resolve the indemnification claims, including any litigation, until 20 business days following the resolution of motions to dismiss the *Augenbaum* action. The parties agreed that the statute of limitations on all claims relating to Empery's indemnification demand would be tolled during the standstill period.

**CVI Agrees To Tolling And Standstill Agreement.** On May 24, 2023, the Company and CVI entered into a similar tolling and standstill agreement. By this time, the Court had dismissed the original complaint in *Augenbaum* and the plaintiff had filed an amended complaint. The agreement provided that the statute of limitations relating to CVI's indemnification claims would be tolled until May 24, 2024. The parties agreed to defer all efforts to resolve the indemnification

3

claims until 10 calendar days following the decision on the motions to dismiss the amended complaint or 14 days prior to the expiration of the tolling period.

**Court Denies Motion To Dismiss Amended Complaint.** On January 24, 2024, the District Court denied defendants' motions to dismiss the *Augenbaum* case and the case proceeded to discovery.

## IV.    NEW AND RENEWED INDEMNITY DEMANDS

**Court Denies Summary Judgment.** On September 30, 2025, the District Court in the *Augenbaum* case denied defendants' motions for summary judgment. Thereafter, the Company began to receive new and/or renewed demands for indemnification pursuant to the SPA.

**Iroquois Demand.** On November 7, 2025, Clark Smith Villazor LLP, on behalf of Iroquois Capital Investment Group, LLC and Iroquois Master Fund Ltd. ("Iroquois"), sent a demand for advancement of $5.2 million of defense costs pursuant to Section 9(k)(iii) of the SPA. The demand asserts that the claim is covered by the SPA because "the [Augenbaum] allegations arise out of, relate to, and result from the execution, delivery, performance and enforcement of the SPA and related transaction documents, the transactions financed in whole or in part by the issuance of the securities under the SPA, disclosures made in connection therewith, and Iroquois' status as an investor in the Company pursuant to the transactions contemplated by the SPA."

**Company Rejects The Iroquois Demand.** On November 12, 2025, the Company rejected Iroquois's demand on grounds similar to those addressed above (*i.e.*, that indemnification of Section 16(b) liability is impermissible as a matter of public policy and the SPA language does not extend to Section 16(b) claims). The Company also questioned the reasonableness of the $5.2 million of defense costs that Iroquois claimed to have incurred solely as to its own defense.

**Molinsky Demand.** On January 9, 2026, Stinson LLP, on behalf of Richard Molinsky ("Molinsky"), made a demand on the Company for indemnity and advancement of $650,000 in interim expenses. The demand makes materially identical arguments as those above.

**Company Rejects The Molinsky Demand.** On January 14, 2026, the Company rejected Molinsky's demand on similar grounds as described above. The letter likewise questioned the reasonableness of Molinsky's purported expenses of $650,000.

**Anson Demand.** On February 6, 2026, Hogan Lovells, on behalf of Anson Investments Master Fund LP ("Anson"), made a demand on the Company and counsel, pursuant to § 9(k), for advancement of $2.8 million in defense costs between January 2022 and December 2025. Similar to the other defendants, Anson argued that the claim in *Augenbaum* is derivative and arises "from the execution, delivery, performance and enforcement of the SPA and related transaction documents, the transactions financed in whole or in part by the issuance of the securities under the SPA, disclosures made in connection therewith, and Anson's status as an investor in the Company." Anson further argued that, although it had not made a demand earlier in the litigation, the Company already had sufficient notice of its indemnity obligations.

**Brio Demand.** On February 10, 2026, Ellenoff Grossman & Schole LLP, on behalf of Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund, LP ("Brio"), made a demand on the

4

Company and counsel for indemnity and advancement of $468,070.18 in interim defense costs based on materially the same arguments as set forth above.

**The Company Rejects The Anson And Brio Demands.** On February 10, 2026 and February 12, 2026, the Company rejected the Anson and Brio Demands, respectively, for materially the same reasons described in connection with the prior rejections above. The rejection likewise questioned the reasonableness of the expenses purportedly incurred.

**M3A Demand.** On February 12, 2026, Litman, Asche & Gioiella, LLP, on behalf of M3A LP ("M3A"), made a materially identical demand on the Company and counsel for indemnification and advancement pursuant to § 9(k). Unlike the other demands, M3A did not specify a dollar amount for incurred expenses.

## IV.     INDEMNIFICATION LITIGATION

**Iroquois Lawsuit.** On January 6, 2026, Iroquois filed a lawsuit in New York state court seeking advancement from the Company. *See Iroquois Master Fund Ltd., et al. v. Kartoon Studios, Inc.*, No. 650077/2026. The complaint asserts two causes of action against the Company: (i) a claim for declaratory judgment "declaring that [the Company] must advance and hold harmless Plaintiffs against fees and expenses for any and all actions, causes of action, suits, claims (including legal fees and expenses reasonably incurred in connection with the Augenbaum Action) incurred by Plaintiffs by virtue of Section 9(k) of the SPA"; and (ii) a breach of contract claim alleging that the Company breached its advancement obligations by "refusing to advance periodic payments to Plaintiffs for the expenses, including attorneys' fees and expenses, they have incurred and will incur in the future as a result of the *Augenbaum* Action." On February 4, 2026, the *Iroquois* action was removed to federal court. On March 13, 2026, Iroquois filed a notice of voluntary dismissal in light of the subsequently filed Empery lawsuit (discussed below). Counsel for Iroquois stated:

> Plaintiffs are dismissing this action in the interest of judicial economy. As reflected in the attached correspondence between counsel, the parties recently discussed a related advancement action in New York state supreme court involving virtually identical issues of law and fact, *Empery Asset Master, Ltd., et al. v. Kartoon Studios, Inc.*, arising from the same securities purchase agreement at issue in this case. *See* Ex. A. The related action in state court is not removable to federal court due to a lack of complete diversity, and the overlapping issues therefore will necessarily be litigated in state court. If this action were to continue to proceed in parallel, it would result in unnecessary duplication of proceedings. Thus, Plaintiffs have determined that dismissal of this action without prejudice will best conserve the resources of the Court and the parties.

**Empery Lawsuit.** On February 12, 2026, Empery filed a materially identical action in New York state court. *See Empery Asset Master, Ltd., et al. v. Kartoon Studios, Inc.*, No. 650906/2026. The complaint alleges that Empery has incurred expenses in excess of $3.5 million.

5

Pursuant to a stipulation between the parties, the Company has until April 20, 2026 to answer or otherwise respond to the complaint.

*          *          *

As of the date of this memo, the aggregate amount demanded by defendants for advancement is approximately $12.6 million, but this amount is understated because additional expenses have likely been incurred since the original demands and not all defendants have disclosed the amount of expenses incurred.

ADD-257

# EXHIBIT 6

ADD-258

**KARTOON STUDIOS, INC.**
(a Nevada corporation)
(the "Company")

**MINUTES OF AN AD HOC MEETING OF THE
LITIGATION COMMITTEE OF THE BOARD OF DIRECTORS**

**DATE:** March 27, 2026
**TIME:** 1:00 p.m. PT
**PLACE:** Conference Call

**DIRECTORS PRESENT:**

Jeff Schlesinger, Co-Chair
Tony Thomopoulos, Co-Chair

**OTHERS PRESENT:**

Michael Jaffa, Chief Operating Officer
Jay Lefkowitz, Kirkland & Ellis LLP
Aaron Morris, Morris Kandinov LLP

**AD HOC MEETING**

A meeting of the Litigation Committee (the "Committee") was held on the above date at the above time by conference call. Mr. Schlesinger began by requesting an update from Mr. Lefkowitz as to his efforts to engage with counsel for plaintiff and defendants in the *Augenbaum* matter. Mr. Lefkowitz stated that he had held numerous discussions with counsel for plaintiff, defendants, and the mediator, David Murphy of Phillips ADR. The discussions had been productive and suggested the potential for significant resolution of the Section 16(b) claims against at least some of the defendants for an amount potentially in the range of $35 million to $50 million. Mr. Schlesinger inquired as to the position of plaintiff's counsel in such discussions, and Mr. Lefkowitz stated that it is not yet certain what plaintiff's counsel's position will be on a potential pre-trial settlement, but that discussions were continuing as to all parties. The Committee thanked Mr. Lefkowitz for his efforts and authorized him to continue such discussions.

Discussion then turned to the memorandum regarding indemnification provided by Mr. Morris earlier in the day. The Committee indicated that additional time would be required to review the memo, and the Committee would further discuss it at the following meeting. A discussion then ensued as to the positions generally taken by the defendants regarding advancement and indemnification and the Company's prior rejection of the demands and negotiation of the standstills. Mr. Morris stated that his firm would provide an additional memo in the coming weeks regarding the litigation record and the evidence and testimony likely to be submitted by the parties

at trial as part of the Committee's ongoing evaluation of the strengths and weaknesses of the Section 16(b) claim.

Discussion then turned to the draft minutes from the March 9, 2026 Committee meeting, which were approved by the Committee.

Following the discussions above, the following resolution was presented to the Committee for consideration and approval:

RESOLVED, that the Committee hereby approves the draft minutes of the March 9, 2026 meeting as the true and accurate record of the proceedings of that meeting.

**ADJOURNMENT**

There being no further business to come before the Committee, the meeting was adjourned.

Michael Jaffa
Secretary

ADD-260

# EXHIBIT 7

**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

---

**MEMORANDUM**

**TO:**    Litigation Committee of Kartoon Studios, Inc. (the "Company")

**RE:**    Summary of Key Arguments and Evidence—*Augenbaum v. Anson Investments Master Fund LP, et al.*, No. 1:22-cv-00249 (S.D.N.Y.)

**DATE:**    April 6, 2026

At the request of the Committee, we have prepared this summary of the record developed in the *Augenbaum* matter through discovery and in connection with the parties' respective motions for summary judgment. As the Committee is aware, the *Augenbaum* matter asserts Section 16(b) claims against investors in connection with the March 2020 Securities Purchase Agreement (*i.e.*, the "March 2020 PIPE"). Because no individual Defendant owned more than the statutory threshold of 10% of the Company's outstanding stock, Section 16(b) liability only applies in this case if Plaintiff can aggregate the ownership of all Defendants by proving the existence of a group under the securities law.

The case is scheduled for trial in June 2026. The record is extensive and provides a clear perspective into the arguments likely to be advanced by both sides and the evidence and testimony likely to be presented. At the summary judgment stage, the Court found disputes of material fact regarding the existence of a group that must be resolved by a jury at trial. At trial, Plaintiff must carry the burden, through evidence and testimony, of proving that a group existed. *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 650 (S.D.N.Y. 2022). Below, we have summarized the anticipated arguments, evidence and testimony likely to be submitted by the parties at trial.

ADD-262

## TABLE OF CONTENTS

I.   APPLICATION OF SECTION 13(D) .................................................................3

II.   PLAINTIFF'S ANTICIPATED EVIDENCE AND TESTIMONY ....................................3

    A.   Certain Defendants Were Preexisting Investors In The Company..........................3

    B.   SEG Acted As The "Hub and Spokes" For The March 2020 PIPE ........................4

    C.   Some Investors Potentially Discussed Terms Of The Transaction .........................6

    D.   The Voting, Leak-Out, Lock-Up and Netting Agreements....................................7

    E.   The Subsequent Registered Direct Offerings ...........................................................9

III.   DEFENDANTS' ANTICIPATED EVIDENCE AND TESTIMONY ...............................9

    A.   Each Investor Made Independent Investment Decisions.........................................9

    B.   The Record Does Not Contain Evidence Of Coordination Between Investors.....11

    C.   SEG Acted Solely On Behalf of the Company As Placement Agent....................15

    D.   The PIPE Terms Were Standard And Do Not Suggest Coordination ...................16

    E.   Leak Out Agreements Were Typical And Requested By The Company..............16

    F.   Defendants Were Not Party to the Voting or Lock-Up Agreements.....................17

I.    **APPLICATION OF SECTION 13(D)**

Section 13(d) of the Exchange Act requires beneficial owners of more than 5% of a company's registered class of voting securities to report their beneficial ownership. The statute provides that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this sub-section." Rule 13d-5(b) states that two or more otherwise unaffiliated investors may form a group when such "persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). As stated by the Court in *Augenbaum*: the "[a]greement is key." Ex. 1, ECF 287, Summary Judgment Opinion at 7 (*citing Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) ("[T]he touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective.")). At the summary judgment stage, the Court held that whether there was a requisite agreement between the investors in this case is a question of fact to be determined by the jury at trial.

To demonstrate that such a group existed, the Plaintiff must prove to the jury that it is more probable than not that there was such an agreement between the group. "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Id.* Further, "the alleged group members need not be committed to 'acquiring, holding, voting, or disposing of equity securities' on certain specified terms, but rather they need only have combined to further a common objective regarding one of the just-recited activities." *Id.*

II.    **PLAINTIFF'S ANTICIPATED EVIDENCE AND TESTIMONY**

Based on the record at the summary judgment stage, Plaintiff is likely to rely on the following arguments and evidence to demonstrate that the Defendants acted as a "group" under Section 13(d) of the Exchange Act.

A.    **Certain Defendants Were Preexisting Investors In The Company**

Plaintiff is likely to introduce communications between Special Equities Group ("SEG"), which the Company had historically utilized for capital market transactions, including its principals Joseph Reda and Jonathan Schechter, Andy Heyward and certain of the Defendants to demonstrate that they were preexisting investors in the Company and knew of and/or spoke to each other prior to the March 2020 PIPE, including:

- On August 16, 2019, Andy Heyward stated to Reda, Schechter, Richard Abbe (Iroquois), and other Company executives and representatives "I have just spoken with both Shaye at Brio, and Rich Molinsky. Explained that Aegis has been terminated. SEG engaged. A restructuring will occur and Rich Abbe will be working closely with Reda and Shex to make it happen, amortizing out of the debt. Though I had nothing more to

3

share, they are on board in principal and will await to hear from Shex." Ex. 2, Dkt. 226-4 at 5.

- On September 19, 2019, Mike Jaffa writes to Molinsky, Nathoo (Anson) and Hirsch (Brio) "[i]n order to extend the term of the note as we have agreed, I will be sending you an amendment to the secured convertible notes via docusign." Ex. 3, Dkt. 254-10 at 2.

- On September 23, 2019, Heyward sends a text to Hirsch (Brio) asking him to send "the final document" to Mike Jaffa who would then forward to Nathoo (Anson) because "they want to see it and not have any surprises added." Ex. 2, Dkt. 226-4 at 174.

- On September 25, 2019, Schechter writes to Nathoo (Anson) and Hirsch (Brio) "Shaye/Amin- I spoke to both of you and this is where we are," including "Shaye gets the option to have his Note redeemed if the Company raises 5mm or more (this is the same term Amin has" and "Any future deals both Shaye and his investor will have the right to split evenly with Amin." Schechter further states "I think we should all jump on the phone to finalize any details and make sure we are on the same page." *Id.* at 180.

- On November 9, 2019, Reda writes to Andy Heyward, Kerry Propper (ATW Partners) and others stating "we should do an all hands call" and "Do you think it makes sense for us to invite Richie [Iroquois], Shaye [Brio] and Amin [Anson] on the call as well?" Ex. 4, Dkt. 254-52,

- On November 17, 2019, Reda writes to Hirsch (Brio) "We have been working with the company and Amin [Anson] and richie [Iroquois] and Kerry all weekend on the restructuring and financing" and "Amin will do 1.4mil shares at $0.21 if you will." Ex. 2, Dkt. 226-4 at 183.

B. **SEG Acted As The "Hub and Spokes" For The March 2020 PIPE**

SEG was engaged by the Company in 2019 to restructure its debt and secure additional private financing. Ex. 2, Dkt. 226-4 at 2. In or around August 2019, SEG and the Company decided to pursue a PIPE transaction, with Anson as proposed lead investor. Ex. 5, Dkt. 226-5 at 55. On January 22, 2020, Anson executed a term sheet to participate in a $10 million offering in which Anson would provide up to $3 million in funding. Ex. 6, Dkt. 226-2 at 163-68. After the term sheet was executed, SEG shopped it to potential investors, including Iroquois (Richard Abbe), CVI (David Feldman), Empery (Ryan Lane), Brio (Shaye Hirsch), and an individual investor, Richard Molinsky.

Plaintiff is likely to present evidence of communications between the investors and SEG to argue that SEG acted as the "hub" of the alleged group agreement with "spokes" to each investor, including:

- On January 14, 2020, Nathoo sent a proposed term sheet to SEG. Reda replies "Shaye wants a right of participation added in there too," to which Nathoo responds "No. I

4

don't want it. I already have it. Why would I want others to also have it. He [Hirsch] can have it if he puts up $1.5mm or more. Not for $500k." Ex. 5, Dkt. 226-5 at 60.

- On January 14, 2020, Reda forwarded Nathoo's proposed term sheet to Hirsch (Brio). *Id.*

- On January 14, 2020, Reda forwards Hirsch's comments on the proposed term sheet to Nathoo regarding the right of participation. Nathoo responds to Reda: "There's no chance anyone else is getting a right of participation for only $650k. If he wants that, he has to step up and put up at least the same amount of net new money that I am. I don't need the right of participation in this deal — I'm happy to remove it completely." *Id.* at 71.

- On January 16, 2020, Schechter asks Hirsch (Brio) for input on comments from non-party ATW Partners. Schechter wrote "We spoke to Amin [Nathoo], see responses below and let us know what you think." Hirsch then asked Schechter to call him. *Id.* at 112-13.

- 
- On January 18, 2020, Hirsch (Brio) asks SEG questions regarding transaction documents, including: "Warrants are now part of the bridge up front?"; "Where is the companys undertaking for shareholder vote?"; "Are non-participating noteholders really being converted at 1.51?"; "How is the cash burn being watched? More importantly – has anyone discussed with them the need to cut costs and is there any plan in place?" SEG forwards the email to Nathoo (Anson). *Id.* at 117.

- On January 24, 2020, Charles Phillips of Ellenoff Grossman & Schole LLP ("EGS"), counsel for Anson for the March 2020 PIPE, sent revised transaction documents to Heyward and other executives, Nathoo (Anson), and SEG. Reda replied to EGS that Schechter had wanted Brett Director, general counsel of Empery, to review documents "before company." Phillips responded that Director "will just improve the docs for all." Ex. 7, Dkt. 226-6 at 93-94. The documents were later sent to Director by Reda to "[w]ork your magic. Get docs in shape for Ryan to do $3mil." *Id.* at 99.

- 
- On January 24, 2020 Sam Winer (CVI) emails Schechter "[t]he Waiver provision won't work for us. Doubt it would work for Empery either." Ex. 8, Dkt. 254-23 at 2.

- Beginning January 27, 2020, Brett Director (Empery) and EGS (representing Anson) exchanged revisions of the transaction documents. Ex. 9, Dkt. 226-7 at 14.

- On January 24, 2020, Reda wrote to Winer (CVI) "That's the goal and ryan [Empery] and Amin [Anson] want you in vs. me opening this up to some of your competitors that would probably do the entire deal and destroy the company." Ex. 10, Dkt. 226-14 at 223.

- On January 24, 2020, Nathoo (Anson) wrote to SEG: "Redmeption [sic] should not be allowed w/o equity conditions being met (registered, liquid etc.) And then given we are

5

getting stock at 15% discount, redemption premium should be 15% up so that we are indifferent between being paid and amortizing out. Those are my thoughts… not sure what other folks with think. Reda, maybe check with Richie [Iroquois] and Ryan [Empery]?" Ex. 7, Dkt. 226-6 at 105.

- On January 29, 2020, Reda emails Sam Winer (CVI) stating that "everyone wants you in…most guys doing $1-2 mil" and Schechter tells Winer "Empery reviewing now." *Id.* at 115.

- On February 23, 2020, Nathoo emailed Reda stating that "if we have a shortage, we show AJ," referring to AJ Pomper of Obsidian Global Partners LLC, an investment manager of M3A. Ex. 9, Dkt. 226-7 at 121.
- On February 24, 2020, Reda emails Feldman (L1) stating "Lead investor is in for $3mil out of $10 mil…All other existing note holders are in!!!" Ex. 6, Dkt. 226-2 at 157.

- In emails between March 4-5, 2020, Reda tells Feldman (L1) which investors have already committed: "Anson ($3mil), Empery ($1.5mil), Brio ($1.25-1.5mil), Iroquois ($1-1.5mil), CEO ($1mil), CEO's friends ($500k-1mil)" Ex. 11, Dkt. 226-9 at 2-4.

- Email chain from March 6-8, 2020, in which Feldman (L1) states "[i]t seems like its [sic] more for existing debt holders to improve their deal" in reference to the March 2020 PIPE. Reda responds "Feldy. I don't think you're looking at this right. I don't agree w u. Empery and Heights [CVI investment manager] don't own existing debt and they are both in for $1.5mil. Shex can explain." *Id.* at 7.

- On May 8, 2020, Schechter sent materially identical emails to Anson, Brio, CVI, Empery and Iroquois regarding the May 8, 2020 registered direct offering stating "[w]hoever doesn't invest in this round their pro-rata will not be invited in on any future GNUS deals 'as per the lead' Let me know your real indication of interest and then shex and I will allocate accordingly." Ex. 12, Dkt. 226-11 at 72-73 (Anson), 78 (Brio), 81 (CVI), 84 (Empery), 88 (Iroquois), 91 (L1).

## C.    Some Investors Potentially Discussed Terms Of The Transaction

Plaintiff is likely to introduce evidence that supports an argument that certain of the investors may have spoken directly about the March 2020 PIPE, including:

- In emails beginning January 27, 2020, Brett Director (Empery) and Robert Charron of EGS (representing Anson) discussed the transaction documents and revisions and Charron states "Here's the revised Note. As you said, ended up being fairly well on point. Note I tried to follow what I believe are the terms here but honestly I think it is totally up for negotiation so see what Ryan says on the business points and we'll go back to them. Turning to the SPA now." Ex. 9, Dkt. 226-7 at 14.

- On February 3, 2020, EGS advises Nathoo (Anson) that "Empery's preference is that the company not file a registration statement but rather rely on 144 in 6 months. I took

6

it out of the TS but . . . can put in the documents fairly easily if you and Shex [Schechter] convince Ryan otherwise." Ex. 7, Dkt. 226-6 at 145.

- On February 24, 2020, Anson's counsel (EGS) states to Reda "Empery told me that they won't participate in the deal if the company files a registration statement." *Id.* at 125.

- On May 28, 2020, SEG drafted a memo to file ("NOTES TO THE FILES") stating, in relevant part, that "[w]e received a call from Anson and Iroquois asking if the company was willing to sell common stock off its shelf registration statement at $1.50." Schechter (SEG) subsequently testified "I've never received a call from Richie and Amin on the phone together, never in my life, unqualified" Ex. 13 - Schechter Dep. Tr. 140:16–141:15. Nathoo (Anson) testified "I am quite certain that I would not have done that given that we don't make calls like that with other investors." Ex. 14 - Nathoo Dep. Tr. 344:13–14, 345:20-22. Abbe (Iroquois) testified "I never made a call with Anson" and "I did not make a call with Anson." Ex. 15 - Abbe Dep. Tr. 203:14, 204:10–11.

- Email chain from March 8-9, 2020, in which Reda tells Nathoo (Anson) to "Get him in for $1.5 mil and we are at $11 mil . . . Go Amin go" in reference to getting commitment from M3A to invest in the March 2020 PIPE. Nathoo responds "He said he was thinking $1.5m. But would decide. By tomorrow." Ex. 11, Dkt. 226-9 at 16-17.

**D.    The Voting, Leak-Out, Lock-Up and Netting Agreements**

Plaintiff has previously attempted to utilize the various ancillary agreements to the PIPE transaction as evidence of coordination between Defendants.

Voting Agreement. The Company was required to obtain stockholder approval of the March 2020 PIPE transaction. In this regard, on March 3, 2020, the Company entered into voting agreements with principal stockholders representing approximately 40% of outstanding common stock to vote in favor of the transaction. Plaintiff is likely to argue two points related to the Voting Agreement. First, Plaintiff will argue the Voting Agreement is evidence of a group because, in Plaintiff's view, Defendants had the ability through the terms of the March PIPE to enforce the terms of the Voting Agreement. Ex. 16, Dkt. 225 at 23. Second, Plaintiff will argue the Voting Agreement caused each Defendant to beneficially own the common stock of the stockholders who entered into the Voting Agreement. In Plaintiff's view, the Defendants were able to direct the voting of the Company's common stock because the Defendants had the right to seek specific performance and injunctive relief to enforce the terms of the Voting Agreement.   *Id.* at 32. Defendants will argue they were not party to the Voting Agreement and the Company's agreement to "use its best efforts" to seek specific performance of the Lock-Up Agreement does not give Defendants the ability to enforce it. Defendants will further argue the Voting Agreement did not provide investment or voting power to anyone and only required the stockholders to vote for specific proposals, which allowed the Company to obtain much needed financing by approving the March 2020 PIPE. Ex. 17, Dkt. 253 at 16, 23.

7

Lock-Up Agreement. On March 10, 2020, the Company also entered into Lock-Up Agreements with Andy Heyward and affiliates, which prevented them from selling stock until 90 days after the one-year anniversary of the closing of the March 2020 PIPE transaction. Plaintiff is likely to argue, as it did in its summary judgment briefing, Defendants had the ability through the terms of the March 2020 PIPE to enforce the terms of the Lock-Up Agreement as third party beneficiaries to the Lock-Up Agreement if the Company failed to do so, further evidences the existence of a group under Section 13(d). Ex. 16, Dkt. 225 at 20-21; Ex. 18, Dkt. 266 at 15. Defendants will argue they were not party to the Lock-Up Agreement and the Company's agreement to "use its best efforts" to seek specific performance of the Lock-Up Agreement does not give Defendants the ability to enforce it. Ex. 17, Dkt. 253 at 18.

Master Netting Agreement. On March 13, 2020, the Company entered into Master Netting Agreements with each defendant. Plaintiff will argue the netting agreement is evidence of coordination as, in Plaintiff's view, the agreement provided for joint sharing of risks and rewards in the event of a bankruptcy. Ex. 16, Dkt. 225 at 14. Defendants will argue the Master Netting Agreements were only between an individual Defendant and the Company, and served only to manage that Defendant's own exposure to the Company, not to allocate exposure or coordinate risk among the Defendants themselves. Ex. 17, Dkt. 253 at 21.

Leak-Out Agreements. Plaintiff is likely to argue that the May 18, 2020 and June 23, 2020 Leak-Out Agreements also demonstrate coordination. On May 18, 2020, after stockholders approved the share issuance and the conversion price and warrant exercise price were reduced to $0.21/share, each Defendant entered into a Leak-Out Agreement providing that any sales below $1.65/share were capped at each Defendant's pro-rata share of 30% of daily trading volume for a period of 90 days after registration became effective. On June 23, 2020, all Defendants entered into a Conversion Agreement with the Company that included a second Leak-Out agreement on the same structure, with a higher price threshold of $2.00/share and a shorter 30-day term. Plaintiff will argue that the Leak-Out Agreements coordinated the Defendants' potential sales in a way that demonstrates that they were acting as a group and that each Defendant entered the Leak-Out Agreements knowing each other Defendant was also agreeing to the same terms. Ex. 16, Dkt. 225 at 31. Defendants will argue that the Leak-Out Agreements were signed at the request of the Company, not the Defendants, that the Company wanted to control potential downward pressure on its stock price, and that the Leak-Out Agreements were never applicable because the trading price generally exceeded the threshold of the restrictions. Dkt. 253 at 13-14.

Plaintiff will likely cite emails between certain of the Defendants and SEG regarding the Leak Out Agreements, including:

- Empery provided the form-leak out agreement to SEG to use and stated, "leak out agreements are not typically publicly filed" and the limit should be "30% pro rata among all investors." Ex. 20, Dkt. 226-12 at 29. Schechter then forwarded the Empery form to Anson. Nathoo of Anson suggested to SEG a 30% aggregate limit on sales, to which Schechter responded, "let's see what others comeback with on the Standstill before we make a final decision." *Id.* at 13.

8

- On May 17, 2020, Feldman of L1 wrote "[a]ny leakout is a very bad idea" and "[i]ts in all of our interests not to have it....." Reda responded "Amin [Nathoo] has his mind made up. I'm happy to patch him in for explanation. You can get all your debt repaid and not sign leak out." *Id.* at 18.

- On May 17, 2020, Nathoo signed the Leak Out Agreement and other documents, asking the signature page be held in "escrow" until Empery, L1, Iroquois, Heights, Brio, and Obsidian also had signed. *Id.* at 123.

- On June 22, 2020, Schechter emailed Ryan Lane of Empery, "Everyone is also agreeing to a Lock-Up Agreement [sic] in the same form and substance as last time" and later wrote "Leak-out attached." Ex. 20, Dkt. 226-12 at 234.

### E.    The Subsequent Registered Direct Offerings

After the March 2020 PIPE, the Company completed registered direct offerings on March 22, May 7, May 8, May 18, and May 28, 2020, in which certain of the Defendants participated. Plaintiff is likely to cite these follow-on offerings as evidence of continued coordination between the Defendants, suggesting a group. Plaintiff will point to evidence other investors were excluded from participating in the subsequent offerings and the shares sold were allocated among participating Defendants roughly in accordance with their pro rata participation in the March 2020 PIPE. Ex. 16, Dkt. 225 at 30.

### III.    DEFENDANTS' ANTICIPATED EVIDENCE AND TESTIMONY

Defendants are likely to present evidence at trial that each investor made independent decisions, did not coordinate with each other, were competitors who did not directly communicate, and SEG, as placement agent solely for the Company, engaged in sales tactics by playing Defendants off each other to maximize contributions and close the transaction. Defendants will also introduce expert testimony to demonstrate the PIPE transaction and agreements were routine and the specific terms and structure of the agreements, as well as the trading patterns of the Defendants, do not suggest group coordination.

### A.    Each Investor Made Independent Investment Decisions

Representatives of each Defendant provided deposition testimony and declarations asserting that they respectively made independent investment decisions regarding the March 2020 PIPE transaction, the follow on registered direct transactions, and the related agreements. Ex. 21, Dkt. 233 at 19. Defendants are likely to offer testimony from SEG that the Defendants were competitors, considered only their own interests, and used their own decision making, including:

Anson. Anson is likely to testify that it made its investment decisions independently and did not communicate with any other Defendants regarding their investment plans. Ex. 22, Dkt. 237 at 2. Anson's role as lead investor was typical and did not create a group. *Id.* at 1. Anson's role as lead investor was to negotiate a term sheet with the Company, which SEG would use to approach

9

other potential investors. *Id.* Anson did not directly communicate with Brio or rely on comments by Brio on the January 2020 term sheet for the 2020 PIPE. *Id.* at 3. Anson's counsel EGS receiving precedent documents and input on transaction documents from Empery's counsel did not establish the existence of a group. *Id.* at 4. Anson exercised no control over which investors SEG and the Company decided to approach for potential participation in any of the transactions. *Id* at 5. Anson did not make an agreement or arrangement with Andy Heyward and had different motivations relative to the transaction, and Heyward had no ability to trade post-transaction in any event because of the Lock-Up Agreement and thus could not have made an agreement regarding trading with Anson. *Id.* at 7-8.

Brio. Brio is likely to testify that it was a competitor with the other Defendants and did not communicate with any of the Defendants regarding terms of any transaction or investment plans. Ex. 23, Dkt. 238 at 1. Brio had a contentious relationship with Anson, evidenced by disagreements over right of participation (*see supra* IIB), and Hirsch telling Heyward he did not trust Nathoo (Anson) and Brio's belief Anson had withheld certain consents required to proceed with prior Brio-led proposed transaction with the Company prior to the March 2020 PIPE. *Id.* at 5, 6-7. Brio did not rely on legal advice from Robert Charron of EGS in relation to the March 2020 PIPE and EGS served as counsel to Anson. *Id.* at 7. Brio, unlike Anson and other Defendants, does not engage in short-selling and did not short the Company's stock. *Id.* at 2 n.2, 5. Brio does not discuss its trading strategy with outside persons or funds. *Id* at 8.

Empery. Empery is likely to testify that it did not communicate or meet with any other Defendant and did not coordinate its investment strategy. Ex. 24, Dkt. 242 at 6. Empery, whether acting as lead investor or not, uses its own transaction documents or provides substantial comments to draft transaction documents sent to it. *Id.* at 3. Empery refused to participate in numerous proposed financings alongside other Defendants between August 2019 and January 2020. *Id* at 6. Empery's counsel, Brett Director, provided input on the transaction documents, including to ensure they could not be misconstrued, and stated expressly in emails "[w]e are not acting as a group with any other investors." *Id*. Empery agreed to sign the May Leak-Out Agreement requested by the Company in exchange for registration of its shares and did not coordinate its decision with any other Defendant. *Id.* Empery's selling strategy was unique from all other Defendants' and reflects no coordination. *Id.*

Iroquois. Iroquois is likely to testify that it made independent decisions to advance its own interests with respect to its prior investments in the Company, the March 2020 PIPE, and the registered direct offerings. Ex. 25, Dkt. 235 at 1. Iroquois was "hostile" and "adversarial" towards the Company prior to the March 2020 PIPE and was the only investor to declare the Company in default on its 2018 Convertible Notes, which worked against interests of other investors. *Id.* at 3-4. Iroquois was viewed as difficult and uncompromising by the Company and other investors. *Id.* Iroquois declined to participate in the March 22, 2020 registered direct offering. *Id.* at 7. In the subsequent May 2020 offerings Iroquois twice tried to increase its investment at the expense of

other investors. *Id.* Iroquois had a distinct trading pattern compared to other Defendants, including being the only one to increase its overall holdings of the Company's stock. *Id.* at 4-5.

CVI. CVI is likely to testify that it made its own investment decisions based on its own interests. Ex. 26, Dkt. 239 at 4. CVI views other Defendants as competitors competing for a finite number of potential transactions and Sam Winer does not have a close relationship with any other Defendants. *Id.* at 2-3. CVI did not receive proposed transaction documents from SEG for the March 2020 PIPE until March 2, 2020. *Id* at 5. Winer provided limited comments to SEG, before independently and without consulting any other Defendants making the decision to invest. *Id.* at 5-6. CVI agreed to enter the May and June Leak Out Agreements because Winer determined it was in the best interest of CVI to obtain the registration being offered by the Company. *Id.* at 6.

M3A. M3A will likely testify that it was a passive participant in the acquisition of the Company's stock and that passive investors do not join or form a group by participating in an offering. Ex. 27, Dkt. 236 at 3.  M3A had never previously invested in the Company and first learned of the March 2020 PIPE on February 29, 2020. M3A was not involved in any negotiations of the term sheet because all negotiations had been completed more than a month before M3A first learned of the deal. *Id.* at 2.

L1. L1 will argue all investment decisions were made independently without any coordination with any other Defendant. Ex. 28, Dkt. 241 at 6. L1 received the term sheet for the March 2020 PIPE from SEG on February 24, 2020, roughly two weeks before the transaction closed and did not comment on the March 2020 PIPE transaction terms. *Id.* at 3. L1 had no relationship with any other Defendant. *Id.* at 4. While L1 was opposed to the Leak-Out Agreements, L1 independently decided to enter into the May and June Leak-Out Agreements. *Id.* at 4-5.

Molinsky. Molinsky will argue he is an individual investor whose investment decisions related to the Company were wholly independent and of his own volition. Ex. 29, Dkt. 240 at 4, 6. Molinsky's invitation to participate in the March 2020 PIPE stemmed from his established relationship with SEG and history as a long-term investor in the Company. *Id.* at 6. Molinsky had no bargaining power with respect to the terms by which he was offered to participate in the transactions. *Id.* at 5-6. Molinsky could not and did not negotiate any terms. *Id.* at 6. The March 2020 PIPE and subsequent registered direct offerings were presented as "take it or leave it." *Id.* Molinsky's marginal position made him irrelevant to any decision-making process and any alleged coordination is highly implausible. *Id.* at 3.

**B.**      **The Record Does Not Contain Evidence Of Coordination Between Investors**

11

Defendants are likely to present evidence and testimony at trial that the record contains no direct evidence or discussion of an agreement or arrangement between the Defendants, and the Defendants never made such an agreement. Such testimony is likely to include:

Testimony from Anson:

- "I never spoke to any of the Defendants, or any representatives of the Defendants, about Genius or any plans I had to purchase or sell any Genius securities. I did not meet with them or speak to them at all during the course of negotiating any of the transactions that Anson made in Genius." Ex. 30, Dkt. 232-2, ¶ 15.

- "I did not participate in a phone call with SEG and Iroquois or any other Defendant regarding the May 28, 2020 offering — or any investment in Genius." *Id.* at ¶ 54.

- "In the context of this case, I learned that one of the ways that SEG attempted to 'sell' Genius to other potential investors was by using my name or Anson's name and suggesting that Anson wanted other investors — our competitors — to be involved in the transaction. I have never authorized or encouraged SEG, Joe Reda, or Jonathan Schechter to use my name or Anson's name to further investments in Genius or any other company. I have never asked SEG to convey my thoughts, concerns, or terms related to Genius to other investors. Had I known SEG was sending false and inaccurate statements to other investors on my behalf, I would have objected." *Id.* at ¶ 11.

- As to the alleged call between Nathoo (Anson) and A.J Pomper (M3A), Anson argued at summary judgment that each "testified they did not communicate" and points to lack of evidence that "the parties coordinated their conduct, relied on anything stated on the alleged phone call, or discussed any terms of the investment." Ex. 31, Dkt. 274 at 4.

Testimony from Brio:

- "Prior to entering the Stock Purchase Agreement, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction." Ex. 32, Dkt. 232-10, ¶ 42.

- Brio did not communicate with any other investor as to the September 2019 extension of maturity of convertible notes (¶ 27); the December 2019 Warrant Exercise (¶ 33); the January 2020 term sheet (¶ 36); the Voting Agreement and Lock-Up Agreement (¶ 39); the Master Netting Agreement (¶ 43); the March 22, 2020 Registered Direct Offering (¶ 51); the May 7, 2020 Registered Direct Offering

12

(¶ 54); the May 8, 2020 Registered Direct Offering (¶ 56); the May 15, 2020 stockholder vote (¶¶ 59-60); the May 18, 2020 Registered Direct Offering (¶ 62); the May 18, 2020 Leak-Out Agreement (¶ 64); the May 28, 2020 Registered Direct Offering (¶ 66); the June 2020 cashless warrant exercises (¶ 70); the timing and amount of Brio's sale of Genius shares (¶ 71); the June 23, 2020 Conversion Agreement (¶ 73); the June 23, 2020 Leak-Out Agreement (¶ 74); and whether, how much, or when Brio would sell Genius shares in July 2020 (¶ 76).

Testimony from Empery:

- "Empery does not coordinate or discuss its investment decisions with any other investment managers, and it did not do so here." Ex. 33, Dkt. 232-8, ¶ 22.

- "I did not communicate, or coordinate, with any other investor (much less any other Defendant) about any aspect of this transaction [December 2019 repricing warrants]. Whether any other Defendant participated in this transaction was not a consideration in my decision-making process." *Id.* at ¶ 22.

- Empery did not coordinate with other investors regarding the March 2020 PIPE (¶ 5), the proposed term sheet (¶ 25), Empery's investment amount (¶ 27), the transaction documents and Stock Purchase Agreement (¶ 28), Empery's decision to invest (¶ 29), the registered direct offerings in May 2020 (¶ 31), the May 15, 2020 stockholder vote (¶ 32), the Leak-Out Agreements (¶¶ 36, 41), the June 2020 Conversion Agreement (¶ 43), and trading in Genius stock (¶ 46).

- Empery did not want the March 2020 PIPE to include a registration statement, which was communicated to "to SEG and Robert Charron, (Anson's outside counsel, who, as counsel to the lead investor, was in charge of drafting the March 2020 transaction documents), along with Mintz Levin, the Company's outside counsel." *Id.* at ¶ 33.

Testimony from Iroquois:

- "I have never communicated with any other investor about the price or terms of any transaction in Genius securities, whether to participate in any transaction in Genius securities, or the terms of any transactional document relating to Genius. And, in deciding whether to invest in a transaction with Genius, I have never considered the fact that any other investor was participating in the transaction. My investment decisions have always been my own, based on my own consideration of what is in Iroquois' best interests. Put differently, I have never coordinated or combined with any other investor for purposes of investing in Genius (or any other issuer, for that matter)." Ex. 34, Dkt. 232-6, ¶ 8.

13

- "I did not participate in a phone call with SEG and Anson (or any other Defendant, for that matter) about the registered direct offerings or any other investment in Genius." *Id.* at ¶ 26.

- Iroquois did not communicate with other investors regarding declaring Genius in default (¶ 16); the December 2019 warrant exercise (¶ 18); Anson's term sheet in January 2020 (¶ 20); the March 2020 Transaction (¶ 23); the May 2020 registered direct offerings (¶ 25); the May 15, 2020 stockholder vote (¶ 27); the May and June Leak-Out Agreements (¶¶ 31–32); and trading in Genius stock after share registration (¶ 34).

Testimony from CVI:

- "I did not have any discussion or communication with any Purported Group Member regarding Genius or CVI's investment in Genius. All decisions regarding CVI's investment in Genius were made by me and my colleagues at Heights and for the sole benefit of CVI. I did not rely upon the fact that any other Purported Group Member was investing in Genius—to the extent such a fact was even known to me—in making investment decisions with respect to Genius." Ex. 35, Dkt. 232-9, ¶ 5.

- CVI did not communicate with other investors regarding its investment decisions and trading activity generally (¶ 6); the waivers and consents in connection with the March 2020 Transaction (¶ 16); the decision to invest in the March 11, 2020 Transaction (¶ 22); the subsequent registered direct offerings (¶ 24); the Leak-Out Agreements (¶ 27); and CVI's trading in Genius securities (¶ 31).

Testimony from M3A:

- "Neither M3A nor 3i nor Obsidian had any role in negotiating the term sheet, and no communications, written oral, with any other investor in Genius Brands." Ex. 36, Dkt. 232-3, ¶ 4.

- "Neither M3A nor 3i nor Obsidian had any communication with any other investor regarding these subsequent offers and were unaware of whether or not any investor purchased stock in these subsequent offerings." *Id.* at ¶ 6.

- "Neither M3A nor 3i nor Obsidian had any contact with any other investor in connection with the leak-out agreements. The offer to register our shares was not dependent on the execution of a leak-out agreement by any other investor." *Id.* at ¶ 7.

14

- M3A argued at summary judgment regarding the potential call with Anson that "there is no allegation the parties agreed to anything during the conversation, that Anson or any other defendant relied in any way on this information, that the parties discussed the terms of the offering, or that the conversation had any impact on the PIPE offering. No agreement was alleged to have been reached during this conversation." Ex. 37, Dkt. 282 at 2.

Testimony from L1:

- "At no time in 2020 did I communicate with any other investor in Genius about L1 Capital's decisions to buy or sell Genius securities." Ex. 38, Dkt. 232-4, ¶ 10.

- L1 did not communicate with other investors about the March 11 transaction documents (¶ 5); all decisions to buy and sell Genius securities (¶ 7); whether Genius investors formed a group (¶ 8); L1 Capital's relationship with other investors (¶ 9); the May Leak-Out Agreement (¶¶ 13, 26); consenting to the registered direct sale (¶ 14); the conversion agreement (¶¶ 15, 34); the June Leak-Out Agreement (¶¶ 17, 36); Anson's term sheet (¶ 18); L1 Capital's investment amount (¶ 19); the price or terms of any Genius transaction (¶ 20); the Voting Agreement (¶ 22); the Lock-Up Agreement (¶ 23); the May 15, 2020 stockholder vote (¶¶ 24–25); cashless warrant exercises (¶¶ 28–29); and the timing, quantity, and decision to sell Genius shares (¶¶ 30–33).

Testimony from Molinsky:

- "Prior to signing [2019 extension agreement], I had no communications or coordination with any other Defendant regarding the terms of the agreement or my investment decision." Ex. 39, Dkt. 232-7, ¶ 8.

- Molinsky did not communicate with other investors regarding the December 2019 Warrant Exercise (¶ 9); the March 2020 PIPE solicitation (¶ 12); the March 2020 PIPE, May 2020 Transactions, and the May and June Leak-Out Agreements (¶ 17); conversion and cashless warrant exercises (¶ 18); and the sale of Genius shares in June and July 2020 (¶ 19).

**C.    SEG Acted Solely On Behalf of the Company As Placement Agent**

Defendants will argue any information provided to investors by SEG was typical of SEG's role as a placement agent on behalf of the Company. Ex. 21, Dkt. 233 at 27-28. Defendants are likely to characterize Reda's emails as sales tactics typical of a placement agent. Defendants will argue that SEG, in its role as placement agent, was required to communicate with various investors to negotiate terms and solicit participation ultimately for the purpose of building an offering for the Company, and such communications are ordinary in PIPE transactions. Defendants are likely

15

to emphasize that agent-to-investor communications are inherent in the structure of every PIPE transaction, no investor agreed to terms other than those reflected in the transaction, and SEG's communications cannot give rise to an inference that the investors were coordinating among themselves. As to emails directly referencing the intention or preferences of other investors, Defendants will argue that SEG was merely performing its function on behalf of the Company to build and close a funding transaction and statements about other investors' commitments were puffery or sales tactics designed to generate urgency and close the deal, not evidence of an actual agreement or coordination. *Id.* at 34-35.

### D.     The PIPE Terms Were Standard And Do Not Suggest Coordination

Defendants are likely to rely on expert testimony from Michael Maline of Covington & Burling LLP, Professor Michael Weisbach of Ohio State University, and David Marcus of Cornerstone Research to show the terms of the March 2020 PIPE and ancillary agreements were industry standard. Based on Defendants' submissions at summary judgment:

- Maline is expected to testify that the terms of the March 2020 PIPE transaction and the subsequent registered direct offerings were consistent with industry-standard practices for nanocap issuers in financial distress, and that the structure of the transactions reflects the ordinary dynamics in the PIPE market rather than evidence of coordination. Ex. 40, Dkt. 232-27, ¶ 7.

- Weisbach is expected to testify that he conducted a study of 45 comparable PIPE transactions involving nanocap companies and found that the terms of the March 2020 PIPE and follow-on transactions as well as the Leak Out Agreements were similar to terms found in other PIPEs issued during the same period. Ex. 41, Dkt. 232-28, ¶ 11.

- Marcus is expected to testify that his analysis of the trading data provided by Defendants indicates they used different trading strategies to hedge risk and sell the Company's stock, including that some Defendants engaged in short selling, some sales were private, and different combinations of options transactions were utilized. Ex. 42, Dkt. 232-26, ¶ 35.

### E.     The Leak Out Agreements Were Typical And Requested By The Company

Defendants are likely to argue that the Leak-Out Agreements do not demonstrate group activity because each Defendant executed an individual, bilateral Leak-Out Agreement with the Company, not with one another, upon request of the Company and after independently determining that it was in the investor's own best interest. Ex. 17, Dkt. 253 at 13. Defendants will argue that the Company requested each investor to execute a Leak-Out Agreement as a condition for the Company agreeing to register the investors' shares for resale and the only parties to any Leak Out

16

ADD-277

Agreement are the Company and each individual Defendant. *Id.*; Ex. 13 - Schechter Dep. Tr. 49:6-16.

### F.    Defendants Were Not Party to the Voting or Lock-Up Agreements

Defendants will argue that the Voting Agreements did not create a group because Defendants were not parties to those agreements. The Voting Agreements were executed between the Company and certain "Principal Stockholders" who agreed to vote in favor of the March 2020 Transaction and restrict their trading in the Company's stock. Ex. 17, Dkt. 253 at 15. Although the Company agreed to use its "reasonable best efforts" to seek specific performance of the Voting Agreements, that commitment did not provide Defendants themselves with any right to obtain injunctive relief or otherwise enforce the Voting Agreements. *Id.* at 16. Because Defendants were not parties to the Voting Agreements, those agreements did not shift any voting or investment power to Defendants and cannot form the basis of a group. *Id.* at 16-17.

Defendants will similarly argue that the Lock-Up Agreements did not create a group because Defendants were not parties to them. The Lock-Up Agreements were executed between the Company and the Principal Stockholders, restricting their sales of Genius stock for fifteen months following closing. *Id.* at 18. Although the Company agreed to use "reasonable best efforts" to enforce these agreements, that obligation did not give Defendants any ability to do so, and thus conferred no "power to dispose, or to direct the disposition of" the Company's securities. *Id.*

17